# United States Court of Appeals
## For the First Circuit

No. 16-2089

UNITED STATES OF AMERICA,

Appellee,

v.

JEFFRI DÁVILA-REYES,

Defendant, Appellant.

No. 16-2143

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ D. REYES-VALDIVIA,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch, Lipez, Howard, Thompson, Kayatta, Gelpí, Montecalvo,
Circuit Judges.

Raymond L. Sánchez-Maceira, for appellant Jeffri Dávila-
Reyes.

Franco L. Pérez-Redondo, Assistant Federal Public Defender, with whom Eric Alexander Vos, Federal Public Defender, Vivianne M. Marrero-Torres, Assistant Federal Public Defender, and Kevin E. Lerman, Research & Writing Attorney, were on brief, for appellant José Reyes-Valdivia.

John M. Pellettieri, with whom Kenneth A. Polite, Jr., Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá-Almonte, Chief, Appellate Division, and David C. Bornstein, Assistant United States Attorney, were on brief, for appellee.

---

October 5, 2023

---

Opinion En Banc

---

BARRON, <u>Chief Judge</u>.   In these consolidated appeals,
Jeffri Dávila-Reyes and José Reyes-Valdivia challenge their 2016
convictions for violating the Maritime Drug Law Enforcement Act,
46 U.S.C. §§ 70501 <u>et seq.</u> ("MDLEA"), despite their having pleaded
guilty unconditionally to the underlying charges.   The charges
were set forth in a single indictment that was handed up in the
District of Puerto Rico in 2015.   The indictment alleged that the
defendants, each of whom is a national of Costa Rica, had violated
the MDLEA by trafficking drugs "on the high seas . . . and within
the jurisdiction of this court" while on board a "covered vessel,"
46 U.S.C. § 70503(a), which includes any "vessel subject to the
jurisdiction of the United States," 46 U.S.C. § 70503(e)(1).   The
indictment alleged that the vessel was "subject to the jurisdiction
of the United States" because it was "without nationality."   46
U.S.C. § 70502(c)(1)(A).

A panel of this Court vacated the defendants'
convictions and ordered the underlying charges dismissed.   The
panel did so based on the defendants' contention that Congress had
no power under the Felonies Clause of the U.S. Constitution to
criminalize their charged conduct because they were foreign
nationals who were aboard a foreign vessel on the high seas at the
time of that conduct. <u>See</u> U.S. Const. art. I, § 8, cl. 10 (granting
Congress the power "[t]o define and punish Piracies and Felonies
committed on the high Seas, and Offences against the Law of

- 3 -

Nations").  The defendants based their contention that the vessel was foreign on the ground that even if the vessel was "without nationality," 46 U.S.C. § 70502(c)(1)(A), for purposes of the MDLEA it was not stateless for purposes of international law.  See United States v. Dávila-Reyes, 23 F.4th 153, 195 (1st Cir. 2022).

The government petitioned for rehearing en banc.  We granted the petition and vacated the panel's ruling.  We now affirm the defendants' convictions, albeit on narrow, record-based grounds that bypass many of the broader questions of international and federal constitutional law that the defendants ask us to resolve.  Because those questions touch on sensitive issues of U.S. foreign relations and national power that have implications far beyond this specific statutory context, it is prudent for us to resolve them only in a case that, unlike this one, requires that we do so.

We do address, however, a threshold legal question about the MDLEA that itself has broad significance: Does 46 U.S.C. § 70503(e)(1), which establishes that a "vessel subject to the jurisdiction of the United States" is a "covered vessel," limit the subject matter jurisdiction of federal courts under Article III of the Constitution?  See U.S. Const. art. III, § 2, cl. 1. We conclude, in accord with an earlier ruling of this Court, see United States v. González, 311 F.3d 440 (1st Cir. 2002), that

§ 70503(e)(1) does not set such a limit and that the provision instead merely limits the substantive reach of the MDLEA.

**I.**

**A.**

The MDLEA applies to drug trafficking on the high seas only if that conduct occurs aboard a "covered vessel." 46 U.S.C. § 70503(a). Section 70503(e)(1) provides that a "covered vessel" includes a "vessel subject to the jurisdiction of the United States."

A U.S. vessel is a "covered vessel." See 46 U.S.C. § 70503(e)(1). But § 70502(c)(1) provides in subsection (A) that a vessel is also "subject to the jurisdiction of the United States" if it is "without nationality." Section 70502(d)(1) then states that:

> the term "vessel without nationality" includes:
>
> (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
> (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel;
> (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally

assert    that    the    vessel    is    of    its
nationality[.][1]

**B.**

A criminal complaint from the District of Puerto Rico
was issued against the defendants on November 9, 2015.  It stated
that the defendants were "in violation of Title 46, United States
Code, Section 70503(a)(1), 70504(b)(1), and 70506(a) and (b)."[2]
An affidavit from a law enforcement officer attached to the
complaint recounted the following facts.

On or about October 29, 2015, a maritime patrol
aircraft's crew identified a "go fast" vessel in international
waters about 30 nautical miles southeast of San Andrés Island,

---

[1] 46 U.S.C. § 70502(d)(1) was amended on December 23, 2022.
See James M. Inhofe National Defense Authorization Act for Fiscal
Year 2023, Pub. L. No. 117-263, § 11519, 136 Stat. 2395, 4142
(2022).  That amendment, which added § 70502(d)(1)(D), is not
relevant to this case.

[2] 46 U.S.C. § 70504(b)(1) states: "Venue. -- A person
violating section 70503 . . . . shall be tried in the district in
which such offense was committed."

46 U.S.C. § 70506(a) states: "Violations. -- A person
violating paragraph (1) of section 70503(a) of this title shall be
punished as provided in section 1010 of the Comprehensive Drug
Abuse Prevention and Control Act of 1970 (21 U.S.C. 960).  However,
if the offense is a second or subsequent offense as provided in
section 1012(b) of that Act (21 U.S.C. 962(b)), the person shall
be punished as provided in section 1012 of that Act (21 U.S.C.
962)."

46 U.S.C. § 70506(b) states: "Attempts and conspiracies. -- A
person attempting or conspiring to violate section 70503 of this
title is subject to the same penalties as provided for violating
section 70503."

Colombia.   The crew reported observing persons on the vessel throwing packages and fuel barrels into the water.

The crew noted that a cloud of white powder was seen escaping from one of the packages.  The crew "also observed what was believed to be a Costa Rica flag painted on the port bow of the go fast" vessel.

The United States Coast Guard dispatched a Boarding Team to intercept the vessel.  The Boarding Team commenced "Right to Approach" questioning of the vessel's crew.

The vessel's master claimed that the vessel was of Costa Rican nationality.  He did not provide the members of the Boarding Team any Costa Rican registration documents,[3] and the Boarding Team did not identify any "further indicia of nationality."

The Boarding Team proceeded to contact the government of Costa Rica to inquire about the vessel.  The government of Costa Rica was unable to "affirmatively and unequivocally assert," § 70502(d)(1)(C), that the vessel was registered with that country.  The Boarding Team "determined" that the vessel was "without nationality."

The Boarding Team found trace amounts of cocaine after searching the vessel and arrested the three people on board -- specifically, the two defendants in these consolidated appeals,

---

[3] The affidavit makes no reference to a "claim of registry" having been made.

Dávila-Reyes and Reyes-Valdivia, and a third crew member.  The
three individuals were taken to the United States's military base
at Guantánamo Bay, Cuba before they were transported to Puerto
Rico, where they were held pending charges.

### C.

Dávila-Reyes, Reyes-Valdivia, and the third member of
the vessel's crew were indicted in the District of Puerto Rico on
November 23, 2015.  The indictment charged each of the three crew
members with two counts of violating the MDLEA while "on board a
vessel subject to the jurisdiction of the United States, as defined
in Title 46, United States Code, Section 70502(c)(1)(A)."  The
indictment did not further specify the ground for so deeming the
vessel.

### D.

Reyes-Valdivia moved on February 1, 2016, to dismiss the
charges.  The motion relied on various constitutional grounds.

Reyes-Valdivia's motion first contended that the charges
must be dismissed because Congress lacked the power under the
Felonies Clause to criminalize the underlying conduct.  The motion
argued that the Felonies Clause does not empower Congress to make
it a crime for a foreign national to engage in drug trafficking
outside the "territorial jurisdiction" of the United States while
aboard a foreign vessel.  The motion further contended that
§ 70502(d)(1)(C)'s definition of a "vessel without nationality"

"extends jurisdiction over vessels that are not in fact stateless under international law, where the claimed nation of registry fails to unequivocally confirm registry."  The motion then asserted that, "[b]ecause the MDLEA's statelessness provision is significantly broader than international law's concept of statelessness, the statute's assertion of jurisdiction over stateless vessels is an invalid exercise of Congress's Article I powers" in that it extends the reach of the MDLEA to persons who are aboard vessels on the high seas that are foreign rather than stateless for purposes of international law.

The motion separately contended that the charges must be dismissed pursuant to the Due Process Clause of the Fifth Amendment.  <u>See</u> U.S. Const. amend. V.  The motion argued that § 70502(d)(1)(A) and § 70502(d)(1)(C) are void for vagueness because neither provision explains the steps that a nation must take either to "den[y]" or "affirmatively and unequivocally assert that the vessel is of its nationality."

The motion also took aim at the charges for two additional reasons under the Due Process Clause.  First, the motion contended that the indictment violated the Due Process Clause because the MDLEA does not require the government to bear the burden of affirmatively proving that the vessel in question was stateless under international law.  Second, the motion contended that the indictment violated the Due Process Clause because it did

not allege the drugs that the defendants were charged with trafficking were "destined for the United States" and so did not allege any "nexus" between the defendants' allegedly unlawful conduct and the United States.[4]

Dávila-Reyes joined Reyes-Valdivia's motion. The government opposed Dávila-Reyes and Reyes-Valdivia's joint motion and attached to its brief in opposition decisions from the District of Puerto Rico that had rejected challenges to the MDLEA like those that the defendants' joint motion advanced.

The District Court denied the motion in a two-page order. The District Court explained that it had "reviewed, considered and analyzed the applicable statutes, case law and the opinions by other judges" attached to the government's opposition to the motion to dismiss the indictment and "agree[d] with their analyses and conclusions."

**E.**

On March 25, 2016, the government filed a motion pursuant to 46 U.S.C. § 70504(a), which provides: "Jurisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense. Jurisdictional issues arising under this chapter are preliminary questions of law to be determined

---

[4] The motion also contended that the MDLEA charges could not be justified under the Treaties Clause, see U.S. Const. art. II, § 2, cl. 2, but neither the defendants nor the government address this argument on appeal and so we need not consider the issue.

solely by the trial judge." The motion asked the District Court to "find, as a matter of law, that the vessel in question was subject to the jurisdiction of the United States, as defined in Title 46, United States Code, Sections 70502(c)(1)(A) and (d)(1)(C)." The motion also requested that the District Court, "prior to the beginning of testimony in this case, preliminarily [instruct] the jury pursuant to Title 46, United States Code, Section[s] 70502(c)(1)(A) and (d)(1)(C) that the suspect vessel carrying the [d]efendants was a vessel [w]ithout [n]ationality and therefore subject to the jurisdiction of the United States."

To support the motion, the government attached an affidavit from the leader of the Boarding Team. The affidavit stated that the master of the vessel initially "claimed . . . that there was no nationality for the vessel," then "later tried to change the claim [of the vessel's nationality] to Costa Rica." The affidavit stated that "a Costa Rican flag [was] painted on the bow" of the vessel. The motion itself asserted that there was no "name, hailing port, or registration numbers on the [vessel's] hull" and that "the vessel was not flying any flag."

In further support of the motion, the government attached a certification from the United States Department of State. Under 46 U.S.C. § 70502(d)(2), such a certification is in and of itself conclusive proof as to the response of a country that has been contacted for purposes of determining that a vessel

is "without nationality" under § 70502(d)(1)(C).    The
certification explained that the vessel was located by law
enforcement 30 nautical miles southeast of San Andrés Island,
Colombia; that law enforcement suspected the vessel of illicit
drug trafficking because the crew was jettisoning unknown packages
in an area where drug trafficking was common; that the master made
a claim of Costa Rican nationality; that no registration documents
were present on the vessel; and that Costa Rica, when contacted,
"could not confirm the vessel's registry."    The certification
concluded that, "[a]ccordingly, the Government of the United
States determined the vessel was "without nationality in
accordance with 46 U.S.C. § 70502(d)(1)(C), rend[er]ing the vessel
subject to the jurisdiction of the United States, pursuant to 46
U.S.C. § 70502(c)(1)(A)."

**F.**

Before the defendants responded to the government's
§ 70504(a) motion or the District Court ruled on it, all three
defendants on April 4, 2016, pleaded guilty to violating the
MDLEA.[5] Each defendant admitted in his respective plea agreement
to:

> [k]nowingly and intentionally combining,
> conspiring, confederating and agreeing with
> others, to commit an offense defined in Title

---

[5] The third crew member entered into substantially the same
plea agreement as Dávila-Reyes and Reyes-Valdivia but, because he
did not appeal his conviction, his case is not before us.

46, United States Code, Section 70503, that
is: to possess with intent to distribute five
(5) kilograms or more of a mixture or
substance containing a detectable amount of
cocaine, a Schedule II, Narcotic Drug
Controlled Substance, on board a vessel
subject to the jurisdiction of the United
States, as defined in Title 46, United States
Code, Section 70502(c)(1)(A).

Each defendant also "adopt[ed]" as part of his plea
agreement the Government's Version of the Facts, which was attached
to the plea agreement. Thus, by signing the plea agreement, each
defendant agreed that, as to the Government's Version of the Facts,
"the facts therein are accurate in every respect and, had the
matter proceeded to trial, that the United States would have proven
those facts beyond a reasonable doubt." The Government's Version
of the Facts stated in relevant part:

A U.S. Coast Guard . . . Boarding Team
approached the vessel and commenced Right to
Approach . . . questioning. The master
claimed Costa Rican nationality for the vessel
but provided no registration paperwork and
there was no indicia of nationality on the
vessel. The government of Costa Rica was
approached and responded that it could neither
confirm nor refute the registry of the suspect
vessel. The vessel was determined to be one
without nationality.

Dávila-Reyes was sentenced to 120 months of imprisonment
on August 2, 2016, and his judgment of conviction was entered that
same day. Reyes-Valdivia was sentenced to 70 months of

imprisonment on August 5, 2016, and his judgment of conviction was also entered that day.[6]

### G.

Dávila-Reyes and Reyes-Valdivia each filed a timely notice of appeal from the "judgment" that the District Court had entered in each of their respective cases.  Dávila-Reyes's and Reyes-Valdivia's appeals were consolidated.

In the defendants' briefing to the panel, the defendants challenged the judgments that the District Court had entered against them under the Felonies Clause and the Due Process Clause. In addition, Dávila-Reyes raised a new argument: Congress lacked the power under the Constitution to criminalize his charged conduct because the vessel that he was aboard was not on the high seas and was instead within the territorial waters of Colombia.

The two defendants contended in their briefing to the panel that they had not waived the constitutional claims that they were raising on appeal by entering unconditional guilty pleas in the District Court.  They argued that § 70503(e)(1), in referencing the "jurisdiction of the United States," establishes a limitation

---

[6] Reyes-Valdivia also appealed his sentence.  The panel affirmed his sentence in its original opinion.  That holding was vacated when that opinion was withdrawn, so Reyes-Valdivia's sentencing appeal remains before us.  United States v. Dávila-Reyes, 937 F.3d 57, 63-64 (1st Cir. 2019).  But Reyes-Valdivia is no longer in custody, and so his sentencing challenge is now moot. See United States v. Suarez-Reyes, 910 F.3d 604, 606 (1st Cir. 2018).

on the subject matter jurisdiction of courts.  On that basis, they contended that they were entitled to raise their various claims on appeal despite their unconditional guilty pleas because the claims implicated the question of whether the District Court had subject matter jurisdiction under Article III to enter the judgments against them.

After the parties filed their briefs with the panel, but before oral argument to the panel, the government filed a letter under Federal Rule of Appellate Procedure 28(j) about Class v. United States, 138 S. Ct. 798 (2018).  There, the Supreme Court of the United States held that an unconditional guilty plea does not necessarily waive a constitutional challenge to the defendant's statute of conviction.  The government argued in the letter that, notwithstanding Class, the defendants were barred from raising their challenges on appeal by their unconditional guilty pleas.

The defendants responded with their own Rule 28(j) letter.  They contended in their letter that Class established that they had not waived their claims by entering their unconditional guilty pleas.

The panel heard oral argument in the defendants' appeals on March 7, 2018.  Then, on January 15, 2019, the panel ordered the parties to submit supplemental briefing to address two questions:

1.  What is the basis for deeming appellants' vessel "a Vessel without nationality" under 4[6] U.S.C. § 70502(d)(1) given that none of the clauses of 46 U.S.C. § 70502(d)(1) appears to apply by its terms?  As background, we note that the statements of fact presented in appellants' plea agreements report that the master of appellants' vessel declared Costa Rican nationality, not Costa Rican registry. That declaration renders § 70502(d)(1)(B) inapplicable, and clauses (A) and (C) refer only to claims of registry.

2.  Assuming that the circumstances do not permit deeming appellants' vessel one "without nationality" pursuant to any clause of 46 U.S.C. § 70502(d)(1), what other jurisdictional basis supports this prosecution by United States authorities under United States law against appellants -- citizens of Costa Rica who were detained in international waters on a vessel claimed to be of Costa Rican nationality?

The parties submitted briefing on the questions.

**H.**

In September 2019, the panel -- in its original opinion, which the panel later withdrew when issuing its subsequent opinion -- rejected the challenges that Dávila-Reyes and Reyes-Valdivia had brought under the Felonies Clause and the Due Process Clause to the "judgments" entered against them.  See United States v. Dávila-Reyes, 937 F.3d 57, 62-64 (1st Cir. 2019) (Dávila-Reyes I).  The panel relied on Class to hold that the defendants' guilty pleas did not "foreclose their right to challenge the constitutionality of the MDLEA."  Id. at 61.  But the panel ruled against the defendants on the merits based on United States v.

- 16 -

Cardales, 168 F.3d 548 (1st Cir. 1999), "and the cases reiterating its approach." Dávila-Reyes I, 937 F.3d at 63.

The panel explained that those precedents established that the MDLEA was a valid assertion of the United States's protective jurisdiction under international law, given the United States's interest in protecting itself from the baleful effects of drug trafficking. Id. at 62-63. The panel explained that this was so no matter the basis under § 70502(c)(1)(A) of the MDLEA for determining that a defendant was on a "vessel without nationality" on which the government was relying. Thus, the panel explained, this was so notwithstanding the defendants' contention that the MDLEA (per § 70502(d)(1)(C)) permitted a vessel to be so deemed even when it was not stateless for purposes of international law.[7] Id.

Dávila-Reyes and Reyes-Valdivia petitioned for rehearing en banc from the panel's ruling in October 2019. The petition contended that the defendants' convictions ran afoul of the Felonies Clause and the Due Process Clause. The petition contended on that basis that Cardales should be overruled.

---

[7] The panel did not appear to address Dávila-Reyes' contention that Congress lacked the power to criminalize his conduct because the vessel that he was aboard was not on the high seas. The defendants did not raise the contention in the petition for rehearing en banc that they filed after the panel's original opinion issued. Thus, the argument has been abandoned, and we need not address it here.

While the petition was pending, our court, sitting en banc, decided United States v. Aybar-Ulloa, 987 F.3d 1 (1st Cir. 2021). In that case, we rejected the defendant's contention that the Felonies Clause did not empower Congress to criminalize his conduct, which involved alleged drug trafficking on the high seas while aboard a vessel "without nationality" under § 70502(c)(1)(A).

Aybar-Ulloa did not rely in so holding, as Cardales and the panel in Dávila-Reyes I had, on the United States's assertion of protective jurisdiction under international law. Aybar-Ulloa relied instead on the ground that Congress had the power under the Felonies Clause to make it a crime for a foreign national to engage in drug trafficking on the high seas while aboard a vessel that was stateless under international law. Id. at 4-5. Aybar-Ulloa explained that the MDLEA conviction at issue there did not exceed Congress's Felonies Clause power because the defendant in that case did not dispute that he was a foreign national who was aboard a vessel at the time of his drug trafficking that was both on the high seas and stateless for purposes of international law. Id. at 5-6.

Following our en banc decision in Aybar-Ulloa, the panel in Dávila-Reyes's and Reyes-Valdivia's cases construed the pending petition for rehearing en banc as a petition for panel rehearing, granted the petition, and vacated the panel's September 2019

opinion.  The panel explained that it had "concluded that the en banc decision in [Aybar-Ulloa] has diminished the force of this circuit's precedent on the protective principle such that the panel . . . deem[ed] it appropriate to address appellants' contention that the government improperly deemed their vessel stateless." United States v. Dávila-Reyes, No. 16-2089, 2021 WL 5276369 (1st Cir. Mar. 17, 2021).

The panel issued a new decision in January 2022 that vacated the defendants' convictions and dismissed the charges against them.  See United States v. Dávila-Reyes, 23 F.4th 153 (1st Cir. 2022) (Dávila-Reyes II).  A majority of the panel explained that Class allowed the defendants to press their constitutional claims despite their unconditional guilty pleas. Id. at 162-164.  Then, the majority turned to the merits.

The majority reasoned that Congress lacks the power under the Felonies Clause to criminalize a foreign national's drug trafficking in international waters unless the United States's assertion of regulatory jurisdiction over that foreign national would be permissible under international law.  Id. at 173-83.  The majority then explained that, although Aybar-Ulloa held that international law permits the United States to assert such regulatory jurisdiction when the foreign national is aboard a vessel on the high seas that is stateless under international law, a vessel cannot be deemed stateless under international law merely

because, as § 70502(d)(1)(C) provides, a foreign nation whose nationality the vessel's master claims for the vessel "fail[s] to supply an 'affirmative and unequivocal' confirmation of nationality." Id. at 186-95 (cleaned up).  And, the majority concluded, the defendants' charges and convictions necessarily depended on the application of § 70502(d)(1)(C) -- and on no other basis -- to deem the vessel that they were aboard at the time of their MDLEA violations to be "without nationality" under § 70502(c)(1)(A).  Id. at 162-65.

In so holding, the majority acknowledged that the government had argued in its supplemental briefing to the panel that the defendants' vessel "could have been deemed without nationality based on . . . jurisdictional theories" other than application of § 70502(d)(1)(C).  Id. at 164-65.  These alternative bases included that the vessel's master "fail[ed] to produce registration paperwork or otherwise substantiate his verbal claim of nationality."  Id. at 164.  But the majority concluded that "it [was] simply too late for the government to proffer alternative bases for jurisdiction" because those bases were "not the basis on which the government relied to arrest and prosecute appellants, and to obtain their guilty pleas."  Id. at 164-65.

Thus, the majority explained, the defendants' charges and convictions exceeded Congress's power, including under the Felonies Clause, because a vessel deemed to be "without

nationality" under § 70502(c)(1)(A) solely by application of
§ 70502(d)(1)(C) is not stateless under international law.  Id. at
194-95.  Accordingly, the panel ordered the defendants'
convictions vacated and the charges against them dismissed.  Id.
at 195.

Then-Chief Judge Howard issued an opinion concurring in
the judgment.  Id. at 195-96 (Howard, C.J., concurring in the
result).  He explained that the MDLEA provides that a vessel is
"without nationality" under § 70502(c)(1)(A) when, as
§ 70502(d)(1)(C) provides, "the master or individual in charge
makes a claim of registry and for which the claimed nation of
registry does not affirmatively and unequivocally assert that the
vessel is of its nationality."  Id.  But, he concluded, the master
of the vessel in question in Dávila-Reyes and Reyes-Valdivia's
cases had made a claim of Costa Rican "nationality" rather than
Costa Rican "registry."  Id.  Then-Chief Judge Howard explained
that as a result the conclusive presumption of a vessel being
"without nationality" that § 70502(d)(1)(C) sets forth had no
application in the defendants' cases and that, for that statutory
reason alone, the defendants' convictions must be vacated and the
charges against them in the indictment dismissed.[8]  Id. at 196.

_____

[8] Then-Chief Judge Howard noted that the defendants' statutory
contention arguably was waived because the defendants did not brief
the statutory argument until ordered to by the panel.  But he

Following the panel's decision, the United States petitioned for rehearing en banc. We granted the petition in July 2022; vacated the panel's February 2022 opinion; ordered supplemental briefing, which the parties then supplied; and heard oral argument.

**II.**

The defendants seek to challenge their convictions on various grounds despite their unconditional guilty pleas. Thus, we confront a threshold question: Did the defendants' guilty pleas waive the various challenges that they seek to have us address? Insofar as we conclude that the defendants' guilty pleas did not, we then also confront one further threshold question: What standard of review applies to each of the challenges that the defendants bring on appeal?

The defendants contend to us, as they did to the panel, that their unconditional guilty pleas did not waive their challenges because the challenges concern whether their vessel was "subject to the jurisdiction of the United States" under the MDLEA. The defendants contend that this requirement in the MDLEA places a limit on a federal court's subject matter jurisdiction and thus a federal court's jurisdiction under Article III of the United

---

suggested that the supplemental briefing may have been sufficient to "bypass [this] appellate waiver." Dávila-Reyes II, 23 F.4th at 196 n.65.

States Constitution.  In consequence, the defendants contend, their challenges take aim at the Article III jurisdiction of the District Court and so are both not waivable by an unconditional guilty plea and subject to de novo (rather than plain error) review whether their challenges were raised below or not.

The defendants also contend, in the alternative, that their guilty pleas did not waive their challenges for a different reason.  Here, they rely on <u>Class</u>.

We explain in Part III why we reject the defendants' Article III-based ground for both permitting their challenges to their convictions to go forward despite their unconditional guilty pleas and reviewing those challenges de novo even if the challenges were not raised below.  We then address in Part IV the defendants' <u>Class</u>-based ground for permitting their challenges to go forward. There, we explain that, even assuming that under <u>Class</u> the defendants' challenges are not waived, we must reject them, either because they have no merit under de novo review or because they

are subject to the plain error standard of review and cannot meet it.[9]

### III.

The defendants contend that their challenges take aim at the subject matter jurisdiction of the District Court because the challenges take aim at the basis for concluding that their vessel was "subject to the jurisdiction of the United States" for purposes of the MDLEA.  This phrase appears in several sections of the MDLEA, although the defendants and the government focus chiefly on its use in § 70502(c)(1) and § 70504 of the MDLEA.  The defendants' and the government's contentions are best understood, however, to be addressing the use of the phrase in § 70503(e)(1).  That provision is the operative one, as it provides that a "vessel subject to the jurisdiction of the United States" is a "covered

---

[9] The government separately contends that both Dávila-Reyes's and Reyes-Valdivia's appeals are barred by the waiver of appeal contained in each of their plea agreements.  We note that Reyes-Valdivia's appeal waiver was predicated on his receipt of a sentence of no more than 57 months of imprisonment.  Because he received a 70-month prison sentence, that waiver appears to be unenforceable.  In any event, we may assume for present purposes that neither waiver is a bar to these appeals because the defendants' challenges to their indictment and convictions fail on other grounds.

vessel" and so the type of vessel that a person must be "on board" to violate the MDLEA under § 70503(a).[10]

We may assume that the defendants are right to contend that their various challenges on appeal implicate § 70503(e)(1), because we agree with the government that, even if the challenges do, the challenges do not implicate the subject matter jurisdiction of the District Court, because § 70503(e)(1) does not impose a limitation on a court's subject matter jurisdiction.  Accordingly, we reject the defendants' Article III-based arguments as to both whether their guilty pleas waived their challenges and why the standard of review that applies to those challenges is de novo regardless of whether the challenges were raised below.

**A.**

The defendants acknowledge up front that, in United States v. González, 311 F.3d 440 (1st Cir. 2002), a panel of this court held that § 70503(e)(1) does not establish a limitation on a court's subject matter jurisdiction.  But the defendants contend that González was wrong to so hold -- as some other circuits have also concluded, see United States v. Miranda, 780 F.3d 1185, 1191-97 (D.C. Cir. 2015); United States v. Tinoco, 304 F.3d 1088, 1106

---

[10] To be clear, our analysis would be no different if we treated the parties as addressing § 70502(c)(1) or § 70504 rather than § 70503(e)(1).

(11th Cir. 2002); United States v. Bustos-Useche, 273 F.3d 622, 626 (5th Cir. 2001) -- and that we should overrule that precedent.

The Second Circuit has comprehensively reviewed the relevant post-González precedent, however, and sided with González.  See United States v. Prado, 933 F.3d 121, 132-51 (2nd Cir. 2019).  We conclude that the Second Circuit's reasoning is persuasive.

**1.**

Congress vested "courts of the United States" (emphasis added) with "original jurisdiction . . . of all offenses against the laws of the United States" in 18 U.S.C. § 3231.  Thus, the defendants need to show that § 70503(e)(1) of the MDLEA, by referring to the "jurisdiction of the United States" (emphasis added), limits the otherwise operative grant of subject matter jurisdiction to federal courts over federal criminal prosecutions that 18 U.S.C. § 3231 sets forth.  See Prado, 933 F.3d at 134-35.

The Supreme Court has explained in a case that post-dates González that "[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional," then the limitation concerns the Article III subject matter jurisdiction of the courts.  Arbaugh v. Y&H Corp., 546 U.S. 500, 515 (2006).  But the Court went on to say in that case that "when Congress does not rank a statutory limitation on coverage as jurisdictional," the limitation does not concern the

- 26 -

Article III subject matter jurisdiction of the courts.  Id. at 516.

Here, of course, the provision in question does use the word "jurisdiction."  But, as Prado emphasized, 933 F.3d at 132, and González itself noted, "[t]he term 'jurisdiction' is notoriously malleable and is used in a variety of contexts . . . that have nothing whatever to do with the court's subject matter jurisdiction," 311 F.3d at 443 (emphasis removed).  We therefore find it telling that, as Arbaugh acknowledges, Congress knows how to write statutes that provide for or limit the subject matter jurisdiction of courts by expressly referring to cases or controversies heard by the courts themselves.  See, e.g., 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); 7 U.S.C. § 2707(e)(3) ("[T]he several district courts of the United States are hereby vested with jurisdiction to entertain such suits [that pertain to orders of the Egg Board] regardless of the amount in controversy."); 16 U.S.C. § 814 ("United States district courts shall only have jurisdiction of cases [concerning suits regarding the use of eminent domain to obtain land to construct a dam or certain public waterways] when the amount claimed by the owner of the property to be condemned exceeds $3,000.").

This past legislative practice is telling because the provision at issue here does not refer to courts having "jurisdiction" over "actions," "suits," or their equivalent.  It refers only to a "vessel" being "subject to . . . jurisdiction" and to "the United States" -- rather than a court -- having "jurisdiction" over the vessel.  Thus, § 70503(e)(1) does not by using the term "jurisdiction" impose a limitation on the Article III subject matter jurisdiction of courts.  It instead defines the scope of the regulatory jurisdiction that Congress is asserting through the MDLEA.

Section 70503(b) supports the same understanding.  That section, titled "Extension beyond <u>territorial</u> jurisdiction," (emphasis added), clarifies that the substantive prohibition that is set forth in § 70503(a) -- the provision that invokes the phrase "covered vessel" -- "applies even though the act is committed outside the <u>territorial jurisdiction of the United States</u>" (emphasis added).  Because the phrase "jurisdiction of the United States" in § 70503(b) clearly is not referring to the jurisdiction of a court, we see no reason to read that same phrase in § 70503(e)(1) to be doing so.  See <u>Prado</u>, 933 F.3d at 142-44.

Other sections of Title 46 of the United States Code, we note, also use the phrase "jurisdiction of the United States" in contexts that make clear that those sections are not referring to the power of courts to adjudicate disputes.  See <u>Prado</u>, 933 F.3d

at 143 n.12 (collecting statutes).  By contrast, § 70505 of the MDLEA states that "[a] failure to comply with international law does not divest a court of jurisdiction and is not a defense to a proceeding under this chapter."  Given that § 70503(e)(1) refers only to the "jurisdiction of the United States" over a "vessel," we see no basis for reading it as if it, like § 70505, were referring to the "jurisdiction" of a "court" over a "proceeding."

In sum, the MDLEA's statutory text provides no support for the conclusion that Congress intended the phrase "subject to the jurisdiction of the United States" in § 70503(e)(1) to impose a limitation on the subject matter jurisdiction of courts.  Nor do we see any basis for concluding that Congress's use of the phrase constitutes the kind of clear statement required by Arbaugh to impose such a limitation.  Accordingly, we see no basis for breaking with our ruling in González.

### 2.

We recognize that the D.C. Circuit, in concluding otherwise in Miranda, noted that the phrase "[j]urisdiction of the United States" also appears in § 70504(a) of the MDLEA, which is titled "Jurisdiction and venue."  780 F.3d at 1196.  The D.C. Circuit concluded from the inclusion of that phrase in a provision so titled that the phrase as it appears in § 70503(e)(1) must be a limitation on the subject matter jurisdiction of courts,

notwithstanding that § 70503(e)(1) is not similarly titled.[11]  We are not persuaded.

The precursor to § 70504(a), which bore the same title to which the D.C. Circuit gave such interpretive weight, was 46 U.S.C. app. § 1903(f) (1996).  That provision, however, had a companion provision, 46 U.S.C. app. § 1903(d) (1996).  And that companion provision was titled "Claim of failure to comply with international law; standing; jurisdiction of court." (emphasis added).

Thus, the relevant statutory history reveals that the "Jurisdiction and venue" title to which the D.C. Circuit gave such import made no reference to the "jurisdiction of court" at a time when the title to a companion provision expressly did.  That makes it difficult to conclude that the "Jurisdiction and venue" title demonstrates that the phrase "jurisdiction of the United States" was intended to set a limit on the "jurisdiction of court[s]."

Congress did later drop "jurisdiction of court" from the title of the companion provision, which now appears in the MDLEA as § 70505.  But Congress made that title change as part of a 2006 effort to "reorganize[] and restate[]" the MDLEA and so to "codif[y] existing law rather than creat[e] new law."  Miranda,

---

[11] Neither the Eleventh Circuit in Tinoco nor the Fifth Circuit in Bustos-Useche presents any arguments that Miranda did not rely on in determining that § 70503(e)(1) implicates the subject matter jurisdiction of courts.

- 30 -

780 F.3d at 1196 (quoting H.R. Rep., No. 109-170, at 2 (2005)).
We thus do not see how we may infer from the change to the title
of § 70505 that Congress intended the phrase "jurisdiction of the
United States" in § 70503(e)(1) to set a subject matter limitation
on the jurisdiction of a court, given that § 70503(e)(1) itself
makes no mention of courts at all.

**3.**

The D.C. Circuit also concluded in <u>Miranda</u> that the
phrase "jurisdiction of the United States" in § 70503(e)(1) must
be construed to limit the Article III subject matter jurisdiction
of courts for another reason.  The D.C. Circuit reasoned that
Congress would have wanted the question of whether a vessel was
"subject to the jurisdiction of the United States" to be non-
waivable "in order to minimize the extent to which the MDLEA's
application might otherwise cause friction with foreign nations"
by ensuring that the defendants were properly subject to
prosecution in the United States "in every case -- and at every
level of review."  780 F.3d at 1193-94.

But the relevant statutory text, as we have explained,
is to the contrary, and nothing in the legislative history shows
that the text does not mean what it appears to say.  <u>Prado</u>, 933
F.3d at 139-40.  In fact, § 70505 appears to reflect a contrary
congressional understanding to the one posited in <u>Miranda</u>: It
provides that "[a] failure to comply with international law does

not divest a court of jurisdiction and is not a defense to a proceeding under this chapter."

**4.**

The D.C. Circuit did also imply that the constitutional avoidance canon supports construing the provision of the MDLEA at issue to limit the Article III subject matter jurisdiction of courts.  The D.C. Circuit explained that, if § 70503(e)(1) establishes an element of the crime, rather than a limitation on the subject matter jurisdiction of courts, then the statute may run afoul of the Sixth Amendment to the United States Constitution. See Miranda, 780 F.3d at 1195-96; see also González, 311 F.3d at 444.

The notion is that, if § 70503(e)(1) were not construed to establish a limitation on the subject matter jurisdiction of a court, then that provision of the MDLEA would establish an element of the offense that would have to be proved to a jury beyond a reasonable doubt.  See Torres v. Lynch, 578 U.S. 452, 467 (2016) ("Both [the substantive and jurisdictional] elements [of a crime] must be proved to a jury beyond a reasonable doubt."). Section 70504(a), however, provides that the determination as to whether a vessel is "subject to the jurisdiction of the United States" need be made only by a court -- rather than a jury.  And this determination, we have held, need be made only by a preponderance of the evidence rather than beyond a reasonable

doubt.  United States v. Matos-Luchi, 627 F.3d 1, 5 (1st Cir. 2010) (holding that a vessel may be shown to be "without nationality" by "a preponderance of the evidence").

The defendants do not themselves invoke the constitutional avoidance canon in pressing their Article III-based arguments to us, however.  And seemingly for good reason.  The canon applies only if there is an ambiguity in the relevant respect, see Nielsen v. Preap, 139 S. Ct. 954, 972 (2019) (constitutional avoidance is "irrelevant" if text of statute is clear); Jennings v. Rodriguez, 138 S. Ct. 830, 842 (2018) (cautioning that the canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction" (quoting Clark v. Martinez, 543 U.S. 371, 385 (2005))), and, as we have explained, there is none here.

Moreover, a majority of a panel of this court has held that even if § 70503(e)(1) does not implicate the Article III jurisdiction of a court, no Sixth Amendment issue arises.  United States v. Vilches-Navarrete, 523 F.3d 1, 19-23 (1st Cir. 2008) (Lynch and Howard, JJ., concurring).  And, despite the law of the circuit established by that ruling, neither defendant makes any argument to us as to why we should reconsider our precedent on that score.

**B.**

For all these reasons, we decline to depart from our holding in González that § 70503(e)(1) merely sets a limit on the scope of the conduct that the MDLEA itself criminalizes.  As a result, we reject the defendants' Article III-jurisdiction-based argument for contending both that their unconditional guilty pleas did not waive the challenges to their convictions that they make on appeal and that we must review all those challenges de novo regardless of whether they were raised below.

**IV.**

The defendants separately contend that, in consequence of Class, their unconditional guilty pleas did not waive the challenges that they now advance on appeal.  Class concerned a defendant who had entered an unconditional guilty plea and then appealed his conviction on the ground that the statute under which he was convicted violated the Constitution.  The Supreme Court allowed the defendant's challenge to proceed, as against a claim that the challenge had been waived by his unconditional guilty plea, because the defendant was pressing a challenge to "'the very power of the State' to prosecute" him.  Class, 138 S. Ct. at 803 (quoting Blackledge v. Perry, 417 U.S. 21, 30 (1974)); see also Menna v. New York, 423 U.S. 61 (1975).

Class made clear the limited nature of this exception to the usual rule that an unconditional guilty plea waives challenges

to the defendant's conviction.  It explained that the exception
applies only to a challenge to the "constitutionality of the
statute of conviction," 138 S. Ct. at 803, and then only when the
challenge "does not in any way deny that [the defendant] engaged
in the conduct to which he admitted" and does not "contradict the
terms of the indictment or the written plea agreement," id. at
804-05.  Moreover, the Court explained the challenge must, "'judged
on its face' based upon the existing record," be of the sort that,
if successful, "would extinguish the government's power to
'constitutionally prosecute' the defendant."  Id. at 806 (quoting
United States v. Broce, 488 U.S. 563, 575 (1989)).

　　　　Dávila-Reyes and Reyes-Valdivia contend that Class
encompasses their challenges on appeal, while the government
disagrees.  The government contends that the defendants are
challenging the MDLEA's constitutionality only as it has been
applied to them in their specific cases and that such as-applied
constitutional challenges do not fall within Class.  The government
further contends that Class does not apply here because the
defendants' challenges on appeal necessarily seek to deny what the
defendants admitted in pleading guilty unconditionally, given that
in so pleading the defendants admitted both that they were aboard
"a vessel subject to the jurisdiction of the United States" and to
certain facts that bear on that very determination.  But, as we
will explain, even if we were to assume that Class permits the

defendants to raise any or all their challenges on appeal despite their unconditional guilty pleas, the challenges still would fail under the standard of review that we conclude applies to each of those challenges.

**A.**

We begin with the defendants' constitutional claim that Congress has no power under the Felonies Clause to criminalize their charged conduct.  The defendants do not spell out the claim as clearly as they might, but we understand it to come to us in two distinct variants.

The first variant tracks the Felonies Clause-based challenge that the defendants made in their motion to dismiss the indictment that they filed in the District Court.  Like that challenge, we understand this variant also to take aim at the indictment and to do so on the ground that it sets forth charges that are asserted to be beyond Congress's power to authorize under the Felonies Clause.

The second variant, by contrast, does not depend on an any assertion that the indictment itself is defective because it sets forth charges that exceed Congress's power under the Felonies Clause.  This variant of the challenge contends instead that, even if the indictment is unassailable, the convictions cannot stand because the nature of the post-indictment record is such that it

shows that the convictions violate the Felonies Clause.    We consider each variant of the Felonies Clause-based claim in turn.

**1.**

The indictment-focused variant depends on the following chain of logic.  The Felonies Clause does not give Congress the power to criminalize drug trafficking by persons on a vessel on the high seas if the United States would not have regulatory jurisdiction over those persons under international law.  Because international law does not permit the United States to exercise regulatory jurisdiction over foreign nationals engaged in drug trafficking on the high seas while aboard foreign vessels, the United States could criminalize the defendants' charged conduct under the Felonies Clause only if the defendants were aboard a vessel on the high seas that was stateless under international law.  A vessel may not be deemed stateless under international law, however, simply because the nation to which the vessel's master has claimed that it belongs fails to "affirmatively and unequivocally assert," § 70502(d)(1)(C), that the vessel is registered with that nation.  Yet, the indictment charged that the vessel that the defendants were aboard was "without nationality" under § 70502(c)(1)(A) solely based on the operation of § 70502(d)(1)(C).  Thus, the indictment necessarily charged the defendants with violating the MDLEA on a basis that is not constitutional, given that § 70502(d)(1)(C) provides that "a

vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality" is a vessel that is "without nationality" for the purposes of the MDLEA.

Because the defendants advanced this exact claim in their motion to dismiss the indictment, it is preserved, such that our review of the challenge is de novo. See United States v. Savarese, 686 F.3d 1, 6 (1st. Cir 2012). But the government contends the challenge nonetheless fails, and we agree. The reason is simple: The indictment cannot be read, even on de novo review, to rely exclusively on § 70502(d)(1)(C) in charging the defendants with having been aboard a "vessel without nationality" under § 70502(c)(1)(A). Thus, the challenge rests on a faulty premise about the basis for the indictment's charge that the defendants were on a vessel that was "without nationality."

The indictment states with respect to whether the defendants were aboard a "vessel subject to the jurisdiction of the United States" only that they were aboard a vessel "as defined in Title 46, United States Code, Section 70502(c)(1)(A)." The indictment thus makes no reference to § 70502(d)(1)(C), let alone solely to that provision. Nor does the indictment refer to any other provision of the MDLEA that bears on the question of whether

the vessel was "subject to the jurisdiction of the United States" because it was "without nationality."

In addition, the indictment alleges no facts that could be understood to limit to § 70502(d)(1)(C) the permissible bases for finding the vessel in question to be "without nationality" under § 70502(c)(1)(A).  For example, the indictment makes no reference to any facts that implicate § 70502(d)(1)(C), such as to the master of the vessel having made a "claim of registry" (or even a "claim of nationality") or the United States having attempted unsuccessfully to confirm the vessel's registration with another country.

Moreover, the defendants do not dispute that a vessel may be shown to be a "vessel without nationality" under § 70502(c)(1)(A) -- the one "jurisdictional" provision of the MDLEA that the indictment does mention -- through means other than the application of § 70502(d)(1)(C).  Nor do we see how the defendants could do so.

As a panel of this court explained in Matos-Luchi, the use of the word "includes" in § 70502(d)(1) makes clear that "the listed examples" set forth in that section "do not exhaust the scope of [§] 70502(d)" in defining a "vessel without nationality." 627 F.3d at 4.  Moreover, Matos-Luchi explained that a vessel may be determined to be "without nationality" under § 70502(c)(1)(A) through a means other than application of any of the subsection of

§ 70502(d)(1) -- namely, when a vessel is not "entitled to fly[] the flag of a State."  627 F.3d at 6 (quoting Molvan v. Att'y-Gen. for Palestine, [1948] A.C. 351 (P.C.) 369-70) (cleaned up).  And Matos-Luchi also described that standard as a proper one for determining whether a vessel is stateless for purposes of international law.  See id.; see also United States v. Rosero, 42 F.3d 166, 171 (3d Cir. 1994) ("Under international law, 'ships have the nationality of the State whose flag they are entitled to fly.'" (quoting Convention on the High Seas of 1958 art. 5(1), Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 11) (cleaned up)).

Because the defendants do not contend that Matos-Luchi was wrong on any of these counts, they fail to explain why the indictment on its face would not permit the government to show that the defendants' vessel was not authorized to fly the flag of any state and so was "without nationality" under § 70502(c)(1)(A) -- and stateless under international law -- for reasons independent of the vessel being the kind of vessel that § 70502(d)(1)(C) describes.  See United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018) ("[T]he government need not recite all of its evidence in the indictment." (quoting United States v. Innamorati, 996 F.2d 456, 477 (1st Cir. 1993))).  Thus, we conclude that, even on de

novo review, the first variant of the defendants' Felonies Clause-based challenge fails.[12]

**2.**

We turn, then, to the other variant of the defendant's Felonies Clause-based challenge.  Here, the defendants contend that, even if the indictment is not dependent on § 70502(d)(1)(C), their convictions still violate the Felonies Clause.  We are not persuaded by this variant of the defendants' Felonies Clause-based challenge, however, given the standard of review that we conclude applies to it.

**a.**

The defendants do not dispute that, as we held in United States v. Ríos-Rivera, 913 F.3d 38, 41-43 (1st Cir. 2019), a constitutional claim that is raised on appeal pursuant to Class is subject to review only for plain error if it was not raised below. Thus, our review of the second variant of the defendants' Felonies Clause-based claim is only for plain error if this variant is being raised for the first time on appeal.

To determine whether this variant of the claim is being newly raised, as the government contends it is, we must attend to

---

[12] The dissent does not take issue with any aspect of the description of the indictment that we have set forth above or with the proposition that a vessel may be deemed to be "without nationality" under § 70502(c)(1)(A) on a ground other than § 70502(d)(1)(C).

the fact that, in pressing this variant of the Felonies Clause-based challenge, the defendants are necessarily taking issue with the import that the government ascribes to the admissions that the defendants made in pleading guilty.  That is because the government contends that those admissions provide a basis independent of § 70502(d)(1)(C) for deeming the defendants' vessel to be both "without nationality" under § 70502(c)(1)(A) and stateless under international law.

In particular, the government contends that under our decision in Matos-Luchi the factual admissions that the defendants made in pleading guilty in and of themselves suffice to show that the defendants' vessel was not "entitled to fly[] the flag of a State," 627 F.3d at 6, and so was both "without nationality" under the MDLEA and stateless under international law for reasons independent of the operation of § 70502(d)(1)(C).  Those admissions are that the sole basis for claiming the vessel had a foreign nationality was the oral claim of that nationality made by the vessel's master and that this oral claim of foreign nationality for the vessel was wholly uncorroborated.

Thus, the government contends, to succeed on their Felonies Clause-based challenge, the defendants need to do more than show that § 70502(d)(1)(C) does not provide a basis for deeming a vessel to be stateless under international law.  The government contends that the defendants also need to explain why

the factual admissions regarding the wholly uncorroborated nature
of the oral claim of the vessel's foreign nationality that the
defendants made in pleading guilty do not themselves provide an
independent basis under Matos-Luchi for deeming their vessel
"without nationality" as a statutory matter and stateless as an
international law matter.  Otherwise, the government contends, the
defendants will have failed to show that the convictions violate
the Felonies Clause because the defendants will have failed to
show that the vessel was not in fact stateless under international
law.

        But, in challenging the indictment in the District Court
under the Felonies Clause, the defendants obviously did not purport
to address the legal significance under Matos-Luchi of any of the
factual admissions that they made in their plea agreements
regarding the wholly uncorroborated nature of the oral claim of
the vessel's foreign nationality to which the government now
directs our attention.  Indeed, at that time, those factual
admissions had not even been made by the defendants, as the
defendants had not at that time entered into any plea agreements.
Rather, at that time, the defendants were merely taking aim at the
indictment itself on the ground that the indictment was dependent
solely on § 70502(d)(1)(C) based on what the indictment alone
provided.  Nor did the defendants at any other time or in any other
filing in the District Court make any argument as to the legal

import of the facts to which they admitted by entering into their plea agreements.

For these reasons, we conclude that the government is right that our review of the defendants' Felonies Clause-based challenge to the merits of their convictions is only for plain error insofar as that challenge does not take aim only at the indictment and instead addresses the relevance under Matos-Luchi of the defendants' post-indictment factual admissions. See Ríos-Rivera, 913 F.3d at 41-43; cf. United States v. Caraballo-Rodriguez, 480 F.3d 62, 68-76 (1st Cir. 2007) (applying plain error review to a challenge to the factual basis for a plea predicated on a challenge to the scope of the statute of conviction). And, as we will explain, we conclude that the defendants have failed to satisfy the second prong of the plain error standard with respect to that aspect of the challenge, given our reasoning in Matos-Luchi about when a vessel may be deemed to be "without nationality" under the MDLEA and stateless for international law purposes. See United States v. Pérez-Rodríguez, 13 F.4th 1, 16 (1st Cir. 2021) (explaining that, to satisfy the plain error standard, the defendant must show not only that "an error occurred" but also that the error "was clear or obvious," "affected the[ir] substantial rights" and "seriously impaired the fairness,

integrity, or public reputation of judicial proceedings" (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001))).

**b.**

We begin with the defendants' contention that the government is wrong to contend based on Matos-Luchi that the factual admissions in the plea agreements concerning the wholly uncorroborated nature of the oral claim of the vessel's foreign nationality provide a basis for deeming the defendants' vessel to be "without nationality" under § 70502(c)(1)(A) other than by the operation of § 70502(d)(1)(C). The government's contention on that score proceeds as follows.

The government points out that the defendants, in admitting to the Government's Version of the Facts through the plea agreements, necessarily admitted both that their vessel had no registration paperwork and that the vessel had no other indicia of nationality on board.[13] The government then contends that -- at least when those factual admissions are considered alongside the defendants' admission that Costa Rica could not confirm the vessel's registry -- the post-indictment record shows that there is a factual basis for finding under Matos-Luchi that the

---

[13] The fact that the vessel's master originally claimed the vessel had no nationality before asserting that it had Costa Rican nationality does not appear in the Government's Version of the Facts to which the defendants agreed when entering their guilty pleas. We thus do not consider that fact in addressing the merits of the defendants' challenges to their convictions.

- 45 -

defendants' vessel was "without nationality" under § 70502(c)(1)(A). It thus follows, according to the government, that at the time of their pleas their vessel could have been deemed to have been "without nationality" under § 70502(c)(1)(A) solely based on § 70502(d)(1)(C).

The defendants' admissions in pleading guilty establish that there is no corroboration whatsoever for the oral claim of the vessel's foreign nationality, even though that oral claim supplies the sole basis for the defendants' contention that the vessel has such a nationality. In consequence, it is not clear or obvious that on the record as it stood at the time of the pleas the defendants' vessel could be deemed to have been "without nationality" under § 70502(c)(1)(A) solely based on § 70502(d)(1)(C) and not also based on the rationale set forth in Matos-Luchi.[14]

Matos-Luchi explained in relevant part that "[u]nder international law, every vessel must sail under the flag of one and only one state; those that sail under no flag or more than one

---

[14] The affidavits filed in support of the criminal complaint and the government's motion requesting that the District Court declare the vessel to be "subject to the jurisdiction of the United States" both included references to a Costa Rican flag painted on the vessel's hull. But the defendants cannot now assert that fact to corroborate the claim that the vessel was of Costa Rican nationality, because that assertion would contradict the statement in the Government's Version of the Facts that "there was no indicia of nationality on the vessel." See Class, 138 S. Ct. at 804.

flag enjoy no legal protection."  627 F.3d at 5.  Matos-Luchi
further explained that "[b]y custom, a vessel claims nationality
by flying the flag of the nation with which it is affiliated or
carrying papers showing it to be registered with that nation."
Id.

True, Matos-Luchi did also explain that "[w]ithout a
flag or papers, a vessel may also traditionally make an oral claim
of nationality when a proper demand is made," while noting that
the MDLEA recognized as much in its provision defining what
constitutes a "vessel without nationality."  Id.  But Matos-Luchi
then went on to note that "[a]lthough enforcement jurisdiction
presumptively lies with the flag state, '[i]t is not enough that
a vessel have a nationality; she must claim it and be in a position
to provide evidence of it.'"  Id. at 6 (citation omitted) (emphasis
added) (quoting Andrew W. Anderson, Jurisdiction over Stateless
Vessels on the High Seas: An Appraisal Under Domestic and
International Law, 13 J. Mar. L. & Com. 323, 341 (1982)).

Moreover, Matos-Luchi added that the MDLEA follows this
approach "energetically."  Id. at 6.  It explained in that regard
that, because "[p]ractically every vessel, including the legendary
Flying Dutchman, has links with some country[,] . . . the
stateless vessel concept in the MDLEA and in international law is
designed prudentially."  Id.  And so, according to Matos-Luchi,
under both § 70502(c)(1)(A) and international law, "[t]he

controlling question is whether at the point at which the authorities confront the vessel, it bears the insignia or papers of a national vessel or its master is prepared to make an affirmative and sustainable claim of nationality." Id. (emphasis added); see also Miranda, 780 F.3d at 1197-98 (affirming finding that a vessel was "without nationality" when factual admissions accompanying guilty pleas included that the vessel was not registered with a foreign nation, did not fly the flag of any nation, and carried no registration paperwork).

The defendants do contend that these statements from Matos-Luchi regarding the "controlling question" in determining whether a vessel is "without nationality" under the MDLEA are nonbinding dicta. But we do not see why that matters on plain error review, at least given the well-considered nature of the dicta. See United States v. Cortés-Medina, 819 F.3d 566, 570 (1st Cir. 2016) (holding that a decision was not plainly erroneous when it was supported by dicta in our circuit precedent).

The defendants separately contend that, in any event, two precedents demonstrate that an oral claim of nationality is, even when wholly uncorroborated, enough to ensure that a vessel has a nationality and so is not "without nationality" under

§ 70502(c)(1)(A).    But, in the face of <u>Matos-Luchi</u>, neither precedent suffices to show that is clearly or obviously so.

The first case is <u>Rosero</u>, 42 F.3d 166, which the defendants assert rejects the kind of "totality of the evidence" test that they contend would have to be endorsed to deem their vessel "without nationality" solely based on the uncorroborated nature of the vessel's master's oral claim of nationality.  But <u>Rosero</u> is an out-of-circuit ruling that also pre-dates key changes that were made to the MDLEA by the time of <u>Matos-Luchi</u>.  <u>Rosero</u> thus addressed only the validity of jury instructions[15] that permitted a finding beyond a reasonable doubt that a vessel is "without nationality" under the MDLEA.  <u>Id.</u> at 171-72.  As a result, it did not purport to address the question that we confront here: Are the facts in question sufficient to show by a preponderance of the evidence that the vessel at issue was a "vessel without nationality" under § 70502(c)(1)(A)?  <u>See</u> <u>Matos-Luchi</u>, 627 F.3d at 5.

Moreover, <u>Rosero</u> concerned a challenge to jury instructions that allowed the jury to engage in "an unstructured weighing of the totality of the evidence." 42 F.3d at 172.  <u>Rosero</u>

---

[15] The version of the MDLEA under which <u>Rosero</u> was decided made the question of whether a vessel was subject to the regulatory jurisdiction of the United States an issue for the jury.  42 F.3d at 171-72.  The current version of the MDLEA makes regulatory jurisdiction issues "preliminary questions of law to be determined solely by the trial judge."  46 U.S.C. § 70504(a).

thus addressed whether a vessel may be deemed "without nationality" under the MDLEA based on jury instructions that invited the jury to consider all the evidence without instructing the jury about what would make a vessel "without nationality."  As a result, Rosero did not address whether (as Matos-Luchi reasoned) a vessel is "without nationality" because, insofar as a sustainable claim of nationality cannot be made, the vessel is not authorized to fly the flag of the nation to which it is claimed to belong.

The other precedent that the defendants point to is one of our own: United States v. Potes, 880 F.2d 1475 (1st Cir. 1989). But we do not agree with the defendants that Potes holds that, contrary to Matos-Luchi's dicta, a bare claim of nationality in and of itself suffices to demonstrate that a vessel is not a vessel "without nationality" under § 70502(c)(1)(A), even absent the application of a provision like § 70502(d)(1)(C).  See Potes, 880 F.2d at 1478-79.

Like Rosero, Potes concerned only the earlier version of the MDLEA.  It thus addressed the standard for showing that a vessel was "without nationality" beyond a reasonable doubt rather than merely by a preponderance of the evidence.  See Matos-Luchi, 627 F.3d at 5.  Moreover, while Potes held that the record there did not suffice to support a determination that sufficient proof of the "vessel without nationality" requirement had been provided, the vessel at issue in that case was flying a foreign flag.  880

F.2d at 1478.  Potes thus does not address whether, per the
reasoning in Matos-Luchi, a vessel in circumstances like those
presented here may be deemed by a preponderance of the evidence to
be "without nationality" under § 70502(c)(1)(A) for reasons
independent of the application of § 70502(d)(1)(C).

### c.

Of course, if it were clear or obvious that the Matos-
Luchi-based ground for deeming the defendants' vessel to be
"without nationality" under § 70502(c)(1)(A) of the MDLEA could
not suffice to show that the vessel was also stateless under
international law, then the defendants might still prevail in
challenging the constitutionality of their convictions under the
Felonies Clause.  In that event, we would have to address how
§ 70502(d)(1)(C) fares under the Felonies Clause to determine
whether the challenge could succeed.

But our review of whether the defendants' vessel is not
only "without nationality" for purposes of § 70502(c)(1)(A) under
Matos-Luchi but also stateless for purposes of international law
under that same precedent is itself only for plain error.  After
all, in purporting to counter the government's reliance on Matos-
Luchi, the defendants are again necessarily challenging the legal
import of the factual admissions that they made in their guilty
pleas.  Yet, the defendants made no argument below that the facts
that they admitted to in pleading guilty could not suffice under

Matos-Luchi to render their vessel stateless under international
law.

Moreover, Matos-Luchi is clear that its analysis is not
limited to the statutory question addressed above about when a
vessel is "without nationality" under § 70502(c)(1)(A) of the
MDLEA. That analysis also applies to the international law
question of when a vessel is stateless. Matos-Luchi, 627 F.3d at
6; see also Rosero, 42 F.3d at 171 (interpreting the predecessor
of § 70502(c)(1)(A) to describe vessels that are both "without
nationality" as a statutory matter and "stateless under
international law"). Thus, here, too, the defendants cannot show
that it is clear or obvious that the government's Matos-Luchi-
based defense of the convictions -- and thus the government's
defense of the convictions on a ground independent of
§ 70502(d)(1)(C) -- is mistaken. As a result, the Felonies Clause-
based challenge fails for that reason alone.

                              **d.**

As a fallback, the defendants contend that they need not
show that the government's Matos-Luchi-based theory is clearly or
obviously wrong to succeed on the Felonies Clause-based challenge
to their convictions, even assuming that the indictment itself is
sound. They contend that is so because the government is engaged
in impermissible "jurisdiction switching" in relying on the Matos-
Luchi theory to defend the convictions on appeal. The defendants

argue in that contention that § 70502(d)(1)(C) is the only jurisdictional provision on which the government relied below. For that reason, they contend, it is also the only jurisdictional provision that the government may put in play on appeal.

The dissent then goes on to contend not only that the defendants are right on this score but also that it follows that the only Felonies Clause-based challenge before us is the defendants' challenge to § 70502(d)(1)(C). And, the dissent proceeds to argue, because the defendants also challenged that provision below under the Felonies Clause in moving to dismiss the indictment, the challenge is preserved, thereby making our review of that challenge on appeal de novo rather than for plain error.[16]

---

[16] In making the claim of "jurisdiction switching," neither the defendants nor the dissent contends that the defendants reasonably but mistakenly thought in pleading guilty that their vessel was being deemed stateless only based on § 70502(d)(1)(C). The defendants and the dissent contend instead only that the plea agreements must be construed to bar the government from arguing that the defendants' vessel is "without nationality" under the MDLEA and stateless under international law on any basis other than § 70502(d)(1)(C). Thus, the aim of the contention is not to explain why the pleas must be vacated for not having been knowingly and voluntarily made, such that we need not resolve whether § 70502(d)(1)(C) comports with the Felonies Clause to overturn the convictions. The aim instead is to show that we must decide whether § 70502(d)(1)(C) comports with that Clause to resolve the defendants' Felonies Clause-based challenge because the government gave up reliance on any other jurisdictional theory.

For reasons that we will next explain, we do not find this line of argument to be persuasive. And that is so even if we were to excuse its late-breaking nature.[17]

To start, the only jurisdictional provision of the MDLEA to which the plea agreements refer is § 70502(c)(1)(A), not § 70502(d)(1)(C). Yet that provision "includes" as a ground for a vessel to be "without nationality" the one that is laid out in Matos-Luchi: The person making the oral claim of nationality for the vessel on which the vessel's claim to being foreign depends is not "in a position to provide evidence" of its claimed nationality. 627 F.3d at 6 (quoting Andrew W. Anderson, Jurisdiction over Stateless Vessels on the High Seas: An Appraisal Under Domestic and International Law, 13 J. Mar. L. & Com. 323, 341 (1982)).

Moreover, the plea agreements incorporated the Government's Version of the Facts, which included facts concerning the lack of any indicia of nationality aboard the defendants' vessel. Yet those facts are relevant only to the Matos-Luchi-based ground that § 70502(c)(1)(A) includes and not to the

---

[17] As we will explain, the defendants raised this concern about "jurisdiction switching" only in their briefing to the en banc court, which they submitted only after the panel majority had sua sponte raised and relied on the ground that the government could not switch jurisdictional theories. See Dávila-Reyes II, 23 F.4th at 164-65.

§ 70502(d)(1)(C)-based ground that the plea agreements do not mention.

These features of the plea agreements warrant attention because, although we construe ambiguities in plea agreements in favor of defendants, United States v. Newbert, 504 F.3d 180, 185 (1st Cir. 2007), we are not free to read the plea agreements "ex silentio, to include a waiver by the government," United States v. Anderson, 921 F.2d 335, 338 (1st Cir. 1990). For, "[w]hile the government must be held to the promises it made in a plea agreement, it will not be bound to those it did not make." Id. (cleaned up) (quoting United States v. Fentress, 792 F.2d 461, 464 (4th Cir. 1986)). And, here, the nature of the plea agreements is such that we could find the claimed waiver only by reading them silently to include it.

Indeed, with respect to the MDLEA's jurisdictional requirement, the plea agreements mirrored the indictment, which itself referred only to § 70502(c)(1)(A) and alleged no facts that impliedly made it dependent on § 70502(d)(1)(C) alone. Given that even the dissent acknowledges that the indictment cannot be construed to be predicated solely on § 70502(d)(1)(C), we find it hard to see how the government may be understood to have "intentional[ly] relinquished" or "affirmatively disclaimed" reliance on any "jurisdictional" provision other than § 70502(d)(1)(C) merely by having entered into plea agreements

that reference only the same more encompassing "jurisdictional" provision that the indictment itself did.  United States v. Carrasco-De-Jesús, 589 F.3d 22, 26 (1st Cir. 2009).

The dissent does make much of the criminal complaint that preceded the indictment.  But, like the indictment, the complaint also does not refer to § 70502(d)(1)(C) or to facts that bear only on its applicability.  And, ultimately, the dissent itself does not contend that the criminal complaint locked the government into relying on that theory alone.

The dissent is right that the defendants chose to "focus[]" on § 70502(d)(1)(C) in their motion to dismiss the indictment.  See dissent, infra, at 7.  But the defendants obviously cannot narrow the indictment -- and thereby preclude the government from asserting a ground for determining the vessel's nationality that the indictment on its face does not exclude -- merely by choosing to challenge the indictment on a limited ground.

So, in the end, the asserted waiver must be found in the government's post-indictment filings.  But we cannot agree that in them the government waived any or all grounds for deeming the vessel to be "without nationality" other than the one that § 70502(d)(1)(C) recognizes.

The government's brief in opposition to the defendants' motion to dismiss the indictment did cite to § 70502(d)(1)(C).

But it did so only twice -- and then without at either point identifying that provision as supplying the sole basis for deeming the defendants' vessel stateless. The brief instead referred to that provision in explaining Matos-Luchi's holding that "the MDLEA's definition of a 'vessel without nationality' provided a non-exhaustive list of possible circumstances that would qualify a particular vessel, while acknowledging that customary international law may encompass additional types of vessels" (citing 627 F.3d at 7).[18]

The paragraph of the government's response to the motion that directly followed that discussion, moreover, set out the same facts that the defendants' plea agreements later included -- that the vessel's master claimed their vessel had Costa Rican nationality, that Costa Rica could not confirm that claim, that the defendants did not present registration paperwork, and that the vessel was devoid of indicia of nationality. And it was only after having recounted all those facts -- the last two of which concern the Matos-Luchi-based predicate rather than the § 70502(d)(1)(C)-based one -- that the government asserted without

---

[18] The brief's other reference to § 70502(d)(1)(C) was made in restating the defendant's contention that that provision was unconstitutionally vague.

reference to any one jurisdictional theory that "[t]herefore, the vessel was without nationality" (emphasis added).

The government thereafter filed a motion of its own in which it requested that the District Court find that the defendants' vessel was "subject to the jurisdiction of the United States." But that filing, too, did not purport at any point to commit the government to relying only on the § 70502(d)(1)(C)-based theory for deeming the defendants' vessel "without nationality" under the MDLEA, regardless of what the indictment charged or the record showed in that regard.

True, the motion pointed to facts that would satisfy § 70502(d)(1)(C). But, in support of the conclusion that there was "ample evidence" that the vessel was subject to the jurisdiction of the United States "as defined in Title 46, United States Code, Sections 70502(c)(1)(A) and (d)(1)(C)" (emphasis added), the motion listed facts that bear on the Matos-Luchi-based theory (which itself falls under § 70502(c)(1)(A)) no less than on the § 70502(d)(1)(C)-based one. We therefore do not understand the motion, in requesting that the District Court "find as a matter of law that the vessel in question was subject to the jurisdiction of the United States" on the statutory grounds, to have amounted to a waiver by the government of its right to rely on a Matos-

Luchi-based ground for so finding insofar as § 70502(c)(1)(A) encompasses that ground.

The dissent does contend that the State Department Certification attached to the government's motion to establish jurisdiction locked the government into proceeding on a § 70502(d)(1)(C)-based theory alone. The dissent emphasizes that the certification states that "the Government of the United States determined the vessel was without nationality in accordance with 46 U.S.C. § 70502(d)(1)(C), rendering the vessel subject to the jurisdiction of the United States, pursuant to 46 U.S.C. § 70502(c)(1)(A)."

But the certification was only one of the evidentiary attachments to the motion, and in purporting to support the jurisdictional basis provided for in § 70502(d)(1)(C), the certification does not purport to disclaim all others. Indeed, as we have explained, the certification was attached to a motion that itself recited facts elsewhere supported in the record that were relevant not only to the § 70502(d)(1)(C)-based theory but also to the Matos-Luchi-based one.

Nor is this a case in which a district court ruling established that the only jurisdictional ground in play was narrower than the grounds encompassed by the indictment and supported by the admitted facts. The defendants pleaded guilty to the charges set forth in the indictment before the District Court

had passed on the government's jurisdictional motion.  And, in doing so, they entered into plea agreements that, like the indictment, conspicuously did not mention -- with respect to whether the vessel was "subject to the jurisdiction of the United States" -- § 70502(d)(1)(C).  Instead, the plea agreements mentioned only the facially more encompassing § 70502(c)(1)(A).

Finally, it is worth noting that, while the defendants now press the "jurisdiction switching" point to fend off the government's Matos-Luchi-based defense of the convictions, the defendants did not make this point in their oral argument to the panel, where the Matos-Luchi theory was raised, nor did they raise it in their supplemental briefing to the panel.  And that is so even though the defendants submitted their supplemental brief after the government had advanced the Matos-Luchi-based theory for deeming their vessel "without nationality" in its own supplemental brief.  If indeed the parties to the plea agreements had agreed that the government precluded itself from relying on a theory of jurisdiction supported by the admitted facts, one would have expected the defendants themselves -- rather than judges who were not party to the agreement -- to have been the ones to raise that interpretation of the agreements.

In fact, the defendants chose at that time to take on the merits of the theory without asserting any waiver.  And, they argued, too, that in pleading guilty they were not making any

admissions at all regarding the legal basis for deeming their vessel "without nationality" under the MDLEA precisely because that question was reserved to the District Court by § 70504(a) of the MDLEA. As the defendants put it, "the guilty plea conceding factual guilt does not resolve the antecedent question of the [United States'] ability to assert jurisdiction over appellants' vessel."

Thus, it was only in the panel opinion -- and not in any filing that the defendants themselves had made up to that point -- that the notion first appeared of the government having agreed in the plea agreements to be barred from relying on a Matos-Luchi-based theory to defend the convictions even if the indictment encompassed it and the record supported it. See Dávila-Reyes II, 23 F.4th at 164-65. So, while the dissent contends that our conclusion that the Matos-Luchi theory of jurisdiction remained available to the government after the plea agreements were struck is "patently absurd," the dissent does not dispute that the contention originated with the panel rather than the defendants themselves. It would thus appear that what the dissent contends is self-evident about the plea agreements was not self-evident to the actual parties to those plea agreements. In our view, then, if a gloss is being retroactively imposed on the record, it is the gloss that would attribute to the government an intentional waiver of the Matos-Luchi-based theory. But, as no authority establishes

that the government must be understood in these circumstances to have intentionally (though silently) made such a waiver, <u>cf. Caraballo-Rodriguez</u>, 480 F.3d at 75 (explaining that "a novel interpretation of the [relevant] statute" advanced by the government in response to a challenge to the factual basis of a plea "cannot be said to be plainly erroneous" even when the court had "found no . . . cases discussing the theory"), we cannot accept the contention that one was made.

## B.

Having explained that the defendants' Felonies Clause-based claim fails in all its variants, we move on to the defendants' remaining claims. The first of those claims is that the indictment does not charge a crime that comports with the Due Process Clause because a key aspect of § 70502(d)(1)(A) and § 70502(d)(1)(C) is void for vagueness.

But here, again, we are not persuaded that there is any basis for concluding, even on de novo review, that the indictment is dependent on the application of § 70502(d)(1)(C) in alleging that the defendants violated the MDLEA while aboard a vessel "without nationality" under § 70502(c)(1)(A). And, as we have explained, there is no basis on plain error review for concluding that the record at the time of the judgments of conviction was such that § 70502(d)(1)(C) provided the sole means of determining the defendants' vessel to have been "without nationality." Nor,

as we also have explained, can we conclude that the government
waived the <u>Matos-Luchi</u>-based theory that it advances in defending
the convictions.  Thus, we must reject this constitutional claim
because it rests on the unfounded premise that § 70502(d)(1)(C)
supplies the sole basis for deeming the defendants' vessel to be
"without nationality" under § 70502(c)(1)(A).  We add only that,
because the defendants at no point developed an argument below or
to us as to how § 70502(d)(1)(A) might apply to their case, we
must reject this challenge as it relates to that provision as well.

### c.

We next must address the defendants' claim under the Due
Process Clause in which they target a supposed failure by the
government to establish any nexus between the defendants'
allegedly unlawful conduct and the United States.  The defendants
have developed this challenge only insofar as they contend that
they were aboard a vessel with foreign nationality.  They have not
developed any argument as to why there must be such a nexus even
if the vessel was stateless under international law.

As we have explained, however, we cannot conclude, even
on de novo review, that the indictment charged the defendants with
being on a vessel that could be deemed "subject to the jurisdiction
of the United States" only on grounds that would fail to show that
the vessel was stateless under international law.  And, as we have
also explained, there is no basis, on plain error review, for

concluding that the record as it stood at the time of the defendants' convictions only supports a ground for deeming their vessel to have been "subject to the jurisdiction of the United States" that clearly or obviously would not suffice to permit the vessel to be deemed stateless under international law. Finally, for the reasons given above, the government may not be understood to have waived all jurisdictional theories save for the one based on § 70502(d)(1)(C). Thus, this constitutional claim fails, too.

### D.

There remains only to address the defendants' claim that the government violated the Due Process Clause by failing to bear the burden of showing that the defendants' vessel was stateless under international law. But, as best we can tell, the premise for this claim is that the sole basis for deeming the vessel to be "without nationality" under § 70502(c)(1)(A) is by operation of § 70502(d)(1). Thus, this constitutional claim fails for the same reasons that the other claims we have addressed fail -- it rests on a premise that cannot be sustained as to the indictment, even on de novo review, or as to the record at the time of the judgments of conviction, under plain error review, and the government did

not intentionally relinquish reliance on all jurisdictional theories save for the one based on § 70502(d)(1)(C).[19]

### V.

For the reasons given above, the judgments of the District Court are **affirmed**.

### -Dissenting Opinion Follows-

---

[19] We note that we must also reject the defendants' sole, purely statutory challenge -- that the government improperly relied on § 70502(d)(1)(C) to establish that their vessel was "without nationality" because § 70502(d)(1)(C) references only a claim of "registry" and defendants made a claim of nationality. The reason is by now familiar. The defendants cannot show, even on de novo review, that the indictment is premised solely on § 70502(d)(1)(C), and they cannot show, on plain error review, that it is clear or obvious from the state of the record at the time that the defendants entered their guilty pleas that § 70502(d)(1)(C) provided the sole basis for deeming the vessel "without nationality." Nor can the defendants show that the government waived all "jurisdictional" theories other than the § 70502(d)(1)(C)-based one.

**LIPEZ, THOMPSON, and MONTECALVO, Circuit Judges,
dissenting.** It is a basic principle of plea agreements, derived
from contract law, that the parties' written agreement embodies
their commitments to each other and governs their expectations.
Today, in their effort to avoid important and complex issues
concerning the United States' authority to prosecute foreign
nationals encountered on vessels in international waters, our
colleagues in the majority have done serious damage to the
reliability of plea agreements. Stymied by the content of
appellants' agreements and the proceedings leading to their pleas,
the majority adopts a view of the record inappropriately favorable
to the government and justifies the analysis with an indefensible
application of the plain-error doctrine. We cannot accept the
resulting perversion of the plea process and, for that reason among
others, dissent from the majority's decision.

## I.

Using the majority's terminology, we wish to make clear
that our disagreement with our colleagues' analysis does not arise
from their treatment of the so-called "first variant" of
appellants' constitutional claim, a dichotomy imposed by the
majority. We recognize that the indictment itself does not specify
the basis on which the government was alleging that the defendants
were on board a vessel without nationality. Nor are we saying
that the criminal complaint that initiated appellants' prosecution

necessarily fixed the boundaries for the indictment and confined the government to showing that appellants' vessel was stateless pursuant to 46 U.S.C. § 70502(d)(1)(C). However, we are saying that when the government reduces the broad terms of an indictment to a specific theory of prosecution and relies on that theory to obtain guilty pleas, the government cannot later justify those convictions with a different rationale when it discovers that its chosen theory is flawed.

The majority's "second variant" analysis, however, endorses just such an unfair substitution. As we shall describe, appellants had no reason in the district court proceedings to challenge any basis for deeming their vessel "without nationality" other than by operation of § 70502(d)(1)(C). The majority nonetheless latches onto the omission of any such challenge to avoid appellants' claim that their convictions violate the Felonies Clause because Congress lacked authority to deem their vessel without nationality based on that provision. In other words, the majority addresses appellants' challenge to their convictions under the false pretense that, at the time appellants signed plea agreements, the government was relying on alternative theories for deeming their vessel stateless.

Put even more bluntly, the majority performs a sleight-of-hand to allow the government to ambush appellants with a theory of jurisdiction under the Maritime Drug Law Enforcement Act

("MDLEA") that was not the one used to secure their guilty pleas. As set forth in detail in Section II below, the government consistently premised its assertion that appellants' vessel was stateless solely on the failure of Costa Rica to "affirmatively and unequivocally" confirm nationality pursuant to 46 U.S.C. § 70502(d)(1)(C). Appellants, in turn, consistently argued that § 70502(d)(1)(C) is unconstitutional and in conflict with international law. That same claim of constitutional invalidity is at the forefront of this appeal from appellants' convictions.

Now, the government insists that we should uphold the prosecution, regardless of the validity of § 70502(d)(1)(C), because the facts included in appellants' plea agreements establish that their vessel was "without nationality" <u>apart from</u> § 70502(d)(1)(C). The government thus asks us to treat the litigation history and appellants' reasonable understanding of their plea agreements as irrelevant. The majority condones that strategy and dwells on one alternative theory in particular: that Reyes-Valdivia's oral claim of Costa Rican nationality when confronted on his vessel was ineffective because it was not substantiated by other indicia of nationality.

Indefensibly, however, the majority contrives a procedural default that does not exist. The government never changed course in its theory of the prosecution from the time of the criminal complaint through the entry of appellants' guilty

pleas; it invoked § 70502(d)(1)(C), implicitly or explicitly, at
every stage.  Nor did any facts change during the course of the
proceedings.  The affidavit attached to the Criminal Complaint
that <u>preceded</u> the indictment contained a "Summary of the
Investigation" that included the following information:

> The master claimed Costa Rican nationality for
> the vessel but provided no registration
> paperwork.  The Boarding Team reported no
> further indicia of nationality.  The
> government of Costa Rica was approached to
> either confirm or deny vessel registry.  Costa
> Rica responded that it could not confirm nor
> refute the registry of the suspect vessel.
> The vessel was determined to be one without
> nationality.

Affidavit in Support of Criminal Complaint, United States v. Reyes-
Valdivia, No. 3:15-cr-00721-FAB (D.P.R. Nov. 9, 2015), ECF No. 1-
1, at 3-4.[20]  These facts, which also appear in the plea agreements,
give rise to jurisdiction under § 70502(d)(1)(C).[21]  The government
recited these same facts repeatedly throughout the subsequent
proceedings to support jurisdiction under § 70502(d)(1)(C).  See
infra Section II.  There was simply no new argument that appellants

---

[20] All subsequent citations in this opinion to the district
court's docket will use the short-form "Reyes-Valdivia, ECF No. __
(filing date)."

[21] Section 70502(d)(1)(C) defines a "vessel without
nationality" to include any vessel "aboard which the master or
individual in charge makes a claim of registry and for which the
claimed nation of registry does not affirmatively and
unequivocally assert that the vessel is of its nationality."  46
U.S.C. § 70502(d)(1)(C).

failed to make, and the majority's plain-error analysis thus depends on altering the assumptions underlying the plea agreements, contrary to basic principles of plea bargaining and contract law.

Of course, the majority's ability to rely on plain error is essential to the decision to affirm appellants' convictions without addressing their constitutional challenge to § 70502(d)(1)(C).  That is so because the majority relies primarily on dicta contained in a single decision of a divided panel of our court -- which in turn cited only a single authority -- for the proposition that Reyes-Valdivia's oral claim of nationality was inadequate on its own to establish that appellants' vessel was not stateless.  See United States v. Matos-Luchi, 627 F.3d 1, 5 (1st Cir. 2010).  The adequacy of an oral claim of nationality under international law is one of the issues at the heart of the merits of this case -- relevant to the constitutionality of § 70502(d)(1)(C) -- and a subject the majority desperately wants to avoid.  See United States v. Dávila-Reyes (Dávila-Reyes II), 23 F.4th 153, 187-93 (1st Cir. 2022).  Only plain-error review allows the majority to give Matos-Luchi's dicta dispositive effect without considering its correctness and, hence, to avoid dealing with the difficult constitutional questions posed by this appeal.

It is no surprise that, to establish MDLEA jurisdiction, the government chose to rely on the government of Costa Rica's

statement that it could neither confirm nor refute Reyes-Valdivia's claim of nationality -- a straightforward method under the MDLEA for deeming a vessel stateless. Now what the government wants us to do, and what the majority has agreed to do, is to uphold the convictions based on a different rationale anchored only in the dicta from Matos-Luchi. That retroactive change-of-course is unfair to appellants and harmful to the plea-bargaining process.

## II.

The en banc majority's analysis rests on the view that the government never relinquished any theory for deeming appellants' vessel "without nationality" that could be supported by the facts incorporated into appellants' plea agreements. Brushing aside the well-established law that ambiguities in plea agreements must be construed in favor of defendants, see infra, the majority instead credits the government with silently preserving a theory of jurisdiction appellants had no reason to contemplate during the plea-bargaining process -- thereby condoning the government's introduction of a new construction of the plea agreements.

In fact, a fair reading of the record shows that, from the outset of appellants' prosecutions, and consistently throughout, the government relied exclusively on 46 U.S.C. § 70502(d)(1)(C) to support jurisdiction over appellants and their

vessel.  As recounted above, that approach was previewed in the affidavit attached to the Criminal Complaint, which stated that the "vessel was determined to be one without nationality" after the master claimed Costa Rican nationality and that "Costa Rica responded that it could not confirm nor refute the registry of the suspect vessel."  Reyes-Valdivia, ECF No. 1-1, at 3-4.  Although -- as we have acknowledged -- the theory of statelessness reflected in the pre-indictment affidavit did not prevent the government from developing other jurisdictional rationales post-indictment, the government's version of the facts and theory of jurisdiction did not change.

Each time the government defended the jurisdictional foundation for the prosecution -- in its response to appellants' motion to dismiss the indictment (dated Feb. 16, 2016), in its own motion in support of jurisdiction (dated Mar. 25, 2016), at the change-of-plea hearing (held on Apr. 4, 2016), and in the plea agreements themselves (filed on Apr. 4, 2016) -- the government presented the same facts originally set forth in the Criminal Complaint (filed in Nov. 2015) and never stated that it was proceeding on alternative theories of jurisdiction, one statutory and one non-statutory.  Appellants focused on § 70502(d)(1)(C) in their motion to dismiss the indictment.  In that motion, after noting that the MDLEA prohibits drug activity by individuals on a vessel subject to U.S. jurisdiction, appellants stated: "As

relevant here, a 'vessel subject to the jurisdiction of the United States' includes . . . 'a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.' [46 U.S.C.] § 70502(c)(1)(A), (d)(1)(C)." Reyes-Valdivia, ECF No. 29, at 3 (Feb. 1, 2016) (emphasis added).

In its response, the government did not contest appellants' assumption that the "relevant" provision was § 70502(d)(1)(C). The response addressed appellants' multiple statutory-based arguments by asserting, inter alia, that the MDLEA is within Congress's authority under the Constitution; that "drug trafficking, as criminalized by the MDLEA, is properly within the scope of the Felonies Clause"; that the MDLEA does not require a nexus between the drug activity and the United States; that the MDLEA is consistent with international law; and that § 70502(d)(1) is not unconstitutionally vague. See Reyes-Valdivia, ECF No. 38, at 3-8, 11-13 (Feb. 16, 2016). The government also noted the applicability of the protective principle of international law. See id. at 17. The government repeated, nearly verbatim, the facts that had appeared in the Criminal Complaint:

> In this case, the Defendants made a claim of Costa Rican nationality over the vessel. The United States approached the government of Costa Rica and they responded that they could not confirm or deny the nationality of the

> vessel. Furthermore, the Defendants failed to
> present any registration paperwork supporting
> their claim and there were no other indicators
> of nationality, such as a flag, on the vessel.
> Therefore, the vessel was without nationality.

Id. at 11.

Although the response cited Matos-Luchi seven times,
none of those references invoked the dicta on the need to
substantiate an oral claim of nationality. See id. at 8, 11, 12,
15, 16. Indeed, the government distinguished appellants' case
from one cited by appellants in which "the [g]overnment [had]
attempted to proceed on two theories of jurisdiction" and had
"failed to provide any evidence that . . . the alleged flagging
nation" had denied the claim of registry. Id. at 16 (discussing
United States v. Potes, 880 F.2d 1475 (1st Cir. 1989)). The
government asserted that, by contrast, in this case it "ha[d] been
consistent in its theory of jurisdiction and provided all
[d]efendants in discovery statements by the boarding team and
pilots that prove the master's claim of Costa Rican nationality,
the lack of other indicia of nationality, and the fact that the
U.S. Coast Guard Seventh District Commander permitted the vessel
to be treated as one without nationality." Id. The government,
in other words, emphasized that it had provided appellants with
the facts, first reported in the Criminal Complaint and now
reproduced in their response to the motion to dismiss, that
appellants understood as premising jurisdiction solely on

§ 70502(d)(1)(C) -- an understanding the government did not dispute in its response to the motion to dismiss.

But even if the government's response left ambiguity in its theory of jurisdiction, any lack of clarity was dispelled when the government later filed its motion in support of jurisdiction. The connection between the government's consistently reported facts and § 70502(d)(1)(C) was drawn explicitly in the Department of State Certification that was submitted as an attachment to the government's motion. The Certification, signed by a U.S. Coast Guard Commander, reported that the master of the vessel "made a claim of Costa Rican nationality," that the United States government "requested that the [g]overnment of the Republic of Costa Rica confirm the registry or nationality of the suspect vessel," and that "the [g]overnment of the Republic of Costa Rica replied that it could not confirm [the] vessel's registry." Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016). The Certification then expressly linked those facts to the assertion of jurisdiction: "Accordingly, the [g]overnment of the United States determined the vessel was without nationality in accordance with 46 U.S.C. § 70502(d)(1)(C), rendering the vessel subject to the jurisdiction of the United States, pursuant to 46 U.S.C. § 70502(c)(1)(A)." Id. (emphases added). Significantly, this motion, with its attached Certification, also gives important context for the government's earlier reference, in its response to appellants'

motion to dismiss, to "the fact that the U.S. Coast Guard Seventh District Commander permitted the vessel to be treated as one without nationality." Reyes-Valdivia, ECF No. 38, at 16.  The Certification specifies that the U.S. Coast Guard Commander gave that permission "in accordance with 46 U.S.C. § 70502(d)(1)(C)."

The Certification language also reveals a significant flaw in the government's attempt to obscure its chosen theory of jurisdiction by insisting that it always relied on § 70502(c)(1)(A) separately from § 70502(d)(1)(C), thereby giving notice that it was contemplating other rationales for deeming the vessel "without nationality." Section 70502(c)(1)(A) of the MDLEA states generally that "a vessel without nationality" is "subject to the jurisdiction of the United States." 46 U.S.C. § 70502(c)(1)(A).  Section 70502(d)(1)(C) specifies one way in which the United States may deem a "vessel without nationality" -- namely, if the master "makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." 46 U.S.C. § 70502(d)(1)(C).  These two provisions plainly operate in tandem when cited together, as the government consistently did in this case.  And, when those provisions were combined with the facts offered by the government, the general allegations of the indictment concerning jurisdiction -- that appellants' vessel was "subject to the jurisdiction of the United States" because it was

"without nationality" -- were reduced to the specific version of the crime the government was charging.

The Certification sets forth that specific theory in unambiguous terms: appellants' boat was subject to United States jurisdiction as a "vessel without nationality" under § 70502(c)(1)(A) because the circumstances satisfied the requirements of § 70502(d)(1)(C).[22] As noted above, the government had emphasized in its response to appellants' motion to dismiss that it "ha[d] been consistent in its theory of jurisdiction," thus giving appellants no reason to believe that it was invoking any theory of statelessness other than § 70502(d)(1)(C). Put simply, the unmistakable import of the government's representations in the district court is that the government relied consistently -- and exclusively -- on the theory of statelessness that appellants have consistently challenged.

The government attempts to step away from that acknowledgment by pointing out that it had no opportunity to press

---

[22] As the panel majority opinion explained, it does not matter that § 70502(d)(1)(C) by its terms applies when there has been a "claim of registry" but, in this case, Reyes-Valdivia made a claim of Costa Rican nationality. See Dávila-Reyes II, 23 F.4th at 165-69. Both the government and appellants assumed that § 70502(d)(1)(C) applied to Reyes-Valdivia's claim of nationality until the panel suggested otherwise in a request for supplemental briefing. Whether § 70502(d)(1)(C) covers claims of nationality is a distinct question from whether, in the particular circumstances of this case, that provision was the basis on which the government asserted MDLEA jurisdiction.

other theories of statelessness because appellants pleaded guilty before the district court ruled on its motion in support of jurisdiction. Nowhere in that motion, however, does the government indicate that it was planning to argue that the vessel could be deemed "without nationality" on the ground that appellants did not substantiate Reyes-Valdivia's oral assertion of Costa Rican nationality with documentary or visual indicia of nationality. There is no reference in the motion to the Matos-Luchi dicta on which the majority relies. Indeed, as described above, the motion included the Certification as an attachment and, referring to the Certification's contents, the government asserted that the Coast Guard Commander "certified that the Government of Costa Rica was approached and could neither confirm nor deny registry of the go-fast vessel, thereby enabling the United States to treat the vessel as one without nationality pursuant to Section 70502(d)[(1)](C)." Reyes-Valdivia, ECF No. 46, at 4 (emphasis added). It is clear from this motion -- filed a week before appellants moved to change their pleas -- that the government was adhering to its "consistent" reliance on § 70502(d)(1)(C).

Critical, of course, is what admissions appellants understood they were making at the time they signed their plea agreements. We have recognized that, in construing plea agreements, "[t]he touchstone is the 'defendant's reasonable understanding.'" United States v. Gardner, 5 F.4th 110, 114 (1st

Cir. 2021) (quoting United States v. Conway, 81 F.3d 15, 17 (1st Cir. 1996)); see generally United States v. Gall, 829 F.3d 64, 72 n.6 (1st Cir. 2016) (citing cases for the general proposition that a court's construction of a plea agreement should align with the reasonable expectations of the parties).  If there is any uncertainty about the scope of defendants' pleas, the consequence of the imprecision "must fall upon the government," United States v. Newbert, 504 F.3d 180, 185 (1st Cir. 2007), "not only because ambiguities in contracts are traditionally interpreted against the drafter, but also because plea agreements implicate broader societal interests, some of constitutional magnitude," id. at 185 n.3 (citation omitted).

At the change-of-plea hearing, when asked to "give a brief explanation of the theory to be presented to prove each Defendant guilty if a trial were to be held," the prosecutor stated, in relevant part:

> The vessel was tracked by aircraft and eventually came to a stop.  The U.S. Coast Guard boarding team approached the vessel and commenced right of approach questioning.
> The master claimed Costa Rican nationality for the vessel but provided no registration[] paperwork, and there was no indicia of nationality on the vessel.
> The Government of Costa Rica was approached.  They responded they could neither confirm nor refute the registry of [the] suspect vessel.
> The vessel was determined to be one without nationality.

Reyes-Valdivia, ECF No. 117, at 25-26 (Oct. 3, 2016). These same facts -- reiterating Reyes-Valdivia's claim of nationality and Costa Rica's failure to confirm or deny his claim -- were incorporated into the plea agreements themselves. Hence, a reasonable defendant would conclude that the plea agreements' inclusion of the same facts used consistently by the government to support jurisdiction based solely on § 70502(d)(1)(C) meant that the government was relying solely on that provision as the jurisdictional foundation for their guilty pleas. It is not reasonable to attribute to appellants an awareness of a different theory of statelessness that they also needed to challenge. Given the government's handling of the case from inception to pleas, the majority's resort to plain-error review of a different jurisdictional rationale is unfathomable.[23]

The majority makes much of the fact that the government's version of the relevant events includes information that is not part of the § 70502(d)(1)(C) requirements, specifically that the vessel had no registration paperwork or other indicia of Costa

---

[23] The government also makes a somewhat different plain-error argument in its en banc briefing, asserting that appellants failed to argue that their guilty pleas lacked a factual foundation. However, putting aside the statutory-language problem first noted by the panel, see supra, Reyes-Valdivia and Dávila-Reyes have not contested that the facts stated by the government satisfy the requirements of § 70502(d)(1)(C) and thus provide a statutory foundation for their guilty pleas. Their claim challenges the authority of the government to rely on § 70502(d)(1)(C).

Rican nationality on board.  However, the government's report that
no evidence of nationality was found on the vessel -- in the same
sentence reporting the master's oral claim of nationality -- does
not indicate, or even suggest, that the government was setting
forth a theory of jurisdiction independent of § 70502(d)(1)(C).
The factual statement does not declare that the vessel was
determined to be without nationality because no corroborating
evidence was found.  Nor does the government preface the report of
its inquiry to Costa Rica with language -- such as "In addition"
-- to indicate that § 70502(d)(1)(C) was a second, independent
basis for deeming the vessel "without nationality."  Rather, the
sequence of facts in the statement confirms that the vessel was
determined to be without nationality, per the Certification, "in
accordance with 46 U.S.C. § 70502(d)(1)(C)."

       The majority's use of the government's reference to the
lack of corroboration to infer an unarticulated alternative theory
of statelessness is thus unjustified from a commonsense reading of
the factual statement.  That approach is especially unacceptable
given our obligation to impose the burden of any ambiguity in plea
agreements on the government.  Absent some explicitly stated
connection between those non-essential facts and a non-statutory
theory of jurisdiction, the inclusion in the plea agreements of
the same facts that had informed every phase of the prosecution
simply does not show -- or even suggest -- that the government is

relying on any basis other than § 70502(d)(1)(C) to deem appellants' vessel without nationality.  We do not know why the government placed those facts in the plea agreements.  Perhaps the government wanted to eliminate any possibility that appellants could reassert their earlier claim that the vessel bore indicia of nationality.[24]  What we _do_ know, however, is that the government did not communicate a connection between those facts and the non-statutory theory of statelessness attributable to the dicta in Matos-Luchi.

There is not even a hint in the provisions of the plea agreements that the government was relying on multiple theories of jurisdiction.  It is irrelevant that the agreements do not expressly cite to § 70502(d)(1)(C).  As explained above, the unelaborated reference in the agreements to § 70502(c)(1)(A) serves to identify the pertinent category of vessels "subject to United States jurisdiction" -- i.e., vessels "without nationality"

_____

[24] Appellants argued to us that "[p]hotos of the vessel clearly show the civil ensign of Costa Rica painted, albeit vertically, on the port and starboard sides of the ship's bow."  See Dávila-Reyes II, 23 F.4th at 164 n.20 (quoting Appellants' Supp. Br. at 18 n.4).  That assertion is supported by a statement attached as an exhibit to the government's motion in support of jurisdiction, in which a U.S. Customs Boarding Officer reported that a marine patrol had spotted a vessel "with a Costa Rican flag painted on the bow."  Id.  As the panel majority observed, however, appellants necessarily gave up the claim that their vessel bore indicia of Costa Rican nationality when they pled guilty based on the "Government's Version of the Facts" incorporated into their plea agreements.  Id.

-- but it does not identify the specific basis on which appellants' vessel fit within that category.  Id.  It is the factual statement incorporated into the plea agreements, detailing the government's compliance with § 70502(d)(1)(C) in the same way the government had been doing throughout the proceedings, that provides the necessary, specific basis for that finding.  There is simply no room for debate about the theory of jurisdiction on which the plea agreements -- and thus the guilty pleas -- rested.

On appeal, too, the government maintained its focus on § 70502(d)(1)(C).  See Dávila-Reyes II, 23 F.4th at 163 n.18.  Its appellate brief linked § 70502(c)(1)(A) and § 70502(d)(1)(C) in the way we have emphasized -- i.e., citing them as a single invocation of jurisdiction -- when it stated: "The absence of an assertion by the Costa Rican government rendered the Appellants' boat a 'vessel without nationality,' [46 U.S.C.] § 70502(d)(1), and thus a 'vessel subject to the jurisdiction of the United States,' id. § 70502(c)(1)(A)."  Id. (alteration in original) (emphases added).  This framing again clearly reveals the government's view that appellants' vessel was subject to United States jurisdiction because the circumstances matched one of the definitions of a stateless vessel listed in § 70502(d)(1).

In its supplemental en banc brief, the government argues at length that the examples of vessels without nationality listed in § 70502(d)(1)(A)-(C) are "non-exhaustive" and that the

government can establish that a vessel is "without nationality" in various ways.[25]  The government asserts that, if appellants had not pleaded guilty, it "would have been prepared" to prove that the vessel both fell within § 70502(d)(1)(C) and "otherwise qualified as a stateless vessel under international law."  But the question here is not what theory the government could have used; the question is what rationale it did use to secure the guilty pleas.[26]

Notably, even in its motion on jurisdiction, when the government was required to make clear to the court the jurisdictional basis for the prosecution, the government

_____

[25] In December 2022, a fourth type of vessel was added to the list in § 70502(d)(1): "a vessel aboard which no individual . . . claims to be the master or is identified as the individual in charge, and that has no other claim of nationality or registry under paragraph (1) or (2) of subsection (e)."  46 U.S.C. § 70502(d)(1)(D).  The pertinent paragraphs of subsection (e) refer to documents "evidencing the vessel's nationality" and "flying [a] nation's ensign or flag."  Id. § 70502(e)(1), (2).

[26] Unsurprisingly, the government's assertion that it could have demonstrated that appellants' vessel "otherwise qualified" as "without nationality" relies, in part, on a report that Reyes-Valdivia initially told a Coast Guard Boarding Officer that appellants' vessel had no nationality.  In other words, the government highlights that Reyes-Valdivia had admitted a fact that would be decisive in establishing that the vessel was "without nationality" apart from the requirements of § 70502(d)(1)(C).  But that fact was not in the Criminal Complaint or the Department of State's official attestation of jurisdiction.  And, critically, it was not in the government's recitation of facts at appellants' change of plea hearing, in the "Government's Version of the Facts" incorporated into their plea agreements, or in appellants' Presentence Investigation Reports.  As the majority also recognizes, at least implicitly, the government cannot now retrieve a fact it plainly chose to abandon.

ultimately and only asked the district court to make a finding and instruct the jury "pursuant to Title 46, United States Code, Section 70502(c)(1)(A) <u>and (d)(1)(C)</u> that the suspect vessel carrying the Defendants was a vessel Without Nationality and therefore subject to the jurisdiction of the United States." <u>Reyes-Valdivia</u>, ECF No. 46, at 5 (emphasis added). There was no alternative request for the court to instruct the jury or make a finding of jurisdiction under general principles of international law based on the lack of corroboration of Reyes-Valdivia's oral claim. Given the definitive pronouncements by the government seeking court validation of § 70502(d)(1)(C) as the basis for its assertion of jurisdiction over the vessel, it is absurd for the majority to validate the government's contention that it was proceeding under alternative theories. And it is simply preposterous to say that appellants should have understood that their plea agreements left the door open to theories of statelessness other than § 70502(d)(1)(C).

Indeed, the majority's view of the record depends on drawing meaning from what the government did <u>not</u> say. In effect, the majority holds that, because the government did not promise to rely only on § 70502(d)(1)(C), any theory of jurisdiction that could be supported by the facts in appellants' plea agreements remained on the table -- regardless of whether the government had specifically invoked such alternatives during the proceedings that

culminated with appellants' guilty pleas.  As we have described, the government never told appellants or the district court that it was relying on the Matos-Luchi dicta as a basis for jurisdiction over appellants' vessel, while it repeatedly relied expressly on § 70502(d)(1)(C).  For the majority, the government's singular reliance on that statutory provision does not matter.  Our colleagues, for example, discount the State Department's certification that appellants' vessel was determined to be without nationality "in accordance with 46 U.S.C. § 70502(d)(1)(C)" by observing that "the certification does not purport to disclaim all other[]" theories of jurisdiction.  In other words, the government may retroactively introduce the non-statutory Matos-Luchi rationale because it never promised not to do so.

We cannot emphasize enough that the question at this juncture is not what theories the government could have offered to support jurisdiction, but what theory informed appellants' decision to plead guilty.  As should be clear by now, the plea agreements incorporated the facts consistently cited by the government to establish that appellants' vessel was "without nationality" pursuant to § 70502(d)(1)(C): the claim of nationality and the failure of Costa Rica to "affirmatively and unequivocally" confirm nationality.  That theory of jurisdiction, and that theory alone, should determine the validity of appellants' convictions.

**III.**

The majority acknowledges that appellants argued in their motion to dismiss the indictment that the government had deemed their vessel to be "without nationality" based solely, and unconstitutionally, on § 70502(d)(1)(C).[27]  Our colleagues thus realize that they cannot say that appellants failed to preserve the argument that their convictions must be vacated because § 70502(d)(1)(C) is unconstitutional.  Hence, needing to find a rationale for the application of plain error, the majority contends that appellants failed to timely argue against theories for deeming their vessel stateless that are <u>not</u> based on § 70502(d)(1)(C).  And, because the government's oft-repeated version of the facts supports a determination of statelessness pursuant to the dicta in <u>Matos-Luchi</u>, the majority concludes that there is no clear or obvious error and that appellants' convictions are properly affirmed.

This contrived use of plain error -- i.e., the disregard of the government's singular reliance on § 70502(d)(1)(C) -- is

_____

[27] The majority notes that appellants argued that "[a] vessel may not be deemed stateless under international law . . . simply because the nation to which the vessel's master has claimed that it belongs fails to 'affirmatively and unequivocally assert,' § 70502(d)(1)(C), that the vessel is registered with that nation." The majority further observes that appellants construed the indictment to "charge[] that the vessel that the defendants were aboard was 'without nationality' under § 70502(c)(1)(A) <u>solely based on the operation of § 70502(d)(1)(C)</u>."  (Emphasis added.)

contrary to our obligation to "hold prosecutors . . . to 'the most meticulous standards of both promise and performance'" in effectuating a plea agreement. United States v. Lessard, 35 F.4th 37, 42 (1st Cir. 2022) (quoting United States v. Clark, 55 F.3d 9, 12 (1st Cir. 1995)).   As we indicated above, our colleagues' reasoning permits the government to retroactively expand the jurisdictional foundation for appellants' guilty pleas.  That is not the way ordinary contracts work, and it is the principles of contract law that govern plea agreements.  See generally Garza v. Idaho, 139 S. Ct. 738, 744 (2019) ("[P]lea bargains are essentially contracts." (quoting Puckett v. United States, 556 U.S. 129, 137 (2009))); see also United States v. Brown, 31 F.4th 39, 50 (1st Cir. 2022) ("Traditional principles of contract law guide our interpretation of the terms and performance of a plea agreement."). We find especially troubling the unilateral revision of a contractual agreement when the result is to disfavor the party who gave up "a panoply of constitutional rights." United States v. Tanco-Pizarro, 873 F.3d 61, 65 (1st Cir. 2017) (quoting United States v. Almonte-Nunez, 771 F.3d 84, 89 (1st Cir. 2014)).

As we have demonstrated, at the time they negotiated and signed their plea agreements, appellants had no reason to evaluate whether to plead guilty based on theories of MDLEA jurisdiction other than § 70502(d)(1)(C).  The facts giving rise to jurisdiction under that provision were undisputed.  But there were factual and

legal issues relevant to the Matos-Luchi dicta on which the majority relies to affirm appellants' convictions. Indeed, appellants gave up the contention that their vessel bore indicia of nationality when they signed plea agreements that included the fact that the vessel lacked any such display. See supra note 24. If the government was not relying solely on jurisdiction under § 70502(d)(1)(C), surely appellants were entitled to explicit notice of such other theory or theories before agreeing to give up competing facts and arguments, and ultimately pleading guilty.

To justify appellants' prosecutions based on jurisdictional theories unspecified when they agreed to admit guilt is not only unfair in this case but also troubling as a precedent for plea agreements more generally. If the government is permitted to support convictions by superimposing a new rationale on plea agreements that were so clearly premised on different understandings, the concept of plea agreements as contracts -- whose linchpin is the reasonable expectations of the parties -- will be grievously eroded.

The government made its choice to rely on § 70502(d)(1)(C) when it obtained appellants' acquiescence to facts the government had consistently invoked to deem their vessel "without nationality" under that specific provision. The panel majority concluded that the government's chosen theory is unconstitutional. Hence, in effect, the en banc majority is

holding that the government may unilaterally renegotiate the deal
it struck with a defendant when flaws are identified in the
original agreement.  The majority's approach is not restricted to
proceedings under the MDLEA and thus could be used to the
government's advantage whenever it chooses.  The harm to the plea-
bargaining process from the majority's holding is severe and
indefensible.

As described above, however, the majority maintains that
appellants should have realized that the facts in the plea
agreements, along with citation to the MDLEA provision that
generally authorizes jurisdiction over vessels "without
nationality," preserved jurisdictional theories that the
government never specifically invoked.  In other words, according
to the majority, appellants should have challenged theories on
which the government did not rely because the government never
pledged to forego reliance on them at a later juncture.  To bolster
their position that plain error thus applies to the <u>Matos-Luchi</u>-
based theory, our colleagues repeatedly and pointedly say that the
claim of "jurisdiction switching" -- their term -- was voiced by
appellants "only in their briefing to the en banc court, which
they submitted only after the panel majority had raised and relied
on the theory sua sponte."  Hence, our colleagues say, "if a gloss
is being retroactively imposed on the record, it is the gloss that

would attribute to the government an intentional waiver of the Matos-Luchi-based theory."

But we are not arguing that the government _waived_ reliance on Matos-Luchi. Rather, the government is precluded from switching jurisdictional gears because of ordinary contract principles and the particular importance of adhering to those principles in the context of plea-bargaining. As explained above, appellants have focused on the validity of their prosecutions based on § 70502(d)(1)(C) because that was the sole jurisdictional rationale specifically relied upon by the government throughout the proceedings in the district court. The panel majority's statement that the government could not reconceive the plea agreements retroactively was -- and is -- merely an inescapable conclusion based on contract law and our obligation to honor a defendant's reasonable understanding of his plea agreement. Even if appellants in their en banc briefs had not repeated the panel's objection to new theories of jurisdiction, it would be wrong for us to ignore the government's attempt to ambush appellants with an alternative basis for deeming their vessel "without nationality."

To the extent this contractual constraint on the government's ability to change course operates like a waiver, that limitation is simply a function of the way contracts and plea-bargaining work. The inclusion of facts extraneous to § 70502(d)(1)(C) in the plea agreements cannot, without some

linkage to a specified jurisdictional theory, open the door to the government's permissible reliance on such an alternative to validate an otherwise impermissible prosecution.  At most, those stray facts create an ambiguity that precedent tells us must be resolved in appellants' favor.  Certainly, the obligation to deal forthrightly with defendants who will be giving up important constitutional rights cannot be met with plea agreements that sub silentio -- at best -- or deceptively -- at worst -- enlarge the government's end of the bargain.

Yet, our colleagues attempt to justify their choice to rely on a contrived plain-error analysis by discrediting the ways in which appellants responded to the government's shift in strategy.  First, the majority notes that appellants have not sought to vacate their pleas as unknowing and involuntary in light of the government's assertion that the plea agreements covered rationales for deeming their vessel "without nationality" other than § 70502(d)(1)(C).  Second, the majority observes that, in the supplemental brief requested by the panel in early 2019, appellants responded to the government's Matos-Luchi-based argument on its merits rather than asserting that the argument had been waived.

This turning of the tables on appellants is another example of the remarkable lengths the majority is traveling to justify avoiding appellants' constitutional challenge to § 70502(d)(1)(C).  Appellants admitted that the government's facts

establish their vessel's statelessness pursuant to § 70502(d)(1)(C), and they necessarily concede that, if § 70502(d)(1)(C) is constitutional, their pleas and convictions would stand (assuming their other challenges to the MDLEA also failed).[28] In other words, appellants do not dispute that their pleas were knowing and voluntary based on the only ground relied upon by the government to secure them. It is patently absurd to suggest that, rather than challenging the constitutional legitimacy of the government's actual theory of jurisdiction, they should be seeking to undo their pleas -- more than seven years later and after Reyes-Valdivia served his entire sentence -- based on a counterfactual version of the record.

The majority also suggests that, by arguing against the merits of the Matos-Luchi alternative, appellants gave up the argument that their plea agreements were reasonably understood to establish their vessel's statelessness only via § 70502(d)(1)(C). But the majority ignores and thereby distorts the significance of appellants' substantive rebuttal to the Matos-Luchi dicta. Appellants addressed Matos-Luchi on the merits only when responding to a series of questions posed to both parties by the panel, including whether there were other possible theories of

---

[28] As described in the majority opinion, appellants also presented multiple arguments alleging violations of the Due Process Clause of the Constitution.

jurisdiction to support the prosecution given that, by its terms, § 70502(d)(1)(C) refers only to claims of registry, not -- as occurred here -- to claims of nationality.  See supra note 22. The government relied heavily on Matos-Luchi in its response, even asserting -- contrary to the reality described in Section II above -- that "[b]efore the Appellants pleaded guilty, the Government's primary basis for determining that their vessel was 'subject to the jurisdiction of the United States' under 46 U.S.C. § 70502(c)(1) was that it bore no indicia of nationality and its master did not support his verbal claim of Costa Rican nationality."  Appellants' response sensibly covered the possibility that our court would allow a post-conviction switch in jurisdictional theory based on Matos-Luchi in disregard of appellants' reasonable understanding of the plea agreements -- a step the majority has, in fact, lamentably taken.[29]

---

[29] The majority's plain-error analysis relying on Matos-Luchi is disturbing beyond the disregard of appellants' understanding of their plea agreements.  At a minimum, the en banc court should be considering whether Matos-Luchi's dicta aligns with international law.  If international law does require corroboration of an oral claim of nationality to establish a vessel's foreign status, appellants' prosecutions at least would be within Congress's authority under the Felonies Clause, even if improper given the government's sole reliance on § 70502(d)(1)(C) to obtain the guilty pleas.  If Matos-Luchi is wrong, however, the prosecutions would be unconstitutional unless sustainable under § 70502(d)(1)(C) or our court's precedent on the protective principle -- issues the majority also refuses to address.

**IV.**

Under <u>Class</u> v. <u>United States</u>, 138 S. Ct. 798 (2018), Reyes-Valdivia and Dávila-Reyes are entitled to challenge their convictions on the ground that Congress exceeded its constitutional authority when it enacted § 70502(d)(1)(C) as a basis for designating a vessel "without nationality." As the panel majority opinion shows, that challenge is legally complex -- requiring us to examine, inter alia, the Constitution's language, the Founding generation's understanding of that language, the legislative history of the MDLEA, our circuit's precedent on the protective principle, and the principles of international law governing vessels traveling on the high seas. Indeed, our court is now ruling on appellants' challenge for the third time, reflecting the difficulty of the issues and the undeveloped nature of our precedent. Twice, the panel confronted the merits of appellants' claims, once after a pause of more than a year for completion of the en banc proceedings in <u>United States</u> v. <u>Aybar-Ulloa</u>, 987 F.3d 1 (1st Cir. 2021) (en banc), a case that presented overlapping issues concerning the United States' authority to prosecute foreign nationals accused of drug-trafficking on the high seas. Now, for the first time, the court's dispositive ruling avoids seriously engaging with any aspect of the merits of appellants' claim.

The majority's justification for that avoidance depends on a non-existent plain-error scenario and a deeply problematic misuse of the plain-error standard.  The plain-error doctrine sets a high threshold for remedying errors on appeal to "keep[] parties from hiding problems below" that could have "been fixed then and there."  United States v. Romero, 906 F.3d 196, 205 n.4 (1st Cir. 2018); see also Puckett, 556 U.S. at 134 ("[T]he contemporaneous-objection rule prevents a litigant from 'sandbagging' the court -- remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." (quoting Wainwright v. Sykes, 433 U.S. 72, 89 (1977))).  Ignoring that rationale for the plain-error doctrine, the majority uses plain error as a convenient off-ramp.  The government consistently relied on § 70502(d)(1)(C) to support the prosecutions, and appellants have consistently challenged the prosecutions as unconstitutional based on the government's reliance on that provision.  Appellants never hid the ball, leaving no justification for invoking the plain-error rubric to avoid their claims.  It is the government, abetted by the majority, that seeks to change the terms of the plea bargain.

The majority's sidestepping of substantial issues of great import based on a contrived procedural ground is particularly disconcerting at this late stage of the case.  At no point during the case's lengthy history in our court was there a suggestion

that the case should end because of a procedural default.  Of course, that history would not justify ignoring a true procedural impediment to the en banc court's reaching the merits.  But the procedural impediment on which the majority relies is an artifice in the name of constitutional avoidance with severe consequences for the practice of plea-bargaining.  Nor should we forget the impact on the two individuals directly affected by the majority's dogged avoidance of the merits.  Reyes-Valdivia and Dávila-Reyes, Costa Rican nationals who plausibly claimed Costa Rican nationality for their vessel, have vigorously pressed their constitutional challenge to § 70502(d)(1)(C), and they deserve to know -- after more than seven years -- whether they were lawfully prosecuted.  Although Reyes-Valdivia completed his sentence, Dávila-Reyes remains incarcerated.

Constitutional avoidance is an important principle.  But it is not properly used here to escape confronting appellants' challenge to § 70502(d)(1)(C).  Indeed, as an intermediate appellate court, we could perform an important service by exploring "the broader questions of international and constitutional law" acknowledged by the majority and attempting to crystalize the issues in a way that would be useful to the Supreme Court if it chose to review our decision.  We do not minimize the "sensitive issues of U.S. foreign relations and national power" implicated by appellants' challenge to § 70502(d)(1)(C), but we cannot sidestep

such questions because of their sensitivity and import when properly raised.  If we answer them incorrectly, the Supreme Court will tell us.  In addition, with their avoidance, our colleagues forsake their obligation to address and clarify multiple unresolved issues in our own law on MDLEA prosecutions, including the role of the protective principle and the validity of the Matos-Luchi dicta as a basis for deeming a vessel "without nationality."  These recurring issues deserve our attention now.

Moreover, the dance the majority performs to avoid appellants' serious constitutional challenge undermines the Supreme Court's decision in Class to forgo the usual finality of unconditional guilty pleas to protect criminal defendants from prosecutions -- and, perhaps most importantly, imprisonments -- that the United States lacks authority to pursue.  See Class, 138 S. Ct. at 805 (holding that an unconditional guilty plea does not bar a direct appeal where the defendant's claims "call into question the [g]overnment's power to 'constitutionally prosecute' him" (quoting United States v. Broce, 488 U.S. 563, 575 (1989))).  Accordingly, we dissent and, based on the analysis set forth in the panel majority opinion, see Appendix, conclude that appellants' convictions should be reversed.[30]

---

[30] The majority suggests that, if appellants' contentions did not otherwise fail, their claims may be waived.  The panel majority explained why appellants' plea agreements do not bar their appeals and why, pursuant to Class, their guilty pleas do not foreclose their constitutional claims.  Those explanations are contained in Section III of the panel majority opinion.  See Appendix.

**Appendix**

# United States Court of Appeals
## For the First Circuit

No. 16-2089

UNITED STATES OF AMERICA,

Appellee,

v.

JEFFRI DÁVILA-REYES,

Defendant, Appellant.

No. 16-2143

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ D. REYES-VALDIVIA,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Thompson, Circuit Judges.

Franco L. Pérez-Redondo, Research and Writing Specialist, with whom Eric Alexander Vos, Federal Public Defender, Vivianne M. Marrero, Assistant Federal Public Defender, and Liza L. Rosado-Rodríguez, Research and Writing Specialist, were on brief, for appellant José D. Reyes-Valdivia.

Raymond L. Sánchez-Maceira on brief for appellant Jeffri Dávila-Reyes.

Thomas F. Klumper, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, John A. Mathews II, Assistant United States Attorney, and David C. Bornstein, Assistant United States Attorney, were on brief, for appellee.

———————

January 20, 2022

———————

LIPEZ, <u>Circuit Judge</u>.  These consolidated appeals arise from the U.S. Coast Guard's interdiction of a small speed boat in the western Caribbean Sea and the subsequent arrest and indictment of the three men on board for drug trafficking under the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501-08.  In a motion to dismiss the indictment, appellants José Reyes-Valdivia and Jeffri Dávila-Reyes challenged the constitutionality of the MDLEA in multiple respects.  Most relevant here, they argued that the statute, which in certain circumstances allows U.S. law enforcement to arrest and prosecute foreign nationals for drug crimes committed in international waters, exceeds Congress's authority under Article I of the Constitution.  The district court denied the motion to dismiss.  Both appellants then pleaded guilty pursuant to plea agreements in which each waived his right to appeal if sentenced in accordance with his agreement's sentencing recommendation provision.

On appeal, appellants renew their constitutional objections to their prosecution.  In our original decision, we did not reach appellants' "primary argument" -- that their prosecution was unlawful because their vessel was not properly deemed stateless -- on the ground that "our governing precedent concerning the protective principle of international law . . . permit[ted] prosecution under the MDLEA even of foreigners on foreign vessels." <u>United States</u> v. <u>Dávila-Reyes</u>, 937 F.3d 57, 59 (1st Cir. 2019)

- 3 -

(withdrawn).[1]  That precedent, we concluded, required that we affirm appellants' convictions.

Appellants then petitioned for panel rehearing and en banc review.  We held their requests in abeyance pending the en banc decision in another drug-trafficking case involving a constitutional challenge to the MDLEA.  See United States v. Aybar-Ulloa, 987 F.3d 1 (1st Cir. 2021) (en banc).  Subsequently, based on our view that the decision in Aybar-Ulloa "diminished the force of this circuit's precedent on the protective principle," we concluded that it would no longer be appropriate to rely on that principle to uphold appellants' convictions.  Order, Nos. 16-2089, 2143 (Mar. 17, 2021).  We therefore granted panel rehearing to address appellants' constitutional challenge to their prosecution under the MDLEA.

We now hold that Congress exceeded its authority under Article I of the Constitution in enacting § 70502(d)(1)(C) of the MDLEA.  That provision expands the definition of a "vessel without nationality" beyond the bounds of international law and thus unconstitutionally extends U.S. jurisdiction to foreigners on foreign vessels.  Hence, appellants' convictions must be vacated.

---

[1] The protective principle of international law "permits a nation 'to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security.'"  Dávila-Reyes, 937 F.3d at 62 (quoting United States v. Cardales, 168 F.3d 548, 553 (1st Cir. 1999)).

- 4 -

I.

We draw the following facts primarily from appellants'
change of plea colloquies and the uncontested portions of their
Presentence Investigation Reports. See United States v. Vélez-
Luciano, 814 F.3d 553, 556 (1st Cir. 2016).[2] In October 2015,
while patrolling waters approximately 30 nautical miles southeast
of San Andrés Island, Colombia,[3] U.S. Coast Guard officers observed
a small vessel[4] moving at a high rate of speed. When the occupants
of the vessel became aware of the Coast Guard boat nearby, they
began throwing packages and fuel barrels overboard. The Coast
Guard officers approached the boat and began to question its
occupants, the two appellants and a third co-defendant. Reyes-
Valdivia, as the "master"[5] of the vessel, claimed Costa Rican

---

[2] We also draw some facts from statements by Coast Guard
officials that were submitted to the district court as attachments
to the government's Motion in Limine and Memorandum of Law in
Support of Jurisdiction. See United States v. Reyes-Valdivia, No.
3:15-cr-00721-FAB (D.P.R. Mar. 25, 2016), ECF No. 46.

We note that all citations to the district court's electronic
docket in this case will hereafter be cited using the short-form
"Reyes-Valdivia, ECF No. __ (filing date)."

[3] Although part of Colombia, San Andrés Island is located off
the coast of Nicaragua.

[4] The government's Motion in Limine describes the vessel as a
35-foot "low profile, open hull, 'go-fast-type' vessel." Reyes-
Valdivia, ECF No. 46, at 3 (Mar. 25, 2016).

[5] The term "master" is synonymous with "captain." It is a
legal term of art meaning the person "to whom are committed the
government, care, and direction of the vessel and cargo."
Kennerson v. Jane R., Inc., 274 F. Supp. 28, 30 (S.D. Tex. 1967).
The statement of facts attached to Reyes-Valdivia's plea agreement

- 5 -

nationality for the vessel but did not provide any documentation
to support that claim.[6]

        The Coast Guard officers boarded and searched the vessel
pursuant to a provision of an agreement between the United States
and Costa Rica "Concerning Cooperation to Suppress Illicit
Traffic."  See Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016)
(Dep't of State Certification).  The officers did not find any
contraband, but a chemical test detected traces of cocaine.  Based
on that evidence, the Coast Guard detained the three men -- all
citizens of Costa Rica -- and took them to the U.S. Naval Base at
Guantánamo Bay, Cuba, and then eventually to Puerto Rico.  At some
point, the United States contacted the government of Costa Rica
requesting confirmation of the vessel's registry or nationality,
and Costa Rica subsequently responded that it could not confirm

---

does not identify him as the "master" of the vessel, see Reyes-
Valdivia, ECF No. 68, at 11 (Apr. 4, 2016), but a statement from
a Coast Guard officer reports that Reyes-Valdivia identified
himself as such, see id., ECF No. 46-1, at 1 (Mar. 25, 2016)
(Statement of Officer Luis Rosado).

    [6] The Coast Guard reported that Reyes-Valdivia initially
stated that "there was no nationality for the vessel" before
asserting Costa Rican nationality.  Reyes-Valdivia, ECF No. 46-1,
at 1 (Mar. 25, 2016) (Statement of Officer Luis Rosado).  However,
this statement was not cited in the U.S. Department of State
Certification as a basis for identifying the vessel as stateless.
The Certification reported only that "[t]he master made a claim of
Costa Rican nationality for the go fast vessel."  Id., ECF No. 46-
2, at 1 (Mar. 25, 2016).  Nor was the statement included in the
government's version of the facts in the appellants' plea
agreements.  See infra.

- 6 -

the vessel's registry.  The United States thus determined that, pursuant to § 70502(d)(1)(C) of the MDLEA, the boat was "without nationality" and subject to U.S. jurisdiction.[7]

All three defendants were charged with two counts of trafficking cocaine in violation of the MDLEA.  Reyes-Valdivia and Dávila-Reyes moved to dismiss the indictment for lack of jurisdiction,[8] arguing that the MDLEA, particularly § 70502(d)(1)(C), is unconstitutional.  In their view, § 70502(d)(1)(C) exceeds Congress's authority under Article I of the Constitution, and it violates the Due Process Clause of the Fifth Amendment because it is unconstitutionally vague, subject to arbitrary enforcement, and criminalizes conduct that has no nexus with the United States.  The district court denied the motion.

Reyes-Valdivia and Dávila-Reyes both subsequently agreed to plead guilty to one count of possession with intent to distribute five or more kilograms of cocaine in violation of the

_____

[7] Section 70502(c)(1)(A) of the MDLEA provides that "a vessel without nationality" is "subject to the jurisdiction of the United States."  46 U.S.C. § 70502(c)(1)(A).  As explained below, § 70502(d)(1)(C) defines a "vessel without nationality" to include any vessel "aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality."  Id. § 70502(d)(1)(C).

[8] Reyes-Valdivia filed the motion, and the district court granted Dávila-Reyes's motion to join.

- 7 -

MDLEA.  See 46 U.S.C. § 70503(a)(1).[9]  Both men agreed to waive appellate review if sentenced in accordance with the sentencing recommendation provisions in their plea agreements.  Ultimately, the district court sentenced Dávila-Reyes consistently with his agreement (a 120-month term), but sentenced Reyes-Valdivia to a term longer than proposed in his agreement (70 months instead of 57) because it found that he should be given a two-level enhancement for being the "captain" of the vessel.  See U.S.S.G. § 2D1.1(b)(3)(C).

Reyes-Valdivia's motion for reconsideration was denied. Both Reyes-Valdivia and Dávila-Reyes then appealed.  We affirmed their convictions on the basis that the protective principle permitted their prosecution.

## II.

As noted, this court's en banc decision in <u>United States</u> v. <u>Aybar-Ulloa</u> led us to withdraw our prior opinion and reconsider appellants' claims.  In <u>Aybar-Ulloa</u>, the en banc court held that "international law accepts the criminal prosecution by the United States of persons . . . who [are] seized by the United States while trafficking cocaine on a stateless vessel on the high seas."  987

---

[9] The third defendant also pleaded guilty to this count and was sentenced to a 57-month term of imprisonment.  He did not file an appeal.

F.3d at 3.[10]   In so holding, the court bypassed our circuit's precedent on the protective principle, which could have provided a straightforward basis for affirming the conviction, and instead addressed a more complex issue of international law.  Notably, the en banc court did not achieve unanimity on the legal basis for U.S. jurisdiction over foreign nationals apprehended on vessels conceded to be stateless.   See infra.   The choice of a non-unanimous analytical path over reliance on the protective principle is one basis for our conclusion that Aybar-Ulloa weakened our circuit's protective principle jurisprudence.

In addition, statements in both the majority and concurring opinions in Aybar-Ulloa more directly suggest skepticism about applying the protective principle to a foreign vessel whose occupants are foreign nationals allegedly involved in drug trafficking, at least absent acquiescence by the flag nation. The majority observed that one of our primary precedents on the protective principle -- United States v. Cardales, 168 F.3d 548 (1st Cir. 1999) -- "can be read as applying only to the circumstance where a foreign flag nation consents to the application of United States law to persons found on that nation's flagged vessel." Aybar-Ulloa, 987 F.3d at 3.  In our prior opinion

---

[10] Generally, there is a consensus that "high seas" denotes areas outside any country's territorial waters.  See, e.g., United States v. Carvajal, 924 F. Supp. 2d 219, 234 (D.D.C. 2013), aff'd sub nom. United States v. Miranda, 780 F.3d 1185 (D.C. Cir. 2015).

- 9 -

in this case, we assumed that appellants' vessel was Costa Rican, as they had asserted, but we concluded that our precedent nonetheless required us to uphold their prosecution based on the protective principle.  The Aybar-Ulloa majority's posited reading of Cardales, however, would foreclose reliance on the protective principle here because the record contains no consent from the Costa Rican government to the prosecution.

The Aybar-Ulloa concurring opinion aired an even broader uncertainty about the protective principle.  In describing Aybar-Ulloa's contentions, the concurrence noted the long-ago observation by then-Judge Breyer that there is a "'forceful argument' against application of [the] protective principle to encompass drug trafficking on the high seas." Id. at 15 (Barron, J., concurring) (quoting United States v. Robinson, 843 F.2d 1, 3 (1st Cir. 1988) (Breyer, J.)); see also id. at 20 (referencing the same skepticism about the protective principle with a citation to Robinson).  Both Aybar-Ulloa opinions, then, caused the panel to doubt its reliance on the protective principle to uphold Reyes-Valdivia and Dávila-Reyes's prosecution under the MDLEA.  See also Aaron J. Casavant, In Defense of the U.S. Maritime Drug Law Enforcement Act: A Justification for the Law's Extraterritorial Reach, 8 Harv. Nat'l Sec. J. 191, 213 (2017) (noting that commentators have rejected the protective principle to support MDLEA prosecutions, "positing that 'the cases that see the MDLEA

- 10 -

- 108 -

as an exercise of protective jurisdiction fundamentally misconceive the principle'" (quoting Eugene Kontorovich, Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes, 93 Minn. L. Rev. 1191, 1231 (2009) (emphasis omitted))); but see id. at 222-23 (noting "a circuit split over whether the crime of maritime drug trafficking warrants the use of the protective principle"); id. at 225 (stating that "the protective principle of international law is broad enough to encompass maritime drug trafficking").

Apart from any reference to the protective principle, both Aybar-Ulloa opinions include statements indicating that the prosecution of a foreign national seized on the high seas under U.S. drug-trafficking laws would not be proper unless the targeted activity and seizure occurred on a stateless vessel. The majority, for example, concludes a passage on the reasonable expectations of "those who set out in stateless vessels" by noting: "Simply put, if a person intent on drug trafficking on the high seas wants to be prosecuted in his own country should he be caught, he should sail under that country's flag." Aybar-Ulloa, 987 F.3d at 9. The majority subsequently describes its holding as limited "to vessels flouting order and custom on the high seas by eschewing the responsibilities and protections of the flag-state system." Id. at 13; see also id. at 8 (quoting United States v. Furlong, 18 U.S. (5 Wheat.) 184, 198 (1820), for the proposition that "the

- 11 -

distinction between foreign vessels and stateless vessels serves
to avoid 'offensive interference with the governments of other
nations'").  In the same vein, the concurring opinion in Aybar-
Ulloa notes the "fair amount of support" for the view that Congress
lacks authority under Article I's Define and Punish Clause "to
subject foreign nationals to our criminal laws" for acts occurring
on foreign vessels on the high seas.  Id. at 15 (Barron, J.,
concurring).[11]

       In sum, we see in Aybar-Ulloa multiple signals that the
majority of judges on our court do not view the protective
principle as supporting U.S. jurisdiction over drug-trafficking

---

[11] Elsewhere, the Aybar-Ulloa concurrence notes that "the
application of the MDLEA to Aybar[-Ulloa]'s conduct in this case"
-- i.e., conduct aboard a stateless vessel -- would likely be
consistent with international law,

> [e]ven if we were to assume that the law of
> nations places limits on Congress's power
> under the Define and Punish Clause to subject
> foreign nationals on foreign vessels in
> international waters to our domestic criminal
> laws, and even if we were to assume that the
> United States may not assert protective
> jurisdiction over drug trafficking merely
> because it occurs on stateless vessels in
> international waters, see Robinson, 843 F.2d
> at 3-4.

987 F.3d at 20.  Although the Aybar-Ulloa concurrence does not
take a position on those hypotheticals, we view them -- and the
reiterated citation to Robinson -- to indicate a level of doubt
about the applicability of the protective principle, at a minimum,
to drug-trafficking activity by foreign nationals on foreign
vessels.

- 12 -

activity conducted on the high seas by foreign nationals on foreign vessels.[12]  Hence, in light of Aybar-Ulloa, we decline to rely on the protective principle to uphold appellants' convictions. Rather, the question we must answer is whether -- as the United States claims -- appellants' vessel was properly deemed stateless, bringing the vessel and its occupants within the scope of the holding in Aybar-Ulloa.

Before addressing that question, however, we review and elaborate on our reasons, set forth in the withdrawn panel opinion, for rejecting the government's argument that appellants waived their claims of constitutional error.  See Dávila-Reyes, 937 F.3d at 60-61.

### III.

The government contends that Reyes-Valdivia and Dávila-Reyes waived their right to appeal in two distinct ways: by the express appellate waiver provisions in their plea agreements and by entry of unconditional guilty pleas to drug trafficking in violation of the MDLEA.  With respect to Reyes-Valdivia, the government is wrong in arguing that his appeal is barred by his plea agreement.  As described above, the district court declined

---

[12] Of course, consent by the flag nation changes the calculus, as acknowledged by one commentator who has advocated for use of the protective principle in the context of drug-trafficking on the high seas.  See Casavant, supra, at 223 (noting that "consent of the flag or coastal state" is a "check on the exercise of U.S. criminal jurisdiction").

- 13 -

to follow the parties' recommended term of 57 months and instead sentenced him to a 70-month term of imprisonment.  Because Reyes-Valdivia's sentence exceeded the recommendation, the waiver provision plainly does not apply.[13]

Dávila-Reyes, however, received a 120-month sentence that aligns with the recommendation in his plea agreement.  He argues that, despite the enforceable waiver, we should exercise our inherent authority to consider his claims to avoid "a miscarriage of justice."  United States v. Teeter, 257 F.3d 14, 25-26 (1st Cir. 2001).  He contends that his appeal raises "important questions of law and [of] first impression" -- including the constitutionality of § 70502(d)(1)(C) of the MDLEA -- and that preventing him from bringing his appeal would be unjust.

We agree that the constitutional issue Dávila-Reyes raises is significant and that the other factors allowing us to exercise our discretion to disregard the appellate waiver also are sufficiently present.  See, e.g., United States v. Ortiz-Vega, 860 F.3d 20, 27-28 (1st Cir. 2017).  Particularly important is the lack of prejudice to the government, given Reyes-Valdivia's

---

[13] The government contends that Reyes-Valdivia is nonetheless bound by the waiver provision because he failed to explain in his opening brief why it is inapplicable.  However, it is apparent on the face of the plea agreement that Reyes-Valdivia was not sentenced in accordance with the sentencing recommendation provision, and he was not obligated to make that obvious point in his opening brief.  See United States v. Colón-Rosario, 921 F.3d 306, 310-11 (1st Cir. 2019).

presentation of the same issues as Dávila-Reyes.  See id. at 27.
Moreover, the potential for relief should not depend on the
happenstance that the district court added an enhancement to Reyes-
Valdivia's sentence.  Thus, we exercise our discretion and decline
to enforce Dávila-Reyes's appellate waiver.

Nor do appellants' guilty pleas foreclose their right to
challenge the constitutionality of the MDLEA.  The Supreme Court
held in Class v. United States that "a guilty plea by itself" does
not bar "a federal criminal defendant from challenging the
constitutionality of the statute of conviction on direct appeal."
138 S. Ct. 798, 803 (2018).  In their briefing and oral argument,
appellants present claims that are permissible under Class.
Although they conceded through their guilty pleas that the MDLEA,
by its terms, allows the government to prosecute them under U.S.
law, they argue that Congress exceeded constitutional limits with
the enactment of the applicable provision.  In other words,
appellants contend that their convictions were within the scope of
the statute but nonetheless unconstitutional.  Such claims may
proceed notwithstanding an unconditional guilty plea.  See id. at
805 (holding that a guilty plea does not bar claims that challenge
"the Government's power to criminalize [the defendant's]
(admitted) conduct" because "[t]hey thereby call into question the
Government's power to 'constitutionally prosecute him'" (quoting
United States v. Broce, 488 U.S. 563, 575 (1989))).

- 15 -

- 113 -

The government asserts that <u>Class</u> does not apply here because appellants "admitted without qualification that their vessel was one 'subject to the jurisdiction of the United States,'" without limiting the basis for jurisdiction to § 70502(d)(1)(C) (whose text is reproduced in footnote 7).[14]  Appellee's Supp. Br. at 18-19.  In making that assertion, the government cites to the appellants' general acknowledgment of guilt at their change-of-plea hearing but disregards their specific admissions.  The prosecution -- and, accordingly, appellants' admissions of guilt -- was premised on their vessel's statelessness under § 70502(d)(1)(C).  The indictment stated generally that jurisdiction was based on appellants' vessel being one without

---

[14] The statutory phrase "a vessel subject to the jurisdiction of the United States" in the MDLEA concerns legislative jurisdiction -- in other words, Congress's authority to enact legislation "regulat[ing] drug trafficking on [] ships" -- rather than the subject-matter jurisdiction of the federal courts. <u>United States</u> v. <u>González</u>, 311 F.3d 440, 443 (1st Cir. 2002); <u>see also United States</u> v. <u>Prado</u>, 933 F.3d 121, 130 (2d Cir. 2019) (adopting and elaborating on this interpretation and rejecting the alternative approach of other circuits). <u>But see United States</u> v. <u>Miranda</u>, 780 F.3d 1185, 1192 (D.C. Cir. 2015) (agreeing with the Fifth and Eleventh Circuits that "the question of whether a vessel is 'subject to the jurisdiction of the United States' is a matter of subject-matter jurisdiction"). "Unlike Congress's employment in other statutes of one-factor jurisdictional elements such as 'by a Federal Reserve Bank,' or 'affect[ing] interstate commerce,' the facts that may cause a vessel to be 'subject to the jurisdiction of the United States' [under the MDLEA] involve numerous complex alternatives, which are spelled out at length in § 70502 under 'Definitions.'" <u>Prado</u>, 933 F.3d at 149. Although appellants assert that their challenge to their prosecution implicates subject-matter jurisdiction, our precedent, as noted above, holds otherwise.

- 16 -

nationality, see 46 U.S.C. § 70502(c)(1)(A),[15] but the Department
of State Certification that subsequently was filed specified that
"the Government of the United States determined the vessel was
without nationality in accordance with 46 U.S.C.
§ 70502(d)(1)(C)," Reyes-Valdivia, ECF No. 46-2, at 3 (Mar. 25,
2016) (Dep't of State Certification) (emphasis added).
Appellants' plea agreements also identified § 70502(c)(1)(A) --
i.e., the subsection referring to vessels "without nationality" -
- as the basis for U.S. jurisdiction, see id., ECF Nos. 68, 72,
at 1-2 (Apr. 4, 2016), and the "Government's Version of the Facts,"
incorporated into those agreements, set forth the facts concerning
the vessel's status in language tracking the requirements of
§ 70502(d)(1)(C): the master's claim of Costa Rican nationality
and the response from the government of Costa Rica "that it could
neither confirm nor refute the registry of the suspect vessel,"
id. at 11. The same facts were recounted by the government at the
change-of-plea hearing. See id., ECF No. 117, at 26 (Oct. 3,
2016).[16] The government's Motion in Limine and Memorandum of Law

---

[15] As previously noted, § 70502(c)(1) lists "a vessel without
nationality" among the list of vessels that are "subject to the
jurisdiction of the United States." 46 U.S.C. § 70502(c)(1)(A).
Other types of vessels on the list include "a vessel registered in
a foreign nation if that nation has consented or waived objection
to the enforcement of United States law by the United States," id.
§ 70502(c)(1)(C), and "a vessel in the customs waters of the United
States," id. § 70502(c)(1)(D).

[16] At the plea hearing, the government was asked to "give a
brief explanation of the theory to be presented to prove each

- 17 -

in Support of Jurisdiction[17] likewise asked the district court to "find, as a matter of law, that [appellants'] vessel was subject to the jurisdiction of the United States, as defined in . . . Sections 70502(c)(1)(A) and (d)(1)(C)." Id., ECF No. 46, at 4 (Mar. 25, 2016).[18]

---

Defendant guilty if a trial were to be held." Id. at 25.  In relevant part, the prosecutor stated:

> The vessel was tracked by aircraft and eventually came to a stop.  The U.S. Coast Guard boarding team approached the vessel and commenced right of approach questioning.
> The master claimed Costa Rican nationality for the vessel but provided no registration[] paperwork, and there was no indicia of nationality on the vessel.
> The Government of Costa Rica was approached.  They responded they could neither confirm nor refute the registry of [the] suspect vessel.
> The vessel was determined to be one without nationality.

Id. at 25-26.

[17] In a 1996 amendment to the MDLEA, Congress stated that jurisdictional issues under the statute "are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. § 70504(a); see also González, 311 F.3d at 442-43.  Appellants moved to change their pleas a week after the government filed the Motion in Limine, and the district court therefore did not rule on it. See Reyes-Valdivia, ECF Nos. 59, 63 (Apr. 1, 2016).

[18] The government has continued to rely on § 70502(d)(1)(C) before us.  In its initial brief, the government quoted the provision in full and then described appellants' admission consistently with the provision's terms -- i.e., "that Costa Rica did not confirm the registry of their vessel (which had no indicia of nationality) and that their vessel was determined to be one without nationality."  Appellee's Br. at 36.  In addition, in asserting that the MDLEA provided sufficient and unambiguous notice of the MDLEA's applicability to appellants, the government

- 18 -

Appellants thus pleaded guilty based on the government's assertion of jurisdiction pursuant to § 70502(d)(1)(C), in accordance with the facts stated in their plea agreements. In other words, they admitted that they "did what the indictment alleged" and that the government accurately described the facts giving rise to U.S. jurisdiction under § 70502(d)(1)(C). Class, 138 S. Ct. at 804. Hence, their challenge to the constitutionality of § 70502(d)(1)(C) does not "contradict the terms of the indictment or the written plea agreement," and, as in Class, the constitutional claim can "be 'resolved without any need to venture beyond th[e] record.'" Id. (quoting Broce, 488 U.S. at 575). Appellants' constitutional challenge is premised on the facts set forth by the government and legal principles that, they claim, invalidate § 70502(d)(1)(C)'s definition of a "vessel without nationality" as a basis for subjecting them to U.S. jurisdiction. We need not go outside the existing record to address that question of law. Consequently, appellants' guilty pleas do not bar this direct appeal. See id. at 805.

The government also appears to argue, however, that it is entitled to sidestep appellants' claim that § 70502(d)(1)(C) is

---

stated: "The absence of an assertion by the Costa Rican government rendered the Appellants' boat a 'vessel without nationality,' [46 U.S.C.] § 70502(d)(1), and thus a 'vessel subject to the jurisdiction of the United States,' id. § 70502(c)(1)(A)." Id. at 38.

- 19 -

unconstitutional because, it says, their vessel could have been deemed without nationality based on other jurisdictional theories and other facts. In its supplemental brief, the government asserts that Reyes-Valdivia's failure to produce registration paperwork or otherwise substantiate his verbal claim of nationality would suffice to "render[] the vessel stateless as a matter of domestic and international law." Appellee's Supp. Br. at 9 (emphasis omitted).[19] The government further notes that the vessel could be deemed stateless because it "had no indicia of nationality other than the master's say-so, and even he presented conflicting information, having initially stated the vessel had no nationality." Id. at 11 (internal quotation marks omitted). But these jurisdictional theories are not the basis on which the government relied to arrest and prosecute appellants, and to obtain their guilty pleas. The defendants therefore had no reason or opportunity to consider those rationales for deeming their vessel stateless before deciding to forgo their right to contest the MDLEA charges,[20] which relied on the undisputed facts establishing

---

[19] This theory also plays a part in the government's defense of § 70502(d)(1)(C), and we address it in that context in Section V.C.

[20] In his supplemental brief, Reyes-Valdivia challenges the government's assertion that the vessel bore no indicia of nationality. He contends that "[p]hotos of the vessel clearly show the civil ensign of Costa Rica painted, albeit vertically, on the port and starboard sides of the ship's bow," and he points out that "the Costa Rica ensign was prominent enough for a Marine Patrol Aircraft ['MPA'] to recognize it from overhead."

- 20 -

statelessness under § 70502(d)(1)(C).[21]  It is now simply too late

for the government to proffer alternative bases for jurisdiction.

Cf. United States v. Mitchell-Hunter, 663 F.3d 45, 50 n.7 (1st

Cir. 2011) (stating that jurisdiction under the MDLEA may be

established "any time prior to trial" (emphasis added)).

     In sum, neither of the government's waiver-of-appeal

arguments has merit.

---

Appellants' Supp. Br. at 18 n.4.  The assertion of visibility from
the air was based on the statement of Customs Officer Luis Rosado
recounting that the MPA had detected a go-fast vessel "with a Costa
Rican flag painted on the bow." Reyes-Valdivia, ECF No. 46-1, at
1 (Mar. 25, 2016).   The government properly points out that
appellants admitted in their plea agreements to a version of the
facts stating that their vessel bore no indicia of nationality and
argues that appellants "may not pursue any contention on appeal
that 'would contradict' that admission."   Appellee's Supp.
Response Br. at 5 (quoting United States v. Sarmiento-Palacios,
885 F.3d 1, 4 (1st Cir. 2018)).  However, the government, too,
must abide by the facts on which it relied to obtain appellants'
pleas.

    [21] We also note that the government has argued, on the one
hand, that "[t]he MDLEA is . . . clear about how the United States
decides  whether  a  vessel  is  stateless,"  citing  46  U.S.C.
§ 70502(d), Appellee's Br. at 35, but, on the other hand, has not
identified a statutory provision that matches its newly offered
theories of jurisdiction. As described more fully infra, the two
other  circumstances  for  classifying  a  vessel  as  "without
nationality" expressly stated in § 70502(d)(1) -- the denial of a
claim by the named country and the master's refusal to make a claim
upon request -- do not apply here.  See 46 U.S.C. § 70502(d)(1)(A),
(B).  Although § 70502(d)(1)'s categories of stateless vessels are
non-exclusive (the provision states that "the term 'vessel without
nationality'  includes"  the  three  listed  examples  (emphasis
added)), the government cannot reasonably expect defendants to
assess their options if it invokes a particular statutory basis
for   jurisdiction   but   reserves   the   right   to   shift
theories -- including to theories beyond the statute's express
language.

### IV.

We must consider one last issue before reaching the merits of appellants' claims. As our colleague notes in his concurrence, the jurisdictional provision relied on by the government to prosecute appellants, 46 U.S.C. § 70502(d)(1)(C), refers to a vessel master's having made a claim of registry, but Reyes-Valdivia claimed Costa Rican nationality, not registry. The parties initially appeared to agree that § 70502(d)(1)(C) nonetheless applies to the facts of this case. In a supplemental brief submitted in response to questions from the court, however, appellants argued for the first time that the provision is inapt where the master of the vessel asserts only a nationality claim.

We are unpersuaded that this distinction between a claim of registry and a claim of nationality provides a basis for vacating appellants' convictions. Although the terms "nationality" and "registry," in formal usage, are not interchangeable,[22] the MDLEA treats them as such throughout

---

[22] In general, the "nationality" of a vessel refers to the country that has certain "international rights and duties . . . in connection with a given ship and its users." Herman Meyers, The Nationality of Ships 129 (1967). The term "registration" refers to the recording of nationality "on land and under the supervision of a government body." Id.; see also id. at 129-30 ("The purpose of a register is to declare the nationality of a vessel engaged in trade with foreign nations, and to enable her to assert that nationality wherever found." (quoting The Mohawk, 70 U.S. (3 Wall.) 566, 571 (1865))).

- 22 -

§ 70502.  Section 70502(e), for example, jointly defines a "claim of nationality or registry" to "include[] only":

> (1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;[23]
> (2) flying its nation's ensign or flag; or
> (3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.

46 U.S.C. § 70502(e).  By allowing the act of flying a national flag or the possession of documents of nationality to suffice as a claim to either nationality or registry, the MDLEA effectively treats the distinction between nationality and registry as irrelevant.  Congress's use of the two terms interchangeably, or at least inconsistently, is even more evident in § 70502(d)(1)(C), where the rejection of a master's claim of registry is premised on the named country's failure to confirm nationality.

Yet, this variation in terminology does not undermine what is otherwise Congress's clear intention to require verification when a master identifies a vessel as "foreign" -- whether by claiming nationality or registry -- and thereby seeks to avoid the jurisdiction possessed by the United States (and all nations) over stateless vessels.  As we shall

---

[23] Article 5 states, in part, that "[e]ach State shall issue to ships to which it has granted the right to fly its flag documents to that effect."  United Nations Convention on the High Seas art. 5, Apr. 29, 1958 ("1958 Convention on the High Seas"), 13 U.S.T. 2312.

- 23 -

explain, we think it evident that Congress used the term "claim of registry" in the first part of § 70502(d)(1)(C) to also encompass a "claim of nationality" -- a common, albeit imprecise, choice of language.

More than fifty years ago, one scholar noted the tendency to use the term registration to signify the broader concept of nationality. See Herman Meyers, The Nationality of Ships 28 (1967) (noting that "[t]he phrase 'registered in', and other word combinations in which the term register is used," are sometimes imprecisely "used as synonymous with nationality"); id. at 127 (noting that, because "in the great majority of cases" nationality and registration, along with documentation and flying the flag, "occur in combination," "the differences between the terms have sometimes been neglected and a pars pro toto [a part taken for the whole] use of the word registration . . . is by no means rare in the doctrine or in the sources of international law"). Indeed, a claim of registry is also a claim of nationality. See supra note 22. Thus, the variable word choice in § 70502(d)(1)(C) does not have the import that it might have in other contexts. See generally DePierre v. United States, 564 U.S. 70, 83 (2011) (noting the usual assumption that a legislature intends different meanings when it uses different words, but also recognizing that "Congress sometimes uses slightly different language to convey the same message").

- 24 -

Importantly, notwithstanding the prior reference to a claim of registry in § 70502(d)(1)(C), Congress's ultimate demand in that same provision is for confirmation of <u>nationality</u>. We can detect no reason why Congress would require affirmative confirmation when a vessel's master makes a claim of registry, while allowing a claim of nationality to stand on its own. Excluding claims of nationality from the provision's scope would allow drug traffickers to evade the verification requirement simply by asserting a claim of nationality. Appellants attribute that glaring loophole to Congress's deference to foreign nations and its intention to stay within the bounds of international law. They note that a claim of nationality "presents a more complicated scenario since not all national ships are registered," making it more difficult for the claimed nation "to confirm or refute the nationality claim." Appellants' Supp. Br. at 8-9. Appellants do not explain, however, why that concern would prompt Congress, in effect, to nullify the verification provision by encouraging vessel masters to claim foreign nationality rather than registry. Inescapably, then, the reference in the first part of § 70502(d)(1)(C) solely to "a claim of registry" must be attributable to the not infrequent practice of treating a "claim of registry" and a "claim of nationality" as essentially synonymous, even though the former term is technically narrower than the latter.

– 25 –

Our view that § 70502(d)(1)(C) is not reasonably construed as limited to claims of registry is reinforced when the provision is considered in the context of the MDLEA as a whole and in light of its legislative history. See, e.g., Abramski v. United States, 573 U.S. 169, 179 n.6 (2014) ("[A] court should not interpret each word in a statute with blinders on, refusing to look at the word's function within the broader statutory context."); United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme -- because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (citations omitted)). The MDLEA reflects Congress's intention to enable the aggressive prosecution of maritime drug trafficking. See 46 U.S.C. § 70501 ("Congress finds and declares that . . . trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States . . . ."). Indeed, § 70502(d)(1)(C) was among several provisions added to the MDLEA in 1996 to "expand the Government's prosecutorial effectiveness in drug smuggling cases." H.R. Rep. No. 104-854, at

- 26 -

142 (1996) (Conf. Rep.), reprinted in 1996 U.S.C.C.A.N. 4292, 4337. Given this statutory backdrop, the majority observed in United States v. Matos-Luchi that "Congress did not expect courts to render a cramped reading of the statute."  627 F.3d 1, 7 (1st Cir. 2010).

In addition, other portions of the MDLEA's legislative history indicate that Congress's specific reference to a claim of registry in subsections (A) and (C) of § 70502(d)(1) -- both involving the claimed nation's response (or lack thereof)[24] -- may reflect the fact that registry claims appear to have been the common way in which drug-trafficking defendants asserted their foreign nationality.  There are multiple references to the difficulty faced by prosecutors in producing "judicially admissible documentary evidence" of the foreign nation's "consent [to board] or denial of a claim of registry." S. Rep. No. 99-530, at 15 (1986) (emphasis added); see also, e.g., USCG Authorizations and Load Lines: Hearing on H.R. 1362 Before the S. Subcomm. on Merchant Marine of the Comm. on Commerce, Sci. & Transp., 99th Cong. 39-40 (1986) (Responses of Adm. James Gracey to questions

---

[24] Like § 70502(d)(1)(C), see supra note 7, subsection (d)(1)(A) specifically references a claim of registry, stating that a "vessel without nationality" includes any vessel "aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed."

- 27 -

from Sen. Hollings).[25]  But whatever the exact explanation for the

chosen language, given the legislative background, together with

_____

[25] This hearing, in May 1986, preceded the adoption that year
of the MDLEA. Asked to "describe the kinds of problems the Coast
Guard and federal prosecutors have encountered" in responding to
jurisdictional objections from accused drug traffickers at trial,
Admiral Gracey responded, in part, as follows:

> The princip[al] problems that have arisen
> involve the difficulty of proving vessel
> status. For [e]xample, if upon inquiry by the
> Coast Guard, a vessel makes a claim of
> registry, the U.S. must confirm that registry
> with the claimed flag state. If the flag state
> denies registry, the vessel is stateless,
> i.e., a "vessel subject to the jurisdiction of
> the United States" . . . . At this point, the
> U.S. may under international law take law
> enforcement action against that vessel.
> However, to prove the element of the offense
> in court, the U.S. must obtain a formal
> certification from the claimed flag state
> attesting that the vessel is not registered in
> that state.  On the other hand, i[f] the
> claimed state verifies registry, the U.S.
> obtains that state's consent to take law
> enforcement action. . . . However, to prove
> the element of the offense in court, the
> United States must obtain a formal
> certification from the flag state verifying
> registry and confirming its consent for the
> U.S. to take law enforcement action.  The
> difficulties in obtaining these documents from
> foreign governments in a timely manner, and in
> a form acceptable to our courts under the
> Federal Rules of Evidence, have been
> considerable.

USCG Authorizations and Load Lines: Hearing on H.R. 1362 Before
the S. Subcomm. on Merchant Marine of the Comm. on Commerce, Sci.
& Transp., 99th Cong. 39-40.

A focus on registry as the common indicator of nationality
also appears in the legislative history of the MDLEA's predecessor,
the Marijuana on the High Seas Act, Pub. L. No. 96-350, 94 Stat.

- 28 -

Congress's blending of the concepts of nationality and registry elsewhere in the MDLEA, a reading of § 70502(d)(1)(C) that excludes claims of nationality would "produce[] a substantive effect that is [in]compatible with the rest of the law." United Sav. Ass'n of Tex., 484 U.S. at 371.

We note, in addition, that this court has treated claims of registry and nationality synonymously in multiple cases. For example, in Matos-Luchi, the majority cited § 70502(d)(1)(A) and (C) -- both of which refer only to a claim of registry -- as applicable to a "claim of nationality [that] is made but rejected [(d)(1)(A)] or not backed up by the nation invoked [(d)(1)(C)]." 627 F.3d at 6; see also United States v. Cuevas-Esquivel, 905 F.2d 510, 513-14 (1st Cir. 1990) (noting the absence of a claim of nationality but citing to a provision in an earlier codification of the MDLEA that referenced only registry (46 U.S.C. App. § 1903(c)(2)(A))); United States v. Maynard, 888 F.2d 918, 925 (1st Cir. 1989) ("Since a 'claim of nationality' was made, the

_____

1159 (1980). See, e.g., Stopping "Mother Ships" -- A Loophole in Drug Enforcement: Hearing Before the S. Subcomm. to Investigate Juvenile Delinquency of the Comm. on the Judiciary, 95th Cong., at 52 (1978) (Statement of Morris Busby, Acting Deputy Assistant Sec. of State for Oceans and Fisheries Affairs) (noting the "well-established principle under international law . . . that a country may exercise jurisdiction on the high seas over a vessel without nationality, one that is not registered in any foreign state"); id. at 53 (explaining that, when the master or crew make "a claim of nationality," the Coast Guard's protocol involves contacting the claimed flag state to "request[] that the government verify the registry of the vessel").

- 29 -

[vessel] can be classified as a stateless vessel only if the 'claim is denied by the flag nation whose registry is claimed.'" (quoting § 1903(c)(2)(A))).

Other courts have likewise used the terms interchangeably. See United States v. Alarcon Sanchez, 972 F.3d 156, 162-63 (2d Cir. 2020) (stating that "[a] claim of registry may be made" by "'a verbal claim of nationality or registry,'" quoting 46 U.S.C. § 70502(e) and relying on § 70502(d)(1)(C) in discussing the master's assertion of nationality); United States v. Prado, 933 F.3d 121, 130 (2d Cir. 2019) ("[A] verbal assertion of nationality by the master constitutes a claim, which is then tested by a U.S. officer's inquiry of the nation's registry authority."); United States v. Hills, 748 Fed. App'x 252, 253 (11th Cir. 2018) (per curiam) (finding that the defendant's vessel was without nationality based on § 70502(d)(1)(C) where the defendant "told [the Coast Guard] that he was the master of the vessel and identified the vessel as Costa Rican"); United States v. Rosero, 42 F.3d 166, 171 (3d Cir. 1994) (referring to "a false claim of nationality or registry" even though the provision at issue, 46 U.S.C. App. § 1903(c)(2)(A), referred only to "a claim of registry"); id. at 174 ("[T]he prosecution can establish that a vessel is stateless by showing that the master or person in charge

- 30 -

made a claim of nationality or registry that was denied by the flag nation whose registry was claimed.").[26]

We therefore see no basis for departing from our prior understanding of § 70502(d)(1)(C)'s scope.[27]  Congress's reference solely to claims of registry in the first part of § 70502(d)(1)(C) is not reasonably construed to exclude from that subsection's verification requirement claims of nationality that are phrased without reference to registration.[28]

---

[26] The government in this case also blended the two concepts. Despite the claim solely of nationality, the United States asked Costa Rica to confirm "registry or nationality."  Costa Rica then "replied that it could not confirm [the] vessel's registry."  See Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016) (Dep't of State Certification).

[27] In so concluding, we note that, contrary to appellants' assertion, the statutory imprecision here is not an instance of ambiguity requiring application of the rule of lenity.  The rule of lenity, which "requires that ambiguity in a criminal statute be resolved in favor of the accused," United States v. Jimenez, 507 F.3d 13, 20 (1st Cir. 2007), "does not apply if the ambiguous reading relied on is an implausible reading of the congressional purpose," Caron v. United States, 524 U.S. 308, 316 (1998).  As we have described, Congress clearly intended to subject a claim of nationality that is not premised on registry to the same verification requirement as a claim of registry.  Accordingly, the rule of lenity does not come into play.  See Moskal v. United States, 498 U.S. 103, 108 (1990) ("[W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." (internal quotation marks omitted)).

[28] Although we do not rely on waiver in rejecting appellants' belated argument that § 70502(d)(1)(C) does not apply to the facts of this case, we note that a request for supplemental briefing does not revive a claim that a party has failed to preserve. See United States v. Galíndez, 999 F.3d 60, 69 n.10 (1st Cir. 2021).

- 31 -

V.

Having addressed these threshold issues, we turn to appellants' constitutional challenge to 46 U.S.C. § 70502(d)(1)(C). As described above, we have construed that provision to allow U.S. authorities to deem a vessel "without nationality" -- i.e., stateless -- when a claim of either registry or nationality asserted by the vessel's occupants is neither confirmed nor denied by the claimed country. See, e.g., Matos-Luchi, 627 F.3d at 6. Under Aybar-Ulloa, a determination of statelessness has a significant consequence: it permits prosecution under U.S. law of any foreign national aboard the vessel. See 987 F.3d at 3. Appellants contend that § 70502(d)(1)(C) exceeds Congress's authority under the "Define and Punish Clause" of Article I, which gives Congress the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10.

It is undisputed that the "vessel without nationality" provisions of the MDLEA were enacted solely pursuant to Congress's authority to "define and punish . . . Felonies committed on the high Seas" ("the Felonies Clause").[29]    See United States v.

_____

[29] Although it may be more accurate to refer to the "Felonies Clause" as the "Felonies Sub-Clause," given that it is contained within the Define and Punish Clause, we use the "Felonies Clause" designation for simplicity.

- 32 -

Cruickshank, 837 F.3d 1182, 1187 (11th Cir. 2016) (stating that the MDLEA "was enacted under Congress's authority provided by the Felonies Clause"). Appellants argue that the definition of "vessel without nationality" in § 70502(d)(1)(C) conflicts with international law and thus authorizes the arrest and prosecution of foreign nationals aboard vessels on the high seas that the Constitution does not permit. This assertion of U.S. jurisdiction is incompatible with the Constitution, appellants contend, because Congress's authority under the Felonies Clause is constrained by international law. Put another way, appellants ask us to conclude that, under longstanding principles of international law, their vessel was not properly deemed stateless, and because Congress's authority in this instance is limited by international law, appellants' arrests and prosecution were unconstitutional.

We review appellants' challenge to the constitutionality of a federal statute de novo. See United States v. Booker, 644 F.3d 12, 22 (1st Cir. 2011). We begin by describing existing law on the MDLEA, and then consider the origins and meaning of the Define and Punish Clause generally, and the Felonies Clause specifically, before assessing whether § 70502(d)(1)(C) of the MDLEA violates the jurisdictional limits imposed by the Felonies Clause.

– 33 –

A.    **Statutory Background and Overview of Case Law on the MDLEA**

The MDLEA makes it unlawful for persons "on board a covered vessel . . . [to] knowingly or intentionally . . . manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C. § 70503(a)(1). The MDLEA's prohibitions apply "even though the act is committed outside the territorial jurisdiction of the United States," id. § 70503(b), and "a covered vessel" includes, inter alia, any "vessel subject to the jurisdiction of the United States," id. § 70503(e)(1).[30]  As relevant here, the Act defines "vessel subject to the jurisdiction of the United States" to include any "vessel without nationality." Id. § 70502(c)(1)(A).

A vessel is expressly considered "without nationality" -- or stateless -- under the MDLEA in three circumstances. First, that label applies when "the master or individual in charge fails," when asked by U.S. law enforcement, "to make a claim of nationality or registry for th[e] vessel." Id. § 70502(d)(1)(B). As noted above, a claim of nationality or registry can be made by presenting documents demonstrating nationality, "flying [the claimed] nation's ensign or flag," or verbally asserting nationality or

_____

[30] Another subsection of the statute defines "covered vessel" to include "any other vessel if the individual [allegedly engaged in drug activity] is a citizen of the United States or a resident alien of the United States." 46 U.S.C. § 70503(e)(2). At issue in this case is U.S. jurisdiction over foreigners, and we therefore do not consider the MDLEA's application to U.S. nationals.

- 34 -

registry.  Id. § 70502(e)(1)-(3).  Second, a vessel is considered stateless if its master does make a claim of nationality or registry, but the nation identified denies the claim when contacted by U.S. officials.  Id. § 70502(d)(1)(A).  Third, a vessel is considered stateless when the country whose nationality is claimed "does not affirmatively and unequivocally assert that the vessel is of its nationality."  Id. § 70502(d)(1)(C).  This last situation -- the foundation for appellants' arrest and prosecution -- is the focus of the constitutional challenge now before us.[31]

Despite the frequency with which MDLEA cases arise in this circuit, waiver and other threshold procedural issues have prevented us from fully addressing the merits of a challenge under Article I to any portion of the MDLEA.  See United States v. Sarmiento-Palacios, 885 F.3d 1, 3-4 (1st Cir. 2018) (finding a challenge to the constitutionality of the MDLEA waived where the defendant failed to develop the argument and conceded that "the MDLEA is a valid exercise of Congress's Article I powers"); United States v. Díaz-Doncel, 811 F.3d 517, 518 (1st Cir. 2016) (holding, before Class, that the defendant had waived the right to challenge the constitutionality of the MDLEA on appeal by entering an

---

[31] A vessel also may be treated as stateless under the MDLEA if it displays more than one country's flag "and us[es] them according to convenience."  1958 Convention on the High Seas, supra, art. 6 (incorporated into the MDLEA at 46 U.S.C. § 70502(c)(1)(B)).

unconditional guilty plea); United States v. Nueci-Pena, 711 F.3d 191, 196-98 (1st Cir. 2013) (addressing defendant's Article I challenge to the MDLEA under plain error review because the argument was not raised in the district court and concluding that there was no plain error in light of the lack of First Circuit and Supreme Court precedent addressing the constitutionality of the MDLEA); United States v. Cardales-Luna, 632 F.3d 731, 737-38 (1st Cir. 2011) (holding that, because the constitutionality of the MDLEA did not implicate the court's subject matter jurisdiction, it was not appropriate for the court to raise the issue sua sponte).

In Aybar-Ulloa, the en banc court was presented with a preserved constitutional challenge. The defendant argued that Article I did not give Congress the authority to assert U.S. jurisdiction over stateless vessels that have no nexus to the United States, basing his argument on the asserted existence of a nexus requirement in international law. See 987 F.3d at 15 (Barron, J., concurring) (elaborating Aybar-Ulloa's constitutional claim). The en banc court did not address Congress's authority under the Constitution, however, because it concluded that international law permits the United States to prosecute foreign nationals engaged in drug trafficking on any stateless vessel, at least when U.S. authorities have boarded and seized the vessel pursuant to the right of boarding recognized under international

- 36 -

law.  Id. at 6, 14.[32]  The court expressly did not "reach the question of whether the application of the MDLEA to Aybar[-Ulloa] would be constitutional were international law otherwise." Id. at 3.  Aybar-Ulloa does not govern this case.  Unlike the defendant there -- who admitted that his vessel was stateless -- Reyes-Valdivia and Dávila-Reyes insist that their vessel was not properly deemed "without nationality."  They assert that the method of determining statelessness in § 70502(d)(1)(C) expands U.S. jurisdiction beyond the bounds permitted by the Constitution.

We have passed upon some related questions, such as whether another of the "without nationality" provisions of the MDLEA is consistent with international law, see Matos-Luchi, 627 F.3d at 6-7 (noting that 46 U.S.C. § 70502(d)(1)(B) is consistent

---

[32] The concurring judge in Aybar-Ulloa declined to join the majority's approach, finding "no clear support in either case law or commentary for the comparatively modest proposition that persons on stateless vessels that a foreign country's officials have seized and boarded pursuant to their recognized right to visit it are subject to that country's territorial jurisdiction under international law." 987 F.3d at 18 (emphasis added).  More particularly, the Aybar-Ulloa concurrence observed that international law experts have "long noted the disagreement that exists over" whether "the prevailing view of the law of nations is that the interdicting country acquires the same territorial jurisdiction over the vessel's occupants as it acquires over the vessel itself." Id. at 17.  Given this lack of support for the majority's approach, and related concerns, see id. at 20-22, the concurring opinion instead rejected Aybar-Ulloa's challenge based on "the more than two-century-old precedent" addressing "the United States' power to prosecute defendants of a range of citizenships and circumstances" "for their felonious conduct on stateless vessels in international waters." Id. at 22, 26 (relying on United States v. Holmes, 18 U.S. (5 Wheat.) 412 (1820)).

- 37 -

with international law allowing a vessel to be deemed stateless if the master refuses to claim a nationality),[33] and whether the MDLEA's flag-nation consent provisions provide due process, see Cardales, 168 F.3d at 553 (holding that "due process is satisfied when the foreign nation in which the vessel is registered authorizes the application of United States law to the persons on board the vessel"). Along with Aybar-Ulloa, these cases provide a useful backdrop to our discussion of the constitutionality of § 70502(d)(1)(C), but they do not answer the question now before us.

Although several of our sister circuits have addressed whether the MDLEA is, in general, a constitutional exercise of Congress's authority under the Felonies Clause, it appears that no circuit has considered the specific authority for § 70502(d)(1)(C)'s definition of a "vessel without nationality." Instead, courts have assumed that the MDLEA applies only to vessels that would be subject to U.S. jurisdiction under international

---

[33] In Matos-Luchi, the panel majority made the broad statement that "the MDLEA is consistent with international law." 627 F.3d at 6. Read in context, however, that statement refers only to the jurisdictional provision at issue there -- § 70502(d)(1)(B). The discussion that follows focuses on deeming a vessel stateless when there is an attempt "to avoid national identification," and concludes by asserting that "the instances specified by Congress -- pertinently, the refusal 'aboard' the vessel to claim nationality, 46 U.S.C. § 70502(d)(1)(B) -- are not departures from international law but merely part of a pattern consistent with it." Id. at 7 (emphasis added).

- 38 -

- 136 -

law, i.e., U.S. vessels and those meeting the international law definition of statelessness. See, e.g., United States v. Ballestas, 795 F.3d 138, 146–47 (D.C. Cir. 2015) (holding that Congress had authority under the Felonies Clause to punish a defendant for conduct committed by his co-conspirators aboard a stateless vessel on the high seas); United States v. Campbell, 743 F.3d 802, 810 (11th Cir. 2014) (stating that "we have long upheld the authority of Congress to 'extend[] the criminal jurisdiction of this country to any stateless vessel in international waters engaged in the distribution of controlled substances'" (quoting United States v. Marino-Garcia, 679 F.2d 1373, 1383 (11th Cir. 1982)) (alteration in original)); United States v. Estupinan, 453 F.3d 1336, 1338 (11th Cir. 2006) (holding that the MDLEA's punishment of drug trafficking "on board a vessel subject to the jurisdiction of the United States" is within Congress's constitutional authority); United States v. Moreno-Morillo, 334 F.3d 819, 824 (9th Cir. 2003) (citing United States v. Davis, 905 F.2d 245, 248 (9th Cir. 1990), for the proposition that "this court clearly has held that the MDLEA is constitutional" in a case where the statelessness of the vessel was uncontested). We have thus found no precedent squarely addressing the argument that appellants make here: that the definition of a "vessel without nationality" in § 70502(d)(1)(C) is broader than the definition of

- 39 -

a stateless vessel under international law and is therefore unconstitutional.[34]

Thus, although we draw on prior cases addressing the constitutionality of the MDLEA and its relationship with international law, the issue before us appears to be one of first impression for the federal courts.

**B.    Constitutional Limits on Congress's Authority to Define and Punish Felonies**

As described above, appellants contend that § 70502(d)(1)(C) of the MDLEA defines "vessel without nationality" to encompass vessels -- including their own -- that are not in fact without nationality under international law. A conflict exists, they explain, because the provision treats a vessel as

_____

[34] Although the same MDLEA provision was at issue in United States v. Bravo, the defendants argued only that their prosecution was flawed because the government failed to satisfy a nexus requirement -- i.e., "that the marijuana transported in the vessel would affect the United States." 489 F.3d 1, 7 (1st Cir. 2007). We rejected the challenge, stating that "[w]e do not read the MDLEA to require a jurisdictional nexus." Id. Hence, we were not confronted with the argument asserted here -- that Congress acted beyond its constitutional authority in adopting § 70502(d)(1)(C). We note that the author of Bravo subsequently rejected the position taken in that case. See United States v. Trinidad, 839 F.3d 112, 116 (1st Cir. 2016) (Torruella, J., dissenting) ("I can no longer support the approach taken by this and our sister circuits in embracing the sweeping powers asserted by Congress and the Executive under the [MDLEA.]"). Trinidad also involved § 70502(d)(1)(C), but the defendant there did not challenge the government's determination that his vessel was "without nationality" under that provision or argue that "his plea agreement must be vacated because Congress exceeded its constitutional authority under Article I in enacting the MDLEA." Id. at 113 n.1.

- 40 -

stateless despite a claim of nationality being made through a method long acceptable under international law -- specifically, in their case, the master's verbal claim -- if the named country does not "affirmatively and unequivocally assert that the vessel is of its nationality." 46 U.S.C. § 70502(d)(1)(C).  In other words, appellants maintain that § 70502(d)(1)(C) rejects a claim of nationality in circumstances where international law accepts the claim.  According to appellants, because of this disconnect between the MDLEA and international law, U.S. authorities who rely on the definition of a "vessel without nationality" contained in § 70502(d)(1)(C) will impermissibly arrest and prosecute foreign nationals on a foreign vessel -- which is what they say occurred in this case.

Appellants' assertion of improper arrest and prosecution depends on two propositions involving international law: first, that Congress's authority to "define and punish . . . Felonies committed on the high Seas," U.S. Const. art. I, § 8, cl. 10, is limited by principles of international law and, second, that § 70502(d)(1)(C) allows the United States to deem vessels stateless even when they would not be deemed stateless under international law.  If both propositions are correct, § 70502(d)(1)(C) would unconstitutionally permit U.S. authorities to assert jurisdiction over vessels that would not be stateless under international law.  In that scenario, the United States would

- 41 -

be imposing its law on foreign individuals on foreign vessels --
an extension of jurisdiction that ordinarily is impermissible.
See, e.g., Aybar-Ulloa, 987 F.3d at 5 (noting that "the flag-state
system guarantees freedom of navigation in international waters,
as states generally may not interfere with the passage on the high
seas of ships lawfully flying the flag of another state" (citing
Richard A. Barnes, "Flag States," in The Oxford Handbook on the
Law of the Sea 313 (Rothwell et al. eds. 2015))); id. at 12 (noting
"the presumption of exclusive flag-state jurisdiction" over
vessels with identified nationality).

Hence, resolving this case requires us first to examine
the intersection between the Felonies Clause and international
law. To be clear, the claim here is not that international law
itself constrains Congress's authority to enact statutes.[35]
Rather, appellants contend that the Felonies Clause of the
Constitution, by original design, requires Congress to adhere to
the jurisdictional limits of international law with respect to

---

[35] The MDLEA states that a person charged under the statute
"does not have standing to raise a claim of failure to comply with
international law as a basis for a defense." 46 U.S.C. § 70505.
The provision further states that "only . . . a foreign nation"
may raise such a claim and that "[a] failure to comply with
international law does not divest a court of jurisdiction and is
not a defense to a proceeding under this chapter." Id. This bar
does not apply here precisely because defendants are not arguing
that international law itself constrains Congress's authority.

- 42 -

determining statelessness.[36]   We thus begin our discussion by examining how the Framers would have understood the authority given to Congress by the Felonies Clause.

### 1.   The Constitution and International Law

The delegates who gathered to draft the Constitution had a primary goal of improving the new nation's ability to meet its obligations to other countries under international law.  See Ryan Goodman & Derek P. Jinks, Filartiga's Firm Footing: International Human Rights and Federal Common Law, 66 Fordham L. Rev. 463, 464 (1997) ("[T]he Framers held the Constitutional Convention in large part due to the perceived inability of the Confederation to uphold American obligations under international law.").[37]   When the Governor of Virginia, Edmund Randolph, introduced the "Virginia Plan" that was to become the basis for the Constitution,[38] he

---

[36] Of course, where possible, we construe statutes to be consistent with international law.  See Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804); Garcia v. Sessions, 856 F.3d 27, 41 (1st Cir. 2017).

[37] In Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980), the Second Circuit held that plaintiffs could bring actions under the Alien Tort Statute ("ATS") "based on modern human-rights laws absent an express cause of action created by an additional statute."  Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 1398 (2018). The plaintiffs in Filartiga were the family members of a young man who had been tortured and murdered by Paraguayan police officers, one of whom was living in New York.  The suit was filed in the United States District Court for the Eastern District of New York, and the appeals court found jurisdiction existed under the ATS.

[38] The Virginia Plan was a set of fifteen "republican Principles" introduced by Randolph for discussion at the Constitutional Convention.  1 Records of the Federal Convention of

- 43 -

criticized the Articles of Confederation because they did not allow the federal government to punish states that "act[] against a foreign power contrary to the laws of nations or violate[] a treaty" or to compel states to punish their citizens who violate the law of nations by, for example, "invad[ing]" the rights of an ambassador. 1 Records of the Federal Convention of 1787 24-25 (Max Farrand ed., 1911) (hereinafter "Farrand's Records"). Likewise, James Madison wrote to James Monroe in 1784 that "[n]othing seems to be more difficult under [the Articles of Confederation] than to impress on the attention of our [state] Legislatures a due sense of those duties which spring from our relations to foreign nations." Letter from James Madison to James Monroe (Nov. 27, 1784), in 2 The Writings of James Madison 93 (Gaillard Hunt ed., 1901).

These statements reflect the Framers' concern that, without the power to "enforce national treaties against recalcitrant states, compel their compliance with the law of

---

1787 27-28 (Max Farrand ed., 1911). It described in general terms the governmental structure that was later adopted in significant part by the Constitution: a bicameral legislature, a national executive (albeit one elected by the legislature), and a judiciary with, among other powers, the authority to "determine Piracies, Captures, [and] Disputes between Foreigners and Citizens." Id. Before introducing this plan, Randolph listed five ways in which the Articles of Confederation did not fulfill "the objects for which it was framed." Id. at 24. The first of these, as explained above, was its failure to ensure compliance with international law. Id. at 24-25.

nations, punish offenses against that law, regulate foreign commerce, and so on, the new republic would be unable to obtain commercial advantages and, given its military weakness and perilous geographic situation, would face external threats." David M. Golove & Daniel J. Hulsebosch, A Civilized Nation: The Early American Constitution, the Law of Nations, and the Pursuit of International Recognition, 85 N.Y.U. L. Rev. 932, 980 (2010); see also id. at 934-35 (explaining that "[d]iplomatic frustrations resulting from state violations of the Treaty of Peace [with England], in particular, helped create the atmosphere of crisis that motivated profederal forces to organize and write a constitution").

In drafting a new constitution, the Framers thus aimed "to provide a national monopoly of authority in order to assure respect for international obligations." Stewart Jay, The Status of the Law of Nations in Early American Law, 42 Vand. L. Rev. 819, 829 (1989). The Framers were "commit[ted] to protecting sovereign interests through rigorous enforcement of the law of nations." Douglas J. Sylvester, International Law as Sword or Shield? Early American Foreign Policy and the Law of Nations, 32 N.Y.U. J. Int'l L. & Pol. 1, 9 (1999); see also Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 1417 (2018) (Gorsuch, J., concurring) ("[W]hen the framers gathered to write the Constitution they included among their chief priorities endowing the national government with

- 45 -

sufficient power to ensure the country's compliance with the law of nations."); Golove & Hulsebosch, supra, at 988 (stating that the Framers "carefully designed the new Constitution to ensure that the new nation would uphold its duties under the law of nations"); Louis Henkin, Foreign Affairs and the United States Constitution 234 (2d ed. 1996) ("The Framers assumed that the new federal government would carry out the obligations of the United States under international law."); Anthony J. Bellia Jr. & Bradford R. Clark, The Law of Nations as Constitutional Law, 98 Va. L. Rev. 729, 751 (2012) ("Of all the rights that can belong to a nation, sovereignty is, doubtless, the most precious, and that which others ought the most scrupulously to respect, they would not do it an injury." (quoting 1 Emmerich de Vattel, The Law of Nations, bk. II, § 54, at 138 (London, J. Newberry et al., 1759), "the most well-known work on the law of nations in England and America at the time of the Founding," id. at 749)); Beth Stephens, The Law of Our Land: Customary International Law as Federal Law after Erie, 66 Fordham L. Rev. 393, 397 (1997) (stating that "the intent of the framers, incorporated into the Constitution, was to ensure respect for international law by assigning responsibility for enforcement of that law to the three branches of the federal government").  Laws governing interactions on the high seas were of particular concern: "The framers of the Constitution were familiar with [the law of the sea] and proceeded with it in mind.

- 46 -

Their purpose was not to strike down or abrogate the system, but to place the entire subject . . . under national control, because of its intimate relation to navigation and to interstate and foreign commerce." Panama R. Co. v. Johnson, 264 U.S. 375, 386 (1924).

The Framers' commitment to international law principles was both pragmatic and ideological. See Jay, supra, at 822 (explaining that, "[i]n the eighteenth century a consensus existed that the law of nations rested in large measure on natural law," and thus the Framers viewed following the law of nations as a moral imperative); Beth Stephens, Federalism and Foreign Affairs: Congress's Power to "Define and Punish . . . Offenses Against the Law of Nations", 42 Wm. & Mary L. Rev. 447, 465 (2000) (describing the Framers' belief that "[e]nforcement of international law norms was . . . a moral obligation"). Indeed, the Framers believed that to be a "nation," the United States must honor the law of nations.[39]

---

[39] At the time of the founding, the phrase "law of nations" was generally used to refer to customary international law (i.e., law established by universal practice rather than by agreement in a treaty). See United States v. Bellaizac-Hurtado, 700 F.3d 1245, 1251 (11th Cir. 2012) (stating that "[w]e and our sister circuits agree that the eighteenth-century phrase, the 'law of nations,' in contemporary terms, means customary international law," and collecting cases). However, it was also used as a broader term for international law, including treaties. See Sarah H. Cleveland & William S. Dodge, Defining and Punishing Offenses under Treaties, 124 Yale L.J. 2202, 2206-07 (2015) (arguing that "Offences against the Law of Nations" includes treaty violations). In this case, where no treaty is at issue, we need not consider the precise meaning of the term "law of nations" as used by the Framers, and

- 47 -

See Chief Justice John Jay, Charge to the Grand Jury of the District of New York (Apr. 4, 1790), reprinted in N.H. Gazette (Portsmouth 1790) (stating, in a charge to a grand jury, that "[w]e had become a nation -- as such, we were responsible to others for the observance of the Laws of Nations"). Hence, as they embarked on drafting a constitution, the Framers saw a federal system capable of upholding international law as an imperative for the United States to achieve equal status in the community of nations. See Aybar-Ulloa, 987 F.3d at 26 (Barron, J., concurring) ("The founding generation was attentive to the strictures of the law of nations.").

        With this backdrop, we think it apparent that the Framers viewed international law as a restraint on Congress's enumerated powers bearing on foreign relations. As John Quincy Adams explained, "[t]he legislative powers of Congress are . . . limited to specific grants contained in the Constitution itself, all restricted on one side by the power of internal legislation within the separate States, and on the other, by the laws of nations." John Quincy Adams, The Jubilee of the Constitution 71 (1839) (emphasis added).

---

we henceforth use the modern term "international law" to refer to the body of law that includes both customary international law and treaties.

There is a particular justification for interpreting the
Define and Punish Clause in relation to the Framers' understanding
of international law principles.  The Define and Punish Clause, of
which the Felonies Clause is a part, refers to "Offences against
the Law of Nations," "Piracies," and "Felonies" -- all concepts
taken directly from international law.  See Banco Nacional de Cuba
v. Sabbatino, 376 U.S. 398, 451 & n.13 (1964) (White, J.,
dissenting) (noting that the language of the Define and Punish
Clause shows the Framers' belief that "the law of nations is a
part of the law of the land"); Golove & Hulsebosch, supra, at 1009
(stating that "[t]his deliberate borrowing suggest[s] that the
established principles of the law of nations might define the scope
of the [congressional] powers themselves").  These phrases, found
in the leading international law treatises of the day, were
familiar shorthand for complex international law concepts.  Their
use in the Constitution is thus strong evidence that the Framers
intended the Define and Punish Clause to align with the
international law understanding of those terms.  See 3 Emmerich de
Vattel, The Law of Nations 295 (1758) (Charles G. Fenwick trans.,
1916) (referencing "offenses against the Law of Nations"); 4
William Blackstone, Commentaries *67-71 (discussing "offences
against the law of nations," and defining "piracy" as one such
offense); 3 Sir Edward Coke, The Institutes of the Laws of England

- 49 -

111 (1644) (describing "Piracies, and felonies . . . done on the sea").

International law thus informs our inquiry into the meaning of the Define and Punish Clause and, specifically, the Felonies portion of the Clause.

### 2. The Meaning of the Felonies Clause

As noted above, the Define and Punish Clause grants Congress the following authority: "To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations."  U.S. Const. art. I, § 8, cl. 10.  We discuss below primarily the text that precedes the comma -- i.e., the authority with respect to "Piracies and Felonies committed on the high Seas."  That is so because, as we have noted, it is undisputed in this case that the MDLEA was enacted pursuant to Congress's authority under the Felonies Clause.  Although the reference to "Piracies" -- a crime "committed on the high Seas" and appearing alongside the term "Felonies" -- necessarily plays a role in our analysis, the separate clause referencing "Offences against the Law of Nations," which applies to crimes committed both on land and at sea, sheds no light on the scope of U.S. jurisdiction on the high seas.  We therefore focus solely on the authority specifically given to Congress over crimes "on the high Seas."

That focus requires us to determine what the Framers intended by the words they chose.  In so doing, we seek guidance

- 50 -

on the Framers' understanding of international law principles, including international law terminology, from contemporaneous sources. See U.S. Steel Corp. v. Multistate Tax Comm'n, 434 U.S. 452, 461-62 & n.12 (1978) (explaining the Framers' separate use of the terms "treaty," "compact," and "agreement" in Article I of the Constitution by reference to treatises on international law with which the Framers would have been familiar); Waring v. Clarke, 46 U.S. 441, 441 n.1 (1847) (stating that "[t]he Constitution . . . refers to the law of nations for the meaning of" the terms "admiralty" and "maritime," and thus interpreting those terms in light of their meaning in international law); see also Zivotofsky ex rel. Zivotofsky v. Kerry, 576 U.S. 1, 12 (2015) (looking to "prominent international scholars" from "the time of the founding" to elucidate the meaning of the Reception Clause, Article II, section 3, of the Constitution).

Just as it does today, at the time the Framers were drafting the Constitution the term "Felonies" meant serious crimes, such as treason, murder, arson, burglary, robbery, and rape. See Blackstone, supra, at *94; 2 Timothy Cunningham, A New and Complete Law Dictionary 23-28 (3d ed. 1783). Before the Constitution became the governing law, all such crimes, whether committed on land or at sea, were defined by state statutes or state common law and punished in state courts. In the only statement at the Constitutional Convention regarding the inclusion

- 51 -

of the term "Felonies," James Madison explained that, "[i]f the laws of the states were to prevail on [the meaning of "Felonies"], the citizens of different states would be subject to different punishments for the same offence at sea. There would be neither uniformity nor stability in the law." 5 Debates on the Federal Constitution 437 (Jonathan Elliot ed., 2d ed. 1836). As voiced by Madison, then, the constitutional drafters recognized the need to create a uniform system of crimes and punishments on the high seas that would apply to all U.S. citizens. There was no mention, however, of conduct committed by foreigners on foreign vessels.

Nonetheless, the independent inclusion of "Piracies" in the Define and Punish Clause provides a clue to the Framers' intent regarding U.S. jurisdiction over felonies committed on foreign vessels. The separate references to "Piracies" and "Felonies" inescapably reflects the Framers' view that Congress's power over each category was meant to be distinct. See generally The Federalist No. 42, at 233 (James Madison) (E.M. Scott ed., 1898) (discussing the necessity of defining each term). That distinction has its origin in international law.

Piracy, as defined by international law -- i.e., "robbery upon the sea," United States v. Smith, 18 U.S. 153, 162

- 52 -

(1820)[40] -- is a crime of "universal jurisdiction,"[41] meaning that it can be punished by any country no matter where it is committed or by whom.  At the time the Constitution was drafted, this feature of piracy under international law was well established.   See

---

[40] A more expansive definition of the universal crime of piracy, updated to include the realm of aviation, is as follows:

> Piracy includes any illegal act of violence, detention or depredation committed for private ends by the crew or passengers of a private ship (or aircraft) against another ship (or aircraft) or persons or property on board it, on (or over) the high seas[.]

R.R. Churchill & A.V. Lowe, The Law of the Sea 209-10 (3d ed. 1999).

[41] As stated in modern international law, the doctrine of universal jurisdiction provides that "a nation may prosecute certain serious offenses even though they have no nexus to its territory or its nationals, and no impact on its territory or its citizens." Cardales-Luna, 632 F.3d at 740 (Torruella, J., dissenting); see also Restatement (Third) of Foreign Relations Law of the United States § 404 (1987) (noting that "[a] state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern," even where there is no nexus between the offense and the state).  Crimes may be universal jurisdiction offenses if they are "contrary to a peremptory norm of international law" and are "so serious and on such a scale that they can justly be regarded as an attack on the international legal order." Kontorovich, Beyond the Article I Horizon, supra, at 1224 n.228 (quoting Universal Jurisdiction: National Courts and the Prosecution of Serious Crimes under International Law 178-79 (Stephen Macedo ed., 2004)).  At present, in addition to piracy, the crimes generally recognized as subject to universal jurisdiction are the "slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism." See Restatement (Third) of Foreign Relations Law of the United States § 404.   Drug trafficking is not recognized as a universal jurisdiction crime. Aybar-Ulloa, 987 F.3d at 14.

- 53 -

Blackstone, supra, at *71 (stating that "every community has a right" to punish piracy because it "is an offense against the universal law of society"); 1 James Kent, Commentaries on American Law 174 (1826) (stating that "piracy, under the law of nations, is an offence against all nations, and punishable by all").  As Justice Story explained in an early piracy case:

> Pirates may, without doubt, be lawfully captured on the ocean by the public or private ships of every nation; for they are, in truth, the common enemies of all mankind, and, as such, are liable to the extreme rights of war. And a piratical aggression by an armed vessel sailing under the regular flag of any nation may be justly subjected to the penalty of confiscation for such a gross breach of the law of nations.

The Marianna Flora, 24 U.S. (11 Wheat.) 1, 40-41 (1825); see also Cardales-Luna, 632 F.3d at 741 (Torruella, J., dissenting) ("Until recently, piracy was the only crime which was punishable by all nations . . . ."); United States v. Yousef, 327 F.3d 56, 104 (2d Cir. 2003) ("The class of crimes subject to universal jurisdiction traditionally included only piracy.").

That the Framers understood the term "Piracies" to refer to the specific offense subject to universal jurisdiction is supported by their statements describing piracy as a term borrowed from international law.  For example, at the Virginia Convention, James Madison explained that "Piracies" was "[a] technical term of the law of nations." 3 Farrand's Records, supra, at 332.  Thus, by

- 54 -

separating the term "Piracies" from "Felonies," the Framers plainly intended to refer to the specific crime that, under international law, could be punished by Congress even when it was committed by foreign nationals on foreign vessels.

Just as plainly, then, the phrase "Felonies committed on the high Seas" was intended to reference other types of serious crimes committed on vessels. At the time, it was a well-accepted principle of international law that countries could enact statutes criminalizing conduct on the high seas other than piracy, but only as to a given country's own nationals or on vessels over which the country could exercise jurisdiction pursuant to international law. See Blackstone, supra, at *71 (describing acts that would be punished as felonies only if committed by an English "subject" at sea); Letter from Thomas Jefferson to Edmond Charles Genet (June 17, 1793) (explaining that a country's jurisdiction over crimes such as murder "on the high seas . . . reaches its own citizens only"); William Rawle, A View of the Constitution of the United States of America 107 (2d ed. 1829) (explaining that Congress's power to punish felonies applies to anyone "except the citizens or subjects of a foreign state sailing under its flag," but that piracy is "punishable in our courts, and in the courts of all nations" (emphasis added)); Henry Wheaton, Elements of International Law 164 (Richard Henry Dana, Jr., ed., 8th ed. 1866) (observing that countries could enact laws punishing conduct at

- 55 -

sea, but such conduct could "only be tried by that State within whose territorial jurisdiction" or "on board of whose vessels, the offence thus created was committed").

Confusingly, these other serious crimes, which would be denominated felonies if committed on land, were often referred to as "piracies" when committed on the high seas, even though they were not "Piracy" as defined by international law. See Wheaton, supra, (explaining that "[t]here are certain acts which are considered piracy by the internal laws of a State, to which the law of nations does not attach the same signification"); Hon. John Marshall, Speech Delivered in the House of Representatives (Mar. 7, 1800), at 10 ("A statute may make any offence piracy, committed within the jurisdiction of the nation passing the statute, and such offence will be punishable by that nation."); Kent, supra, (explaining that, under international law, "[t]he statute of any government may declare an offence committed on board its own vessels to be piracy, and such an offence will be punishable exclusively by the nation which passes the statute"). As one scholar explains, the term piracy "had a popular meaning of serious or capital offense on the high seas," Eugene Kontorovich, The "Define and Punish" Clause and the Limits of Universal Jurisdiction, 103 Nw. L. Rev. 149, 166 (2009), and the term was thus used colloquially to refer to any felony committed at sea, see John Marshall Speech at 10 ("It is by confounding general

- 56 -

- 154 -

piracy with piracy by statute, that indistinct ideas have been produced, respecting the power to punish offences committed on the high seas.").

      The Framers' separation of "Piracies" and "Felonies" in the Define and Punish Clause avoids this confusion and reserves the precise meaning of "Piracy" under international law for that specific crime.  The Framers' use of the separate terms "Piracies" and "Felonies" thus manifests an intent to distinguish between crimes with different jurisdictional limits under international law: classic piracy, which can be punished no matter where committed or by whom, and Felonies, which can be punished only if committed by U.S. nationals[42] or on vessels subject to U.S. jurisdiction under international law.  As noted in the Aybar-Ulloa concurrence, "the United States itself early on took the position before the Supreme Court that the Define and Punish Clause" "is

---

    [42] As stated supra, we do not address here the MDLEA's application to U.S. citizens and resident aliens.  However, the sources quoted above indicate that the Framers would have understood the Felonies Clause to permit U.S. authorities to exercise jurisdiction over U.S. nationals on foreign vessels in at least some circumstances.  See Skiriotes v. Florida, 313 U.S. 69, 73 (1941) (stating that "the United States is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed"); United States v. Kaercher, 720 F.2d 5, 5 (1st Cir. 1983) (per curiam) (quoting the Restatement of Foreign Relations Law of the United States for the proposition that "[a] state has jurisdiction to prescribe a rule of law . . . attaching legal consequences to conduct of a national of the state wherever the conduct occurs" (alteration and omission in original)).

impliedly limited by the law of nations in ways that constrain Congress's authority to rely on that Clause to subject foreign nationals to our criminal laws for conduct that they engage [in] while they are on foreign vessels -- even when those vessels are on the high seas." 987 F.3d at 16 n.7, 15 (Barron, J., concurring); see id. at 16 n.7 (quoting the argument of Mr. Blake on behalf of the United States in United States v. Palmer, 16 U.S. (3 Wheat.) 610, 620 (1818): "A felony, which is made piracy by municipal statutes, and was not such by the law of nations, cannot be tried by the courts of the United States, if committed by a foreigner on board a foreign vessel, on the high seas; because the jurisdiction of the United States, beyond their own territorial limits, only extends to the punishment of crimes which are piracy by the law of nations.").

### 3. Jurisdiction on the High Seas under International Law

Given the Framers' clear intention to draw a jurisdictional distinction between "Piracies" and "Felonies," the question of when a vessel sailing on the high seas may be subject to U.S. jurisdiction under international law -- i.e., the question at the heart of this case -- has constitutional significance. It is a bedrock principle of the international law of the sea, recognized long before the founding of this country, that "all nations have an equal and untrammelled right to navigate on the high seas." Marino-Garcia, 679 F.2d at 1380; see also United

- 58 -

States v. Maine, 475 U.S. 89, 96 n.11 (1986) (explaining that
"since the days of Grotius, the principle of the freedom of the
high seas found an ever wider currency" and "crystallized into a
universally accepted principle of international law" by "the
beginning of the nineteenth century" (quoting Yehuda Z. Blum,
Historic Titles in International Law § 61, at 242-43 (1965)));
Hugo Grotius, The Freedom of the Seas 44 (Ralph V.D. Magoffin
trans., 1916) ("It is clear . . . that he who prevents another
from navigating the sea has no support in law."); United Nations
Convention on the Law of the Sea ("UNCLOS") art. 90, Dec. 10, 1982,
1833 U.N.T.S. 397.[43]   To ensure this right of free navigation,

---

[43] Although the Senate has not ratified the UNCLOS, it was
signed by the President and is generally recognized by the United
States as reflecting customary international law, i.e., universal
practice.   See United States v. Alaska, 503 U.S. 569, 588 n.10
(1992) (acknowledging the U.S. government's position that the
UNCLOS provisions are part of customary international law); see
also Aybar-Ulloa, 987 F.3d at 5 n.2 (citing the UNCLOS "as evidence
of the customs and usages of international law"); United States v.
Hasan, 747 F. Supp. 2d 599, 635 (E.D. Va. 2010) ("[T]he United
States has consistently accepted UNCLOS as customary international
law for more than 25 years."). Moreover, "many of the provisions
of the [UNCLOS] follow closely provisions in the 1958 conventions
to which the United States is a party and which largely restated
customary law as of that time."  Restatement (Third) of Foreign
Relations Law of the United States, Part V, Introductory Note; see
also Mayagüezanos por la Salud y el Ambiente v. United States, 198
F.3d 297, 304 n.14 (1st Cir. 1999) (referring to the "UNCLOS only
to the extent that it incorporates customary international law,"
and noting that, as a signatory, "the United States 'is obliged to
refrain from acts that would defeat the object and purpose of the
agreement'" (quoting Restatement (Third) of Foreign Relations Law
of the United States § 312(3))).  The UNCLOS provisions defining
a stateless vessel discussed infra have long been part of the
international law of the sea and are largely identical to those in

"international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas," and "vessels are normally considered within the exclusive jurisdiction of the country whose flag they fly."[44] Marino-Garcia, 679 F.2d at 1380; see also Aybar-Ulloa, 987 F.3d at 5; John Marshall Speech at 5 (stating that "the opinion of the world is, that a fleet at sea, is within the jurisdiction of the nation to which it belongs").

To preserve this system of flag-state jurisdiction, "every vessel must sail under the flag of one and only one state; those that sail under no flag . . . enjoy no legal protection." Matos-Luchi, 627 F.3d at 5; see also, e.g., Aybar-Ulloa, 987 F.3d at 6 (noting that "international law renders stateless vessels 'susceptible to the jurisdiction of any State'" (quoting Barnes, supra, at 314)); United States v. Pinto-Mejia, 720 F.2d 248, 260 (2d Cir. 1983) (explaining that "a stateless vessel, which does not sail under the flag of one state to whose jurisdiction it has submitted, may not claim the protection of international law and does not have the right to travel the high seas with impunity"); United States v. Rubies, 612 F.2d 397, 403 (9th Cir. 1979) ("'In

_____

the 1958 Convention on the High Seas, which has been ratified by the United States. See supra, arts. 5 & 6.

[44] Although the nationality of a vessel is often referred to as its "flag," there is no requirement that a vessel fly a physical flag to maintain its nationality. See Matos-Luchi, 627 F.3d at 5. Rather, "[s]hips have the nationality of the State whose flag they are entitled to fly." UNCLOS art. 91, § 1 (emphasis added).

the interest of order on the open sea, a vessel not sailing under the maritime flag of a State enjoys no protection whatever, for the freedom of navigation on the open sea is freedom for such vessels only as sail under the flag of a State.'" (quoting Lassa Oppenheim, International Law 546 (7th ed. 1948))). Therefore, it has long been understood that the United States -- and any other country -- may exercise jurisdiction over vessels that are considered stateless under international law. We confirmed that understanding in Aybar-Ulloa.    See, e.g., 987 F.3d at 12 ("[S]tateless vessels are treated as subject to the exercise of authority by any nation."); see also, e.g., Matos-Luchi, 627 F.3d at 6 (noting that "international law . . . treats the 'stateless vessel' concept as informed by the need for effective enforcement," and, hence, "a vessel may be deemed 'stateless,' and subject to the enforcement jurisdiction of any nation on the scene, if it fails to display or carry insignia of nationality and seeks to avoid national identification"); Andrew W. Anderson, Jurisdiction over Stateless Vessels on the High Seas: an Appraisal Under Domestic and International Law, 13 J. Mar. L. & Com. 323, 337 (1982) ("[T]he extension of United States jurisdiction over stateless vessels seems not only to be a reasonable claim but completely consistent with both customary and treaty international law.").

- 61 -

These general principles of jurisdiction on the high seas are not disputed in this case, and, indeed, the Supreme Court applied these principles in the decades immediately following the Constitution's adoption. In 1790, Congress passed a law making murder and robbery committed by "any person" on the high seas punishable under U.S. law. See Palmer, 16 U.S. (3 Wheat.) at 626. It was an open question, however, whether the statute extended to conduct by foreigners on foreign vessels. When he was a congressman, John Marshall argued that the Define and Punish Clause

> can never be construed to make to the government a grant of power, which the people making it, did not themselves possess. It has already been shown that the people of the United States have no jurisdiction over offences, committed on board a foreign ship, against a foreign nation. Of consequence, in framing a government for themselves, they cannot have passed this jurisdiction to that government.

John Marshall Speech at 24-25.

Not surprisingly, then, the Supreme Court in United States v. Palmer, in an opinion written by now Chief Justice Marshall, held that the statute did not extend U.S. jurisdiction to foreigners on foreign vessels for the common law form of robbery, as distinguished from classic piracy. See 16 U.S. (3 Wheat.) at 630-34. The Court reiterated its holding on the statute's reach two years later, concluding that it did not criminalize the murder of a foreigner on a foreign vessel on the

- 62 -

high seas because Congress knew it "had no right to interfere" in

such cases.  Furlong, 18 U.S. (5 Wheat.) at 198; see also id. at

197 (observing that "punishing [murder] when committed within the

jurisdiction, or, (what is the same thing,) in the vessel of

another nation, has not been acknowledged as a right, much less an

obligation").  By contrast, the Supreme Court recognized the

classic form of piracy as "a crime within the acknowledged reach

of the punishing power of Congress" even when "committed by a

foreigner upon a foreigner in a foreign ship," id. at 197, and

noted in other cases that "[m]urders committed by and against

foreigners on stateless vessels . . . could be prosecuted in the

United States," Aybar-Ulloa, 987 F.3d at 7 (citing United States

v. Klintock, 18 U.S. (5 Wheat.) 144, 151 (1820) and United States

v. Holmes, 18 U.S. (5 Wheat.) 412, 417-18 (1820)).[45]

        Thus, in light of these well-established limitations on

Congress's ability to criminalize the conduct of foreign nationals

---

[45] As noted above, the concurring opinion in Aybar-Ulloa also
reports the historical support, in caselaw and commentary, for the
contention that Congress lacks authority under the Define and
Punish Clause to punish foreign nationals for conduct committed on
foreign vessels, "even when those vessels are on the high seas."
987 F.3d at 15-16 & n.7 (Barron, J., concurring); see also id. at
22-26 (discussing the cases "decided just decades after the
Constitution's ratification" that "dealt with the United States'
power to prosecute defendants of a range of citizenships and
circumstances who shared the attribute of having been indicted in
our country pursuant to our criminal justice system for murder,
robbery, or other wrongdoing on the high seas").

aboard foreign vessels on the high seas,[46] the question that arises
when the United States seeks to impose its law on foreigners on
the high seas is how to identify a vessel that is not within any
other country's jurisdiction -- potentially exposing those aboard
to every country's jurisdiction.[47]  In other words, when may a
vessel be characterized as stateless?  Stateless vessels do not
appear to have been a primary focus at the time of the Framers,
and we have found no explicit statements in their deliberations on
when a vessel should be deemed stateless.  That silence, of course,
is unsurprising, given the focus on avoiding improper intrusions
into the affairs of foreign nations.

        As we have concluded, however, there can be no doubt
that the Constitution's drafters intended that Congress's

---

[46] There are, of course, exceptions to the broad principle
that Congress cannot extend U.S. criminal jurisdiction to crimes
like common law robbery or murder committed by foreigners against
foreigners on foreign vessels.  For example, a country may
prosecute such crimes with the consent of the foreign nation.  See
Matos-Luchi, 627 F.3d at 7; see also 46 U.S.C. § 70502(c)(1)(C).
But these exceptions are not pertinent here.

[47] We use the word "potentially" because we declined in Aybar-
Ulloa to decide "whether the United States may prosecute a foreign
citizen engaged in drug trafficking on a stateless vessel where
the United States never boarded and seized the vessel."  987 F.3d
at 14.  We note, in addition, the observation in the Aybar-Ulloa
concurrence that the Third and Fourth Restatements of Foreign
Relations Law of the United States do not "establish that the
prevailing view of the law of nations is that the interdicting
country acquires the same territorial jurisdiction over the
[stateless] vessel's occupants as it acquires over the vessel
itself."  Id. at 17 (Barron, J., concurring).

- 64 -

authority under the Define and Punish Clause, including the Felonies portion of it, be constrained by currently applicable international law whenever Congress invokes that Clause to assert its authority over foreign nationals and their vessels on the high seas.  The Framers sought to ensure that Congress would respect the sovereignty of other nations, and the limits placed on the prosecution of other countries' nationals is an essential component of the international system of mutual respect. Necessarily, then, that constraint applies when Congress passes legislation deeming vessels on the high seas stateless.  If the Constitution instead permitted Congress to define a vessel as stateless in any way it wished, there would be a risk that Congress could contravene international norms determining when a country may prosecute felonies committed by foreign nationals on the high seas.  It therefore follows that the Felonies Clause requires Congress to abide by international law principles in defining statelessness.  We thus review those principles.

### 4. Statelessness under International Law

International law allows each nation to decide for itself the process through which it will grant its nationality to a vessel. See Lauritzen v. Larsen, 345 U.S. 571, 584 (1953) ("Each state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring

- 65 -

authority over it."); UNCLOS art. 91, § 1 ("Every State shall fix
the conditions for the grant of its nationality to ships, for the
registration of ships in its territory, and for the right to fly
its flag."); 5 J.H.W. Verzijl, International Law in Historical
Perspective 146 (1972) (describing an 1801 proclamation by the
King of England regarding the conditions under which merchant ships
may fly the British flag, and noting "[t]he general principle
. . . that it is within the domestic jurisdiction of any State
. . . to determine on what conditions it will allow a sea-going
vessel to fly its flag and thus grant her its 'nationality'").
The simplest definition of a stateless vessel under international
law is thus a vessel that has not been granted nationality by any
state.    Pursuant to that definition, a vessel will lack
nationality, for example, "if no state has ever authorized [the
vessel] to fly its flag, if a state has cancelled its
authorization, or if the political entity that authorized a ship
to fly its flag is not recognized as an international person."
Rosero, 42 F.3d at 171; see also id. ("[A] vessel is without
nationality if it is not authorized to fly the flag of any
state."); Matos-Luchi, 627 F.3d at 16 (Lipez, J., dissenting)
("Under international law, a stateless vessel is simply one that
does not have a valid grant of nationality from any country.").

        Authorities encountering a vessel on the high seas would
not be aware of some of these circumstances -- e.g., if a state

- 66 -

has cancelled a vessel's registration -- and thus will be unable to definitively determine nationality by sight even if a vessel is flying a flag. Nonetheless, international law recognizes a presumption of nationality in the flag-flying situation, among others. We have noted that "[b]y custom, a vessel claims nationality by flying the flag of the nation with which it is affiliated or carrying papers showing it to be registered with that nation." Matos-Luchi, 627 F.3d at 5 (citing Lassa Oppenheim, International Law § 261, at 594-96 (H. Lauterpacht ed., 8th ed. 1955)); see also United States v. Bustos-Guzman, 685 F.2d 1278, 1280 (11th Cir. 1982) (per curiam) (noting that flying a flag is generally "prima facie proof" of nationality under international law); The Chiquita, 19 F.2d 417, 418 (5th Cir. 1927) ("The flag under which a merchant ship sails is prima facie proof of her nationality.").

Absent a flag or papers, "a vessel may also traditionally make an oral claim of nationality when a proper demand is made." Matos-Luchi, 627 F.3d at 5; see also Aybar-Ulloa, 987 F.3d at 5 (quoting Matos-Luchi, 627 F.3d at 5); United States v. Obando, 891 F.3d 929, 939 (11th Cir. 2018) (Black, J., specially concurring) (noting that, under "longstanding principles of admiralty law," the master "speak[s] on behalf of the ship" and must be the one to make a verbal claim of nationality); The Little Charles, 26 F. Cas. 979, 982 (Marshall, Circuit Justice, C.C. Va. 1818) ("The

- 67 -

vessel acts and speaks by the master."); Anderson, supra, at 341 (noting that a vessel may claim nationality "by showing its flag, presenting its documents, or making some other outward or oral claim to a nationality" (emphasis added)).  The MDLEA itself recognizes this form of asserting nationality, stating that "[a] claim of nationality or registry under this section includes . . . a verbal claim of nationality or registry by the master or individual in charge of the vessel."  46 U.S.C. § 70502(e)(3).

International law also recognizes two specific circumstances in which a vessel may be deemed stateless regardless of its actual status and absent any effort to determine its nationality: when the vessel refuses to claim any nationality or when it claims more than one nationality.  See Matos-Luchi, 627 F.3d at 6-7 (stating that "a vessel may be deemed 'stateless' . . . if it fails to display or carry insignia of nationality and seeks to avoid national identification" by "refus[ing], without reasonable excuse, to reveal its" nationality (quoting Meyers, supra, at 322) (internal quotation marks omitted)); UNCLOS art. 92, § 2 (stating that "[a] ship which sails under the flags of two or more States . . . may be assimilated to a ship without nationality"); The Commander's Handbook on the Law of Naval Operations ¶ 3.11.2.4 (2017), https://www.gc.noaa.gov/pdfs/CDRs_HB_on_Law_of_Naval_Operations_AUG17.pdf (stating that "[a] vessel may be assimilated to a vessel

- 68 -

without nationality," inter alia, "when the vessel makes multiple claims of nationality . . . or the master's claim of nationality differs from the vessel's papers").[48]

Hence, whether authorities are seeking to ascertain nationality in the first place -- by examining documents or eliciting a verbal claim -- or to resolve a concern about nationality that was declared by means of a flag, they may need close contact with the vessel and its master.  It is therefore

---

[48] The 2017 version of the Commander's Handbook -- applicable to the U.S. Navy, Marine Corps, and Coast Guard -- also states that a vessel may be "treated as one without nationality" when, among other factors, it displays no "identifying characteristics," when -- consistent with § 70502(d)(1) -- the master makes no claim of nationality or registry, or when "[t]he claim of registry or the vessel's display of registry is either denied or not affirmatively and unequivocally confirmed by the State whose registry is claimed."  Commander's Handbook ¶ 3.11.2.3 (2017), supra; see also id., References 4 (listing MDLEA, 46 U.S.C. §§ 70501-70507).  Interestingly, the Handbook's previous version, in effect when appellants were detained, did not include the failure-to-verify scenario that mirrors § 70502(d)(1)(C) of the MDLEA.  Rather, its list of characteristics of a stateless vessel all relied on inconsistencies in a vessel's presentation of nationality to observers or the absence of, or refusal to provide, identification.  See Commander's Handbook ¶ 3.11.2.4 (2007), https://www.marines.mil/Portals/1/Publications/MCTP%2011-10B%20(%20Formerly%20MCWP%205-12.1).pdf?ver=2017-07-11-151548-683 (providing "a partial list of factors that should be considered in determining whether a vessel is appropriately assimilated to stateless status: (1) No claim of nationality; (2) Multiple claims of nationality; (3) Contradictory claims or inconsistent indicators of nationality (e.g. master's claim differs from vessel's papers; homeport does not match nationality of flag); (4) Changing flags during a voyage; (5) Removable signboards showing different vessel names and/or homeport; (6) Absence of anyone admitting to be the master; displaying no name, flag, or other identifying characteristics; and (7) Refusal to claim nationality").

- 69 -

understood that international law's so-called "right of visit" permits authorities to inquire, board, and conduct a limited search "designed to elicit information about the vessel's identification and registration." Cuevas-Esquivel, 905 F.2d at 513; see also Aybar-Ulloa, 987 F.3d at 6 (recognizing that a "clearly-marked law enforcement ship of any state may board [a private ship] . . . if there is reason to suspect that the ship . . . is without nationality" (quoting Restatement (Third) of Foreign Relations Law of the United States § 522(2)(b) (1987)) (omissions in original)); United States v. Cortes, 588 F.2d 106, 109 (5th Cir. 1979) (stating that, under international law, "stateless vessels are subject to this type of examination").[49]    The question in this appeal, addressed in Section V.C infra, is whether international law

---

[49] The "right of visit" under international law allows a "warship" (which would include a law enforcement ship like the Coast Guard vessel here) to stop and question a foreign ship if "there is reasonable ground for suspecting that the ship is engaged in piracy," slave trading, or illegal broadcasting, "is without nationality," or, although flying a foreign flag, is actually of the same nationality as the warship.  UNCLOS art. 110, § 1. However, the right of visit does not provide an independent ground for exercising jurisdiction over a vessel, and certainly does not allow a state to apply its domestic laws to those aboard that vessel.    Rather, it is simply a mechanism for a state to investigate suspected wrongdoing and then take actions within its authority under international law.    See, e.g., Penelope Mathew, Address - Legal Issues Concerning Interception, 17 Geo. Immigr. L.J. 221, 224-25 (2003) (discussing the limited nature of the right of visit and noting that "a State would have to rely on some positive basis of jurisdiction . . . to exercise jurisdiction over persons on a stateless ship").

- 70 -

permits Congress to dictate the results of such an inquiry as provided in § 70502(d)(1)(C) of the MDLEA.

### 5. Summary: The Felonies Clause and Stateless Vessels

Our review of the law governing jurisdiction on the high seas thus reveals clear signs in multiple sources -- the historical record, the well-established perspective in the late eighteenth century on the role of individual nations in the international sphere, and contemporaneous legal precedent -- that the Framers' invocation of international law terminology in the Define and Punish Clause was deliberate. Seeking to ensure their new nation's compliance with international law, the Framers invoked principles drawn from that law in drafting the Define and Punish Clause generally and the Felonies Clause specifically. In particular, they knew the distinction in international law between "Piracies," which can be punished by any country wherever they occur, and other serious crimes on the high seas, which can be punished by a country only when committed by individuals subject to its jurisdiction. The Framers' goal of incorporating respect for international norms into the federal system thus makes clear that, under the Felonies Clause, Congress's authority to set the boundaries of domestic law on the high seas must be consistent with international law principles. Pursuant to those principles, the key to determining whether Congress can apply domestic law to foreign nationals on a non-U.S. vessel on the high seas ordinarily will depend on whether

- 71 -

international law would deem the vessel to be "without nationality" -- i.e., stateless.  Finally, international law recognizes that an oral claim by the vessel's master constitutes prima facie proof of the vessel's nationality.

With that understanding of the applicable law, we turn to the question of whether Congress exceeded its power to "define and punish . . . Felonies committed on the high Seas" in the challenged provision of the MDLEA.

## C.    Constitutionality of § 70502(d)(1)(C)

The MDLEA reflects Congress's objective of addressing, to the full extent of its authority, the scourge of drugs entering the United States from abroad.  See Matos-Luchi, 627 F.3d at 11 (Lipez, J., dissenting) (noting that the MDLEA and its predecessor, the Marijuana on the High Seas Act, Pub. L. No. 96-350, 94 Stat. 1159 (1980), manifest Congress's objective to "give the Justice Department the maximum prosecutorial authority permitted under international law" (quoting S. Rep. 96-855, at 2 (1980))); id. at 7 ("The MDLEA was responding to repeatedly frustrated efforts to prosecute maritime drug trafficking.").  Undoubtedly mindful of the prohibition against applying domestic law to foreigners traveling on foreign vessels on the high seas, Congress plainly sought in the MDLEA provision defining a stateless vessel to reach as broadly as possible through an expansive definition of statelessness.  The statute, however, can reach no farther than

- 72 -

the authority granted to Congress by the Felonies Clause, which, as we have determined, is constrained by the norms of international law.

As detailed above, the MDLEA provides three descriptions for a "vessel without nationality" in § 70502(d)(1). See 46 U.S.C. § 70502(d)(1).[50]  Two are clearly consistent with international law: when the nation whose registry is claimed denies the claim, id. § 70502(d)(1)(A), and when the individual in charge of a vessel fails to make a claim of nationality or registry for the vessel upon request of an authorized United States officer, id. § 70502(d)(1)(B); see, e.g., Matos-Luchi, 627 F.3d at 6 (involving

---

[50] For convenience, we provide here the full text of § 70502(d)(1):

In this chapter, the term "vessel without nationality" includes --

(A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
(B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
(C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 U.S.C. § 70502(d)(1).

- 73 -

a refusal to make a claim of nationality).  The third definition, however -- the one at issue here -- allows a vessel to be treated as stateless where there _is_ a claim of nationality recognized by international law but the identified country neither confirms nor denies that claim.  See 46 U.S.C. § 70502(d)(1)(C).

This provision thus treats a response that reports only that the named country is unable to confirm nationality -- or the country's failure to respond at all to U.S. inquiry -- as evidence that is equivalent to an outright _denial_ of a master's claim of nationality or registry.  In other words, § 70502(d)(1)(C) displaces the prima facie showing of nationality that arises from an oral assertion of nationality or registry -- made in accordance with international law -- without any affirmative evidence to the contrary.  See Bustos-Guzman, 685 F.2d at 1280 (referring to the "prima facie proof" of nationality that arises from flying a flag); The Chiquita, 19 F.2d at 418 (same); 46 U.S.C. § 70502(e) (listing flying a flag and a verbal claim as alternative methods of making a claim of nationality).  In so doing, § 70502(d)(1)(C) adds a new category to the limited circumstances in which international law deems a vessel stateless (the refusal to claim a nationality, claiming more than one nationality, and disavowal of a claim of nationality by the named country).  A response stating only that the country is unable to confirm nationality, or the country's failure to provide any response, suffices to nullify even an

- 74 -

unequivocal claim of nationality or registry made by the person in charge of the vessel.

The government contends that this variation on deeming a vessel stateless is implicitly, if not explicitly, recognized in international law. The government asserts that international law requires a vessel not only to make a claim of nationality, but also to "'be in a position to provide evidence of [nationality].'" Appellee's Br. at 29 (quoting Matos-Luchi, 627 F.3d at 6). Consequently, the government proposes, an absence of "affirmative[] and unequivocal[]" confirmation from the claimed country may properly be relied upon in deeming the vessel stateless. Id. at 36.

In making this assertion, the government relies heavily on dicta in Matos-Luchi, a case in which the defendants had declined to make a claim of nationality in response to a request from Coast Guard personnel. See 627 F.3d at 2.[51] As we have described, avoiding national identification is a well-established basis for deeming a vessel stateless, and it is incorporated into the MDLEA in § 70502(d)(1)(B). See supra note 50; see also, e.g., Meyers, supra, at 322 ("[A] ship which obscures the cognoscibility of its allocation repeatedly, deliberately, and successfully may

---

[51] In Matos-Luchi, when the Coast Guard approached a small vessel whose crew members were suspected of drug trafficking, the crew initially fled and, when subsequently apprehended, "declined to make a claim of nationality" for their vessel. 627 F.3d at 2.

- 75 -

be treated as stateless." (internal quotation marks omitted)). However, the Matos-Luchi majority went beyond that indisputable basis for deeming a vessel stateless -- and the facts before it -- to suggest that an oral declaration of nationality is inadequate if the vessel's master provides no other evidence of the claimed nationality. See 627 F.3d at 6. Stated without examination of the issue, the majority's dicta, which is not binding on another panel, does not support the government's contention that international law allows a vessel to be deemed stateless based solely on the absence of confirming evidence of the master's verbal claim. As the government acknowledges, the MDLEA recognizes "a verbal claim of nationality or registry by the master" as a "claim of nationality or registry" equivalent to flying a flag or producing "documents evidencing the vessel's nationality." 46 U.S.C. § 70502(e). Rejecting a verbal claim of nationality based solely on a lack of substantiating evidence effectively negates that distinct method for claiming nationality recognized both by the MDLEA and by international law.

The government also directly invokes international law to support its position. In its supplemental brief, the government cites articles 17(1) and (2) of the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Dec. 20, 1988, 1582 U.N.T.S. 95 ("UN Narcotics Convention"), and article 5(2) of the 1958 Convention on the High

- 76 -

Seas, _supra_, in arguing that the United States may deem a vessel stateless if neither its master nor the claimed nation substantiates a verbal claim of nationality. Neither of these sources supports that proposition. The first cited provision of the UN Narcotics Convention calls for cooperation "to suppress illicit traffic by sea, in conformity with the international law of the sea," _id._ art. 17(1), and the second states that a party with "reasonable grounds to suspect that a vessel flying its flag or not displaying a flag or marks of registry is engaged in illicit traffic may request the assistance of other [p]arties in suppressing its use for that purpose," _id._ at 17(2). These principles of cooperation do not speak to the circumstances in which international law deems a vessel stateless.

The provision of the 1958 Convention on the High Seas cited by the government provides that "each state shall issue to ships to which it has granted the right to fly its flag documents to that effect." The UNCLOS contains a nearly identical provision, _see_ UNCLOS art. 91, § 2, and another UNCLOS provision specifically addresses registration, requiring states to "maintain a register of ships containing the names and particulars of ships flying its flag, except those which are excluded from generally accepted international regulations on account of their small size," _id._ art. 94, § 2(a). The government suggests that such provisions create an expectation that all vessels will carry documents and

- 77 -

that, if a vessel's master does not substantiate a verbal claim with documents or other evidence, the claimed country of nationality "has accepted through its international treaty obligations that the vessel may be deemed stateless." Appellee's Supp. Br. at 16.

However, these treaty provisions demanding that countries issue documents evidencing vessel nationality say nothing about when a vessel may be deemed stateless. Nor can the provisions reasonably be construed to provide consent to the exercise of jurisdiction over a signatory's vessel by all other signatories based solely on the master's failure to produce documents in support of a claim of nationality. Indeed, as we have noted, consent by the country whose nationality is claimed provides a separate basis for jurisdiction under the MDLEA, see 46 U.S.C. § 70502(c)(1)(C), and the statute specifies that consent "may be obtained by radio, telephone, or similar oral or electronic means," id. § 70502(c)(2)(A). The government's theory of implicit consent is at odds with this scheme.

The government also attempts to infer from treaty provisions a principle of international law that when a country both fails to confirm a claim of registration or nationality and the vessel carries no registration or other identifying documents the vessel may be deemed stateless. This theory conflates two discrete international law issues. Even accepting documentation

- 78 -

requirements as within customary international law, it does not follow that a country's failure to issue identifying documents or "maintain a register" renders a vessel stateless when its master has verbally claimed that country's nationality.  The relevant question is not whether the claimed country has satisfied its obligations under international law.  Rather, the question is what type of inquiry and response suffices to permit the United States to deem a vessel stateless despite a claim of nationality recognized by international law.  On that question, the government cites no source of international law expressly recognizing a lack of documents, or the claimed country's failure to confirm nationality (instead of an outright denial), as a basis for overcoming the prima facie showing of nationality arising from the master's oral declaration.

That lack of support for the government's proposition is unsurprising.  As we have explained, the master's oral declaration has long sufficed under international law to establish a presumption of nationality.  See, e.g., N.P. Ready, Ship Registrations 3 (3d ed. 1998) ("A vessel may be considered as possessing the nationality of a State even though she is unregistered, possesses no documents evidencing that nationality, nor even flies the flag of that State."); see also Aybar-Ulloa, 987 F.3d at 5 (observing that, "[w]ithout a flag or papers, a vessel may also traditionally make an oral claim of nationality

- 79 -

when a proper demand is made" (quoting <u>Matos-Luchi</u>, 627 F.3d at 5)).[52] That presumption is sensibly overcome by the named country's express denial of the claim, a scenario long embedded in international law.

However, a response stating that the country can neither confirm nor deny the claim, or the named country's failure to respond at all, may say very little about the veracity of the master's assertion of nationality. Indeed, the inability to confirm the claim may have more to do with the responding country's bureaucracy than with the vessel's status. The facts in <u>United States</u> v. <u>Hernandez</u>, 864 F.3d 1292 (11th Cir. 2017), graphically illustrate the problem with § 70502(d)(1)(C). The captain of a vessel told Coast Guard officers that his boat was registered in Guatemala -- a truthful claim -- and he and the other three crew

_____

[52] In addition to the traditional methods of claiming nationality discussed above -- flying the flag, presenting documents, and oral declaration -- authorities may in some instances look to the nationality of the vessel's owner. <u>See</u>, <u>e.g.</u>, <u>The Chiquita</u>, 19 F.2d at 418 ("If [a vessel] is not properly registered, her nationality is still that of her owner."). However, whether the owner's nationality establishes that of the vessel will depend on the practice of the particular country. As discussed above, "a State is absolutely independent in framing the rules concerning the claim of vessels to its flag." Oppenheim (8th ed.), <u>supra</u>, at 595; <u>see</u> <u>also</u> <u>id.</u> (noting that Great Britain "allow[s] only such vessels to sail under [Great Britain's] flags as are the exclusive property of their citizens or corporations established on their territory," while "[o]ther [countries] allow vessels which are the property of foreigners" to do so); Churchill & Lowe, <u>supra</u>, at 213 n.19 (noting that a country may not register small ships but may "regard such ships as having its nationality if they are owned by its nationals").

- 80 -

members all identified themselves as Guatemalan citizens. Id. at

1297. Indeed, at some point, Guatemalan registration documents

were found on the vessel. Id. Nonetheless, when asked by the

Coast Guard to confirm the registry claim, the government of

Guatemala responded that it could neither confirm nor deny it.

Id. Although the vessel plainly was not stateless, the court

rejected the defendants' challenge to their convictions under the

MDLEA because Guatemala had not "'affirmatively and unequivocally

assert[ed]' the ship's registry." Id. at 1299 (quoting

§ 70502(d)(1)(C)).[53]   In other words, the vessel was deemed

---

[53] The defendants in Hernandez contended that jurisdiction
under the MDLEA was improper because their vessel was in fact
registered and because the Coast Guard had identifying information
about their vessel "that would easily have confirmed its registry,"
but "failed in bad faith to convey that information" to the
Guatemalan government. 864 F.3d at 1299.  In rejecting those
contentions, the court observed that "[t]he MDLEA does not state
what information the United States must convey to the foreign
government during its communication, and it does not state that
actual registry overrides the [Department of State]
certification's proof of statutory statelessness." Id. "MDLEA
statelessness," the court explained, "does not turn on actual
statelessness, but rather on the response of the foreign
government." Id.  The court further observed that, given the
MDLEA's "clear terms" deeming their vessel stateless, "any
diplomatic consequences of the criminal prosecution" -- including
any violation of international law -- were the responsibility of
the executive branch and not a basis for undoing the convictions.
864 F.3d at 1297.

    One defendant in Hernandez also argued "that the MDLEA is an
unconstitutional assertion of Congressional power because it
reaches stateless vessels on the high seas without a proven nexus
to the United States" -- an argument rejected there as foreclosed
by Eleventh Circuit precedent. 864 F.3d at 1303. The Hernandez
defendants did not make the argument asserted here that
§ 70502(d)(1)(C) is unconstitutional because Congress acted beyond

- 81 -

"stateless" even when verification of its nationality should have been easily accomplished.

Moreover, where -- as in <u>Hernandez</u> and here -- the master's oral declaration of nationality is consistent with the citizenship or nationality of all individuals aboard the vessel, the declaration is particularly forceful. To reject the master's declaration of nationality in such circumstances based solely on the claimed country's failure to provide affirmative and unequivocal confirmation -- or its failure to respond at all -- would eviscerate a method long accepted for identifying a vessel's nationality under international law. We cannot infer displacement of that method merely based on treaty provisions imposing obligations on signatory countries to register vessels or issue other documents.[54]

That is not to say that the government's emphasis on registration or documentary evidence of nationality is wholly misplaced. International law does, in general, promote a system

---

its authority under the Felonies Clause in defining a vessel without nationality to include a vessel whose master makes a verbal claim of nationality that is not affirmatively and unequivocally confirmed by the identified country.

[54] Importantly, § 70502(d)(1)(C) on its face applies not only to verbal claims of nationality, but to any claim of registration or nationality, even one based on documentation. By its terms, therefore, it allows the United States to reject a claim of registration or nationality that is supported by documentary evidence based solely on an equivocal response, or no response at all, from the identified country.

- 82 -

of registration.[55]  It is reasonable to expect that registered
vessels would have documents onboard, and, if not, that the claimed
country of nationality would be able to easily confirm a legitimate
claim by checking its registry.  However, not all vessels must be
registered.  Small vessels are excluded from the UNCLOS registry
requirement, see UNCLOS art. 94, § 2(a), perhaps because some
countries typically do not register small vessels -- whether
defined by length or by tonnage.  In the United States, for
example, the registration of smaller boats is generally left to
individual states.  See 46 U.S.C. § 12102(b) (providing that "[a]
vessel of less than 5 net tons may engage in a trade without being

---

[55] As we recognized in Aybar-Ulloa, it is important that some
country exercise jurisdiction over a vessel.  See 987 F.3d at 5.
A flag state

> has several responsibilities [under
> international law], including the
> responsibility to ensure that its ships comply
> with domestic and international law and
> regulations.  . . .  Most notably, a state
> must exercise "jurisdiction and control [over
> its fleet] in administrative, technical, and
> social matters."  Control includes ensuring
> that ships are seaworthy and comply with
> relevant labor regulations and criminal laws.

Allyson Bennett, Note, That Sinking Feeling: Stateless Ships,
Universal Jurisdiction, and the Drug Trafficking Vessel
Interdiction Act, 37 Yale J. Int'l L. 433, 439 (2012) (second
alteration in original) (footnotes omitted) (citing various
provisions of the UNCLOS); see also Purchase of Ships of
Belligerents by Neutrals, 6 Op. U.S. Att'y Gen. 638, 640 (1854)
("The law of nations and common sense combine to require that every
ship shall have a nationality[.]").

- 83 -

documented"); id. § 12301 (providing that "[a]n undocumented
vessel equipped with propulsion machinery of any kind shall have
a number issued by the proper issuing authority in the State in
which the vessel principally is operated"); see also U.K. Mar. &
Coastguard Agency, Guidance: Vessel Classification and
Certification (2018), https://www.gov.uk/guidance/vessel-
classification-and-certification#certification-requirements-for-
uk-vessels (stating that, in the United Kingdom, a certificate of
registry is optional for "small commercial vessel[s]," defined as
vessels under 24 meters (roughly 79 feet)); R.R. Churchill & A.V.
Lowe, The Law of the Sea 213 n.19 (3d ed. 1999) (noting that "a
State may not require, or permit, the registration of ships below
a certain size"); Meyers, supra, at 160 ("Many states . . . do not
issue documents to ships with a tonnage below a given figure.").[56]

---

[56] We note that 24 meters (roughly 79 feet) is a cutoff point
for the applicability of several major international conventions.
See, e.g., International Convention on Tonnage Measurement of
Ships art. 4, June 23, 1969, 1291 U.N.T.S. 4 (exempting "ships of
less than 24 metres (79 feet) in length"); International Convention
on Load Lines art. 5, Apr. 5, 1966, 9159 U.N.T.S. 134 (same); see
also Gudrun Petursdottir, Olafur Hannibalsson & Jeremy M.M.
Turner, Part II: International Conventions and Guidelines on
Safety at Sea, in Safety at Sea as an Integral Part of Fisheries
Management, Food & Agric. Org. of the United Nations (2001),
available at https://www.fao.org/3/X9656E/X9656E01.htm (stating
that recommendations and conventions developed by the
International Maritime Organization and International Labor
Organization "are aimed at large vessels, primarily the merchant
fleet on international voyages" and observing that "[s]ome
conventions explicitly exempt fishing vessels, and most do not
apply to vessels under 24m thus leaving out the majority of fishing
vessels and transport boats in the developing countries").

- 84 -

Case: 16-2089    Document: 96    Page: 85    Date Filed: 01/20/2022    Entry ID: 6472425

Hence, proof of a vessel's nationality via a centralized registry or other evidence of registration may be unavailable, and a country whose citizens have properly claimed nationality on behalf of their vessels thus may be unable either to confirm or deny those claims when contacted by the U.S. Coast Guard or other authorities.[57]

Importantly, we do not suggest that international law requires the United States to accept a bare assertion of nationality where there is conflicting evidence and attempts to resolve the conflict prove fruitless. Although the master's oral declaration constitutes prima facie proof of nationality, that verbal assertion can be undermined by contrary evidence, as is the case for any prima facie showing. For example, if the vessel's claimed nationality differs from the nationality of most crew

_____

According to the government, appellants' boat was 35 feet in length. See supra note 4.

[57] That may be what occurred in this case. The Department of State's Certification, which describes the measures taken to verify the master's claim of nationality, indicates that, on the day the Coast Guard encountered the vessel -- October 29, 2015 -- U.S. officials "requested that the Government of the Republic of Costa Rica confirm the registry or nationality of the suspect vessel, and, if confirmed, provide disposition instructions." Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016) (emphasis added). The Certification reports that, nearly three months later, "the Government of Costa Rica replied that it could not confirm [the] vessel's registry." Id. (emphasis added). Separately, although not presented as an issue on appeal, the time lag between the defendants' initial detention and Costa Rica's response to the verification request strikes us as problematic, given that the status of a vessel determines whether U.S. law enforcement officials may proceed with prosecuting the crew members under the MDLEA.

- 85 -

members, or if a small vessel is interdicted far from the claimed country,[58] U.S. authorities could properly seek verification of the master's claim.  In other words, where surrounding facts provide legitimate reason to doubt an oral claim of nationality, international law would permit the United States to treat the vessel as stateless absent the sort of confirmation required by § 70502(d)(1)(C).  See, e.g., Commander's Handbook (2017), supra, ¶ 3.11.2.4 (stating that "[a] vessel may be assimilated to a vessel without nationality" if, inter alia, there are contradictory or inconsistent indicators of nationality).

Put differently, when U.S. authorities are presented with mixed signals about the nationality of a vessel, it would be permissible under international law for the United States to seek confirmation from the country of asserted nationality and, if none is forthcoming, to treat the vessel as stateless.  As we have described, a vessel may be deemed stateless under international law both when it "seeks to avoid national identification," Matos-Luchi, 627 F.3d at 6, and when it "sails under the flags of two or

---

[58] The government posits such a scenario, asserting that it would be absurd to require countries to accept unconfirmed verbal claims of nationality because "[d]rug traffickers . . . could falsely claim their vessels are the nationals of a small Micronesian island or, more perplexingly, a country like North Korea with limited diplomatic contacts." Appellee's Supp. Br. at 15.  We do not disagree.  Our analysis permits further inquiry when a vessel's master claims a nationality that is at odds with surrounding circumstances, including the vessel's location or the nationality of the master and crew.

more States," UNCLOS art. 92, § 2 -- two situations that produce ambiguity concerning the vessel's nationality.[59]  International law, by inference, likewise permits treating a vessel as stateless when its master makes a verbal claim of nationality that is <u>both</u> unsubstantiated <u>and</u> inconsistent with other relevant indicators of the vessel's nationality.  As when the master of a vessel avoids claiming a nationality or when a vessel indicates that it is attempting to claim multiple nationalities, conflicting signals of nationality create an ambiguity that properly gives rise to inquiry and, absent confirmation, permits designation of the vessel as "without nationality."[60]

---

[59] These two circumstances are reflected in the MDLEA's provisions addressing vessels without nationality.  As we have described, § 70502(d)(1)(B) covers the avoidance scenario, defining a "vessel without nationality" to include one for which the master fails "to make a claim of nationality or registry" upon inquiry.  The scenario of multiple identities is covered in § 70502(c)(1)(B), which states that a "vessel subject to the jurisdiction of the United States" includes "a vessel assimilated to a vessel without nationality under paragraph (2) of article 6 of the 1958 Convention on the High Seas."  Paragraph (2) of the Convention states: "A ship which sails under the flags of two or more States, using them according to convenience, may not claim any of the nationalities in question with respect to any other State, and may be assimilated to a ship without nationality." 1958 Convention on the High Seas, <u>supra</u>, art. 6.

[60] As described above, the government in its supplemental briefing suggests that the circumstances here involved mixed signals because, according to a Coast Guard officer's statement, Reyes-Valdivia initially stated that the vessel lacked a nationality.  Although the government noted the reported disclaimer of nationality in its Motion in Limine in support of jurisdiction, it chose for whatever reason not to include that fact in the version of the facts presented at appellants' change-of-plea hearing or in appellants' plea agreements.  See <u>supra</u>.

- 87 -

However, that conflicting-signals limitation is not part of § 70502(d)(1)(C) as currently enacted. Rather, as we have described, even where the circumstances offer no rationale for displacing the prima facie showing of nationality established through a verbal claim, § 70502(d)(1)(C) treats a vessel as stateless based solely on the named country's failure to respond "affirmatively and unequivocally" to U.S. inquiry. The statute on its face is thus inconsistent with international law,[61] and we have no license to rewrite it to satisfy constitutional requirements. See Iancu v. Brunetti, 139 S. Ct. 2294, 2301 (2019) (stating that, although the Court "may interpret 'ambiguous statutory language'

---

Accordingly, as indicated in our discussion of the government's Class argument, see Section III supra, it may not rely now on that untested fact. Moreover, any attempt to raise a new theory of prosecution at this juncture would raise serious due process questions.

[61] Although the government in its briefing at times depicts appellants' claim that § 70502(d)(1)(C) is unconstitutional as an as-applied challenge, that characterization is inapt. The classification of a vessel as stateless based solely on the named country's indecisive response to inquiry, or its failure to respond, is a "constitutional flaw evident in the statutory terms themselves." Marc E. Isserles, Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement, 48 Am. U.L. Rev. 359, 365 (1998); cf. Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449-50 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."). The mere fact that a cognizable legal challenge by necessity concerns the application of a statute to individuals does not transform a facial challenge into an as-applied challenge. See generally Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321 (2000).

to 'avoid serious constitutional doubts,' . . . '[w]e will not rewrite a law to conform it to constitutional requirements'" (first quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 516 (2009), and then quoting United States v. Stevens, 559 U.S. 460, 481 (2010))); see also Jennings v. Rodriguez, 138 S. Ct. 830, 843 (2018) ("Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases."). It is up to Congress to narrow the language of § 70502(d)(1)(C) if it so chooses.[62]

Even the absence of conflicting evidence of nationality, however, does not mean that foreign nationals engaged in drug trafficking on the high seas can evade prosecution based solely on a verbal claim -- whether true or false -- of a vessel's nationality. The Coast Guard and other countries' authorities can always ask the claimed country of nationality for consent to arrest and prosecute the individuals onboard.   See 46 U.S.C. § 70502(c)(1)(C) (stating that a "vessel subject to the jurisdiction of the United States" includes "a vessel registered

---

[62] We recognize that the three examples of vessels without nationality listed in § 70502(d)(1) are not exclusive, and the government might argue in future cases -- as the government belatedly argued in this case -- that a vessel may be properly deemed without nationality under the MDLEA based solely on mixed signals, without the need to make any inquiry of the sort required by § 70502(d)(1)(C). We need not, and therefore do not, consider the viability of such an argument, including whether reliance on a rationale for deeming a vessel without nationality that is not expressly described in the MDLEA would raise due process concerns.

- 89 -

in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States"); see also, e.g., Cardales-Luna, 632 F.3d at 736 (noting that the United States obtained consent from the government of Bolivia, which "waived objection to the enforcement of U.S. laws by the United States with respect to the vessel . . . , including its cargo and all persons onboard" (quoting State Department certification)); Matos-Luchi, 627 F.3d at 18 (Lipez, J., dissenting) (noting that the government in that case had failed to obtain consent from the likely country of nationality, "which could have provided a fallback position in the event that the evidence of statelessness proved deficient").

Indeed, it is common practice for countries, including the United States, to negotiate bilateral and multi-lateral agreements to facilitate the apprehension of drug traffickers operating on the high seas. See, e.g., Casavant, supra, at 205 (stating that the United States has entered into twenty-seven such agreements, including with countries in South America, Central America, and the Caribbean, providing a "process by which the two [or more] nations can operate to suppress drug trafficking while also respecting flag state jurisdiction").[63] The United States

---

[63] As previously noted, the United States relied on such an agreement to board appellants' vessel. The State Department's Certification reports that "United States law enforcement personnel boarded the vessel" "pursuant to Article V of the

also can address its concerns about maritime drug trafficking by seeking to persuade other countries to take enforcement action against their own vessels and nationals. See generally James Kraska, Broken Taillight at Sea: The Peacetime International Law of Visit, Board, Search, and Seizure, 16 Ocean & Coastal L.J. 1, 11 (2010) ("Nowhere is collaboration [among countries] so ingrained than in counter-drug operations at sea."). In this regard, a 2021 report by the U.S. Department of State noted that the Coast Guard of Costa Rica -- the claimed flag-state here -- "is a successful regional partner with the United States for maritime interdiction." See U.S. Dep't of State, Bureau of Int'l Narcotics & Law Enforcement Affairs, Int'l Narcotics Control Strategy Report, Vol. 1, Mar. 2021, at 117; see also id. at 119 ("[A] bilateral agreement between the United States and Costa Rica is regularly used in maritime drug interdiction operations[.]").

What the United States cannot do consistently with the Constitution, however, is arrest and prosecute foreigners on foreign vessels by relying on a concept of statelessness that conflicts with international law. And that is what § 70502(d)(1)(C) allows. It overrides international law by treating a country's failure to supply an "affirmative[] and

---

Agreement between the Government of the United States of America and the Government of the Republic of Costa Rica Concerning Cooperation to Suppress Illicit Traffic." Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016).

unequivocal[]" confirmation of nationality -- including a failure
to respond at all -- as evidence sufficient to invalidate an oral
claim of foreign nationality even when there are no mixed signals
that would call the claim into doubt.  That is, the MDLEA treats
as stateless a vessel that, under international law, would be a
vessel with nationality.  Accordingly, the prosecution of foreign
nationals traveling on such a vessel for a violation of U.S. law
is impermissible under the Felonies Clause of the Constitution,
the only source of authority asserted for Congress's adoption of
the  MDLEA.    See  Aybar-Ulloa,  987  F.3d  at  4  (referring  to
"Congress's power under Article I '[t]o define and punish Piracies
and Felonies committed on the high Seas'" (quoting U.S. Const.
art.  1,  § 8,  cl.10));  Mitchell-Hunter,  663  F.3d  at  49  n.3
(explicitly stating that "[t]he MDLEA is derived from Congress'
power to 'define and punish Piracies and Felonies committed on the
high Seas'" (quoting U.S. Const. art. 1, § 8, cl.10)); Cruickshank,
837 F.3d at 1187 (same).

VI.

        The  Framers  intended  international  law  to  be  a
constraint on Congress's authority "[t]o define and punish . . .
Felonies committed on the high Seas."  Two centuries ago, the
Supreme  Court  held  that  Congress  lacked  authority  under  the
Felonies Clause to extend U.S. jurisdiction to felonies committed
by foreign nationals on foreign vessels.  See Furlong, 18 U.S. (5

Wheat.) at 198; Palmer, 16 U.S. (3 Wheat.) at 632-34.  With § 70502(d)(1)(C), Congress violated this principle, extending U.S. jurisdiction beyond the limits of international law and, hence, beyond the authority conferred by the Felonies Clause.

In this case, relying on the authority provided by § 70502(d)(1)(C), the Coast Guard treated a vessel whose master made a claim of Costa Rican nationality cognizable under international law as a "vessel without nationality."  The United States government improperly relied on that classification -- in violation of constitutional limits -- to arrest and prosecute Costa Rican citizens, Reyes-Valdivia and Dávila-Reyes.  We therefore vacate their convictions and remand the case to the district court with instructions to dismiss the MDLEA charges against them.[64]

So ordered.

-CONCURRING OPINION FOLLOWS-

---

[64] Because we vacate appellants' convictions based on their Felonies Clause argument, we do not reach their due process challenges to the MDLEA or Reyes-Valdivia's appeal from the district court's application of the "captain" sentencing enhancement.

- 93 -

HOWARD, <u>Chief Judge</u>, concurring in the result. As noted in the majority opinion, we withdrew our prior panel opinion and granted panel rehearing after the en banc court issued its opinion in <u>Aybar-Ulloa</u>. In <u>Aybar-Ulloa</u>, the en banc court did not address arguments raised by the parties about the protective principle. In light of the now uncertain status of our protective principle precedent, like my colleagues I am reluctant to unquestioningly rely on the protective principle to affirm the convictions underlying these appeals. Unlike my colleagues, I would not decide these appeals on constitutional grounds.

I would instead reverse these convictions on the basis that the agreed facts do not support the statelessness claim charged by the government.[65] The government claims the vessel is stateless per 46 U.S.C. § 70502(d)(1)(C), which provides that 'vessels without nationality' include:

---

[65] Although this ground for reversal of the convictions was not initially raised in the appeals, the panel was concerned enough about the mismatch that we requested that the parties brief the issue, and they complied. That the issue was addressed by the parties through supplemental briefing may not by itself be reason enough for us to bypass appellate waiver -- including not only the failure to raise the issue on appeal but also, in the case of Dávila-Reyes, the affirmative waiver of appeal contained in the plea agreement. But the majority's constitutional analysis depends in part on an equivalency between "nationality" and "registry" that it finds in § 70502(d)(1)(C). My disagreement about whether that equivalency exists is consequential, such that it should not be relegated to a dicta detour along the way to finding waiver. At this stage of the proceedings, the gap in the statelessness determination under § 70502(d)(1)(C) is stark enough for me to join the majority, albeit in result only.

- 94 -

> a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

The majority asserts that the facts here meet the criteria described above in § 70502(d)(1)(C) because § 70502 treats "registry" and "nationality" synonymously. But I find no support for that observation in the text of § 70502 or in our cases.

To reach its conclusion that "registry" and "nationality" are used interchangeably in the statute, the majority argues that interpreting these terms to have independent meanings would leave an incongruous hole in statutory coverage; how, the majority wonders, could Congress have intended to cover a situation in which a master asserts Costa Rican registration, but not Costa Rican nationality?

The answer becomes apparent when we examine the overall legal terrain. Section 70502(d)(1) establishes three avenues to find statelessness. But this list is not exclusive, and leaves in place other ways in which the government can establish lack of nationality. See United States v. Matos-Luchi, 627 F.3d 1, 4 (1st Cir. 2010); id. at 15 (Lipez, J., dissenting) ("As the majority correctly holds, Congress did not intend those three examples [in § 70502(d)(1)] to be exhaustive. The MDLEA extends to vessels that are considered stateless under international law, even if those vessels do not fall within one of the specifically

- 95 -

enumerated categories."); see also United States v. Miranda, 780 F.3d 1185, 1197 (D.C. Cir. 2015) ("[T]he statute contains three nonexclusive examples of 'vessels without nationality,' each of which turns on the 'registry' of the vessel."); United States v. Rosero, 42 F.3d 166, 171 (3d Cir. 1994) (Alito, J.). Thus, giving meaning to all the terms in § 70502(d)(1) does not immunize vessel masters who claim foreign nationality rather than registry.

Here, the master asserted Costa Rican nationality for the vessel; at no point did he assert Costa Rican registry. Accordingly, by its terms, § 70502(d)(1)(C) is not applicable, nor did the government assert an alternative basis for finding statelessness when prosecuting appellants. I would reverse the convictions on that ground and go no further.