Nos. 16-2089 and 16-2143

In the

# United States Court of Appeals
### for the First Circuit

UNITED STATES OF AMERICA,
Appellee,

v.

JEFFRI DÁVILA-REYES and JOSÉ D. REYES-VALDIVIA,
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
District Court No. 15-CR-721 (Besosa, J.)

**SUPPLEMENTAL EN BANC REPLY BRIEF FOR THE UNITED STATES**

W. STEPHEN MULDROW
United States Attorney

MARIANA E. BAUZÁ-ALMONTE
Chief, Appellate Division

DAVID C. BORNSTEIN
Assistant United States Attorney
District of Puerto Rico

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1258
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

1.  The Term "Registry" in 46 U.S.C. § 70502(d)(1)(C) is Interchangeable with Nationality ..................................................................... 1

2.  Procedural Barriers Foreclose the Court from Reversing Defendants' Convictions on the Grounds They Raise on Appeal ...................................... 2

3.  The MDLEA Covers Defendants Because Their Vessel was Stateless ......... 4

4.  Neither Waiver nor Due Process Precludes the Court from Affirming on These Alternative Grounds ............................................................. 5

5.  Assuming International Law Limits Congress's Authority Under the Felonies Clause, § 70502(d)(1)(C) is a Permissible Exercise of Prescriptive Jurisdiction Under the Protective Principle of International Law ................................................................................. 5

6.  *Aybar* Leaves This Court's Protective-Principle Precedents Undisturbed ............................................................................................. 8

7.  International Law Does Not Constrain Congress's Legislative Authority Under the Felonies Clause ............................................................. 8

8.  Assuming International Law Limits Congress's Authority Under the Felonies Clause, § 70502(d)(1)(C) is Consistent with International Law and Therefore a Lawful Exercise of Congress's Legislative Power ....................................................................................................... 12

CERTIFICATE OF COMPLIANCE .......................................................... 17

CERTIFICATE OF SERVICE ................................................................... 18

i

# TABLE OF AUTHORITIES

## Cases

*Alden v. Maine,*
    527 U.S. 706 (1999) ........................................................................ 9

*Bousley v. United States,*
    523 U.S. 614 (1998) ........................................................................ 5

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ...................................................................... 10

*Chisholm v. Georgia,*
    2 U.S. (2 Dall.) 419 (1793) ........................................................ 12

*Class v. United States,*
    138 S. Ct. 798 (2018) .................................................................... 3

*Lauritzen v. Larsen,*
    345 U.S. 571 (1953) ...................................................................... 12

*United States v. Aybar-Ulloa,*
    913 F.3d 47 (1st Cir. 2019), *vacated,* 987 F.3d 1 (1st Cir. 2021) .................................. 6

*United States v. Broce,*
    488 U.S. 563 (1989) ...............................................................2, 3, 5

*United States v. Bustos-Useche,*
    273 F.3d 622 (5th Cir. 2001) ........................................................ 4

*United States v. Dávila-Reyes,*
    23 F.4th 153 (1st Cir. 2022) ......................................................... 1

*United States v. Díaz-Rodríguez,*
    853 F.3d 540 (1st Cir. 2017) ........................................................ 3

*United States v. Furlong,*
    18 U.S. (5 Wheat.) 184 (1820) ............................................... 10, 11

*United States v. González,*
    311 F.3d 440 (1st Cir. 2002) ...................................................... 3, 4

*United States v. Gonzalez,*
    776 F.2d 931 (11th Cir. 1985) ...................................................................... 6, 8

*United States v. Hernandez,*
    864 F.3d 1292 (11th Cir. 2017) ............................................................... 14, 15

*United States v. Kitts,*
    27 F.4th 777 (1st Cir. 2022) ........................................................................... 3

*United States v. Matos-Luchi,*
    627 F.3d 1 (1st Cir. 2010) ............................................................................... 1

*United States v. Miranda,*
    780 F.3d 1185 (D.C. Cir. 2015) ..................................................................... 4

*United States v. Nueci-Peña,*
    711 F.3d 191 (1st Cir. 2013) ......................................................................... 11

*United States v. Palmer,*
    16 U.S. (3 Wheat.) 610 (1818) ..................................................................... 10

*United States v. Prado,*
    933 F.3d 121 (2d Cir. 2019) ........................................................................... 4

*United States v. Rosero,*
    42 F.3d 166 (3d Cir. 1994) ............................................................................. 2

*United States v. Saac,*
    632 F.3d 1203 (11th Cir. 2011) ................................................................... 11

*United States v. Suerte,*
    291 F.3d 366 (5th Cir. 2002) ....................................................................... 10

## Statutes

18 U.S.C. § 3231 ................................................................................................. 4

46 U.S.C. § 70501 ............................................................................................... 6

46 U.S.C. § 70502 ...................................................................................... *passim*

Crimes Act of 1790, Ch. 9, § 12, 1 Stat. 112 ................................................. 10

## Other Authorities

3 J. Story, *Commentaries on the Constitution* (1833) ................................. 9

3 James Wilson, *Works of the Honourable James Wilson* (1804) ........................... 11

4 William Blackstone, *Commentaries on the Laws of England* (1769) ..................................... 9

Andrew W. Anderson, *Jurisdiction over Stateless Vessels on the High Seas: an Appraisal Under Domestic and International Law*, 13 J. Mar. L. & Com. 323 (1982) ........................................................................................................ 14

E. Kontorovich, *Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug Crimes*, 93 Minn. L. Rev. 1191 (2009) ...................... 7, 8

H.R. Rep. No. 104-854 (1996) ...................................................................... 2

Michael Sinclair, *The Wicked Problem of Drug Trafficking in the Western Hemisphere*, Brookings Inst. (Jan. 15, 2021) .................................................. 7

N.P. Ready, *Ship Registration* (3d ed. 1998) .............................................. 1

Restatement (Fourth) of the Foreign Relations Law of the United States ................. 6, 8

Ruth Wedgwood, *The Revolutionary Martyrdom of Jonathan Robbins*, 100 Yale L.J. 229 (1990) ............................................................................. 10, 12

Ted. L. McDorman, *Stateless Fishing Vessels, International Law and the U.N. High Seas Fisheries Conference*, 25 J. Mar. L. & Com. 531 (1994) ................................. 15

The government submits this brief in reply to defendants' supplemental briefs.

1.    **The Term "Registry" in 46 U.S.C. § 70502(d)(1)(C) is Interchangeable with Nationality**

Although international law permits a state to confer its nationality on certain vessels without requiring registry, the Maritime Drug Law Enforcement Act (MDLEA) does not use the term "registry" in that narrower sense and instead follows the common practice of using the terms "registry" and "nationality" interchangeably. *See* GSEBB 1-4.[1] The terms are technically not identical, but they "are often used as if they were coterminous," and the term "generally used to describe the attribution of national character to a vessel is *registration*." N.P. Ready, *Ship Registration* 2-3 (3d ed. 1998).

The MDLEA's text and purpose refute the suggestion (RSEBB 2-4) that Congress intended the statute's reach to depend on the specific verbiage used by drug traffickers on the high seas when claiming a connection with a state (often in a foreign language). The panel majority correctly identified multiple textual features of the MDLEA indicating that Congress did not intend to distinguish between "nationality" and "registry." *See United States v. Dávila-Reyes*, 23 F.4th 153, 165-67 (1st Cir. 2022). And construing the term "registry" in § 70502(d)(1)(C) in its narrow, technical sense would leave a significant gap in that provision's coverage, contrary to Congress's aim to "reach broadly." *United States v. Matos-Luchi*, 627 F.3d 1, 3-4 (1st Cir. 2010); *see also* H.R. Rep.

---

[1] "GSEBB" refers to the government's supplemental en banc brief. "RSEBB" and "DSEBB" refer to the respective supplemental briefs filed by defendants Reyes-Valdivia (Reyes) and Dávila-Reyes (Dávila).

No. 104-854, at 142 (1996) (explaining that § 70502(d)(1)(C) was intended to "expand the Government's prosecutorial effectiveness in drug smuggling cases").

Because registry and nationality will typically exist in tandem for a vessel on the high seas (see GSEBB 3), where, as here, a master of a vessel on the high seas makes a claim of nationality, that claim is reasonably understood as a claim that the vessel is registered with the claimed nation. *Cf. United States v. Rosero*, 42 F.3d 166, 174 & n.15 (3d Cir. 1994) (factfinder could determine that claim of nationality "constituted a claim that the boat was registered"). Accordingly, any technical distinction between the terms "nationality" and "registry" does not undermine defendants' convictions in this case.

Defendants have waived any contention that their vessel did not factually meet the criteria in § 70502(d)(1)(C), but regardless, at a minimum, they would—as they apparently concede (RSEBB 5-6, DSEBB 9)—need to demonstrate plain error to obtain relief. And at the very least, defendants cannot show that their construction of the terms "registry" and "nationality" in the MDLEA is clear or obvious.

## 2. Procedural Barriers Foreclose the Court from Reversing Defendants' Convictions on the Grounds They Raise on Appeal

The claims defendants raise on appeal are foreclosed by their unconditional guilty pleas, appeal waivers, and failure to raise certain claims in the district court or on appeal.

"A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence." *United States v. Broce*, 488 U.S. 563, 569 (1989). Accordingly, in *United States v.*

*González*, 311 F.3d 440, 444 (1st Cir. 2002), this Court held that a plea of guilty to drug trafficking aboard a "vessel without nationality" forecloses a "claim that the [ship] was other than a stateless vessel." The Court also held that a vessel's status as "without nationality" does not determine the district court's subject-matter jurisdiction. *Id.* at 442-44. Thus, by pleading guilty, defendants admitted that their vessel qualified as a vessel without nationality under any available definition and waived any contrary claim.

a.     Defendants contend (RSEBB 9-10) that the Supreme Court's decision in *Class v. United States*, 138 S. Ct. 798 (2018), abrogated *González.* To the contrary, *Class* confirmed that "a valid guilty plea relinquishes any claim that would contradict the 'admissions necessarily made upon entry of a voluntary plea of guilty.'" *Id.* at 805 (quoting *Broce*, 488 U.S. at 573-74). *Class* may permit a claim that a conviction is invalid despite such factual admissions, such as a claim that the underlying statute is unconstitutional, but as discussed below, that exception does not assist defendants.

A defendant can raise a claim on appeal that his guilty plea was defective because it lacked a sufficient factual basis. *See, e.g.*, *United States v. Díaz-Rodríguez*, 853 F.3d 540, 544 (1st Cir. 2017). But defendants here have not raised such a claim and cannot do so now. And even if they could, defendants would have to (but could not) establish plain error. *See, e.g.*, *United States v. Kitts*, 27 F.4th 777, 784 (1st Cir. 2022).

b.     In the alternative, defendants assert (RSEBB 10-13) that this Court should reconsider *González* en banc. They are wrong. Whether a vessel qualifies as a "vessel subject to the jurisdiction of the United States" under the MDLEA, *e.g.*, a "vessel

3

without nationality," 46 U.S.C. § 70502(c)(1)(A), does not determine the district court's subject-matter jurisdiction. The Second Circuit recently concluded, in a comprehensive opinion, that *González* is "persuasive" and correct, explaining in detail several "factors that compel[led] [its] agreement with *Gonzalez*." *United States v. Prado*, 933 F.3d 121, 133 (2d Cir. 2019). Among other things, a separate statute, 18 U.S.C. § 3231, confers subject-matter jurisdiction on the federal courts in criminal cases, and the text and context of the MDLEA indicate that the term "jurisdiction" in the statute "refers to the substantive reach of the *statute*—applying to some vessels but not others—and not to the subject matter jurisdiction of the court." *González*, 311 F.3d at 442-44; *see Prado*, 933 F.3d at 133-51. Although two courts of appeals have reached a contrary conclusion, *see United States v. Miranda*, 780 F.3d 1185, 1195 (D.C. Cir. 2015), and *United States v. Bustos-Useche*, 273 F.3d 622, 626 (5th Cir. 2001), "none of [those] opinions . . . refutes the persuasive reasoning of *Gonzalez*." *Prado*, 933 F.3d at 151.

**3.    The MDLEA Covers Defendants Because Their Vessel was Stateless**

The term "vessel without nationality" in § 70502(c)(1)(A) and § 70502(d)(1) encompasses (1) a vessel that meets the criteria in § 70502(d)(1)(C), as well as (2) a vessel that otherwise qualifies as stateless under international law. GSEBB 7-9. Even if § 70502(d)(1)(C) were invalid, the latter definition of a "vessel without nationality" would remain in effect. Because defendants' guilty pleas encompass the admission that their vessel was "without nationality" under both definitions, their convictions should be affirmed regardless of the constitutional validity of § 70502(d)(1)(C). GSEBB 4-5.

4.    **Neither Waiver nor Due Process Precludes the Court from Affirming on These Alternative Grounds**

Defendants assert (RSEBB 13-15) a variety of meritless arguments to avoid the conclusion that their convictions should be confirmed, regardless of the validity of § 70502(d)(1)(C), because their vessel—consistent with the government's filings throughout the litigation—was stateless under international law. Defendants suggest (RSEBB 14-15) that pretrial factual findings by the district court now limit the bases for determining whether their vessel was "without nationality," but the court was never required to make any factual findings because defendants pleaded guilty and thereby admitted that their vessel was without nationality. Defendants assert (RSEBB 15) that treating their guilty pleas as an admission that their vessel was stateless would "eviscerate due process," but they do not explain why or cite any authority other than the panel opinion. A guilty plea may violate due process if a defendant does not receive adequate notice of the charges, *see Bousley v. United States*, 523 U.S. 614, 618 (1998), but as explained, defendants have not challenged the adequacy of their guilty pleas. And due process does not foreclose a guilty plea from "comprehend[ing] all of the factual and legal elements necessary to sustain" a conviction. *Broce*, 488 U.S. at 569.

5.    **Assuming International Law Limits Congress's Authority Under the Felonies Clause, § 70502(d)(1)(C) is a Permissible Exercise of Prescriptive Jurisdiction Under the Protective Principle of International Law**

The protective principle confirms that the exercise of jurisdiction over drug trafficking on a vessel that meets the criteria in § 70502(d)(1)(C) is on sound

international-law footing. *See* GSEBB 11-16. Defendants' arguments to the contrary (RSEBB 15-18; DSEBB 15-18) do not withstand scrutiny.

1.    Defendants contend that the protective principle only supports United States jurisdiction over crimes that "involve an 'actual cognizable threat to the nation,'" which they suggest is only present in maritime drug-trafficking crimes involving vessels in U.S. waters, vessels flying the U.S. flag, vessels heading to or departing from the U.S., or vessels carrying U.S. citizens. RSEBB 16-17 (quoting *United States v. Aybar-Ulloa*, 913 F.3d 47, 58 (1st Cir. 2019) (Torruella, J., dissenting), *vacated*, 987 F.3d 1 (1st Cir. 2021)). But as the government has explained, for the protective principle to support jurisdiction over a criminal offense, "no constituent element of the offense and no actual or intended effect in the territory of the regulating state need be shown." Restatement (Fourth) of the Foreign Relations Law of the United States § 412 reporters' n.1; *see* GSEBB 12-13. Rather, the protective principle supports jurisdiction over a crime that "has a potentially adverse effect" on the nation's security interests "and is generally recognized as a crime by nations that have reasonably developed legal systems." *United States v. Gonzalez*, 776 F.2d 931, 939 & n.11 (11th Cir. 1985).

Congress specifically determined that these factors were present when enacting the MDLEA, finding that "trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501(1). These findings do not, as defendants suggest (RSEBB 19-20), attempt to change international

law; rather, the findings—which are entitled to deference—track the criteria for protective-principle jurisdiction under international law. GSEBB 13-14.

Even aside from the deference owed to Congress's findings, there is ample basis to conclude that maritime drug trafficking not only presents the potential for adverse effects in the United States but creates actual adverse effects in the country—the standard that defendants (erroneously) contend (RSEBB 16, 19) is required. Not only do much of the drugs trafficked in the Western Hemisphere end up in the United States, but drug trafficking fuels corruption, violence, and instability in countries throughout the region, resulting in direct threats to the United States. GSEBB 14-16; *see, e.g.*, Michael Sinclair, *The Wicked Problem of Drug Trafficking in the Western Hemisphere*, Brookings Inst. (Jan. 15, 2021) (stating that violence by Latin American criminal organizations, fueled by drug-trafficking proceeds, "severely destabilizes the entire hemisphere" and has contributed to the "large numbers of migrants arriving at the United States southern border"), *available at* https://perma.cc/76H6-HPCK. Thus, available data confirm Congress's findings and support application of the protective principle as an additional basis for exercising jurisdiction under § 70502(d)(1)(C).

2.     The protective principle does not require, as defendants contend, a showing that an individual defendant's "'*particular* conduct endangered the United States.'" RSEBB 17-18 (quoting E. Kontorovich, *Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug Crimes*, 93 Minn. L. Rev. 1191, 1231 (2009)). This argument derives from a novel gloss placed on the protective principle by

7

Professor Eugene Kontorovich, but he acknowledges that "[m]ost courts" take a different view and interpret the protective principle to permit "jurisdiction over conduct of the general kind that could endanger the United States." Kontorovich, *supra*, at 1230. That prevailing understanding aligns with the view that the protective principle does not require any "actual or intended effect" in the United States, Restatement (Fourth) § 412 reporters' n.1, and applies so long as the extraterritorial conduct has a "potentially adverse effect" on the nation's security interests. *Gonzalez*, 776 F.2d at 939 & n.11.

6.    *Aybar* **Leaves This Court's Protective-Principle Precedents Undisturbed**

Defendants contend (RSEEB 18-19) that *Aybar*'s background discussion of the events that led to en banc review in that case establish that the protective principle requires a nexus to the United States, but the Court expressly declined to address the protective principle and ruled on other grounds. The Court's silence does not alter the Court's earlier precedents on the protective principle or support a reading of those precedents that adds an unfounded nexus requirement. But as in *Aybar*, the Court need not address the protective principle here because other grounds require affirmance.

7.    **International Law Does Not Constrain Congress's Legislative Authority Under the Felonies Clause**

As a general matter, Congress, when enacting legislation, possesses the authority to override international-law limitations on the exercise of prescriptive jurisdiction. *See* GSEBB 16-17, 21. The Felonies Clause does not deviate from this general understanding by incorporating international-law limitations on Congress's authority.

1.    Defendants argue (RSEBB 20-22) that the Framers must have imposed international-law limits on Congress's authority to proscribe felonies on the high seas because piracies are a subset of felonies and therefore the phrase "Piracies and Felonies" in the Define-and-Punish Clause is redundant unless the Framers meant to impose different jurisdictional limits on Congress's authority to define and punish piracies versus felonies. At the time of the Founding, however, piracies were not understood as a subset of felonies. For instance, Justice Story, quoting Lord Coke, explained that "a pardon of felonies would not pardon piracy, for 'piracy or robbery on the high seas was no felony, whereof the common law took any knowledge" and instead "'was only punishable by the civil law.'" 3 J. Story, *Commentaries on the Constitution* § 1157, at 55 (1833). Blackstone, whose *Commentaries* were highly influential with the founding generation, *see, e.g.*, *Alden v. Maine*, 527 U.S. 706, 715 (1999), likewise explained that "a pardon of felonies will not include piracy; for that is no felony punishable at the common law." 4 William Blackstone, *Commentaries on the Laws of England* 393 (1769).

The use of the phrase "Piracies and Felonies" thus does not support the conclusion that the Framers *sub silentio* incorporated nuanced—and, as discussed below, then-disputed—international-law limitations on Congress's authority to proscribe felonies on the high seas. Rather, the use of the phrase is most reasonably understood as empowering Congress to define and punish serious criminal conduct on the high seas of the type covered by both terms.

2.    Defendants erroneously contend (RSEBB 22-25) that postadoption legal developments show that the Felonies Clause incorporates international-law limitations.

a.    The First Congress, whose decisions "provide[] 'contemporaneous and weighty evidence' of the Constitution's meaning since many of the Members of the First Congress 'had taken part in framing that instrument,'" *Bowsher v. Synar*, 478 U.S. 714, 723-24 (1986), enacted the Crimes Act of 1790. That Act contained provisions that appeared to show Congress "[s]tepping beyond the law of nations." Ruth Wedgwood, *The Revolutionary Martyrdom of Jonathan Robbins*, 100 Yale L.J. 229, 243 (1990). The Act not only criminalized robbery on the high seas (piracy), for example, but also made it a crime for "any seaman or other person" to "commit manslaughter upon the high seas." Ch. 9, § 12, 1 Stat. 112, 115; *see United States v. Suerte*, 291 F.3d 366, 372 (5th Cir. 2002).

Although, consistent with the *Charming Betsy* canon, the Supreme Court construed the Act narrowly to avoid potential clashes with the law of nations, the Court did not, as defendants contend (RSEBB 22-25), hold that international law limited Congress's constitutional authority to legislate. In *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818), the Court held, as a matter statutory interpretation, that the Act's prohibition of robbery on the high seas (piracy) did not apply to a robbery of a foreigner committed on board a foreign vessel. *Id.* at 633-34. And in *United States v. Furlong*, 18 U.S. (5 Wheat.) 184 (1820), the Court concluded that *Palmer*'s interpretation of the Act compelled the conclusion that the statute's prohibition of murder on the high seas similarly did not cover murder of a foreigner committed on a foreign vessel. *Id.* at 195.

The opinion also contained dicta from Justice William Johnson reflecting his thoughts about Congress's "powers" (apparently under international law) to proscribe murder "committed by a foreigner upon a foreigner in a foreign ship," *id.* at 196-98, but dicta aside, *Furlong* is "a case about statutory interpretation." *United States v. Nueci-Peña*, 711 F.3d 191, 198 n.7 (1st Cir. 2013); *see United States v. Saac*, 632 F.3d 1203, 1209-10 (11th Cir. 2011) (same). *Furlong* did not construe the Constitution, let alone hold that international law limits Congress's authority under the Felonies Clause.

b.    Also unavailing is defendants' reliance (RSEBB 23-24) on postadoption views expressed by James Wilson and John Marshall. Wilson expressed "some doubts" about the provision of the Crimes Act of 1790 making it unlawful to commit murder on the high seas. 3 James Wilson, *Works of the Honourable James Wilson* 374 (1804). He questioned whether "this design [could] be carried into effect, consistently with the predominant authority of the law of nations," *id.* at 377, because according to Wilson, the law of nations "may be altered by the municipal legislature of any state, in cases affecting *only* its own citizens," but "no state or states can, by treaties or municipal law, alter or abrogate the law of nations any farther," *id.* at 376. Marshall expressed similar views about the law of nations and the ability of the United States to exercise its jurisdiction beyond the limits authorized by international law. *See* GSEBB 20-21. But contemporaries of Wilson and Marshall expressed different views; Justice James Iredell, for example, stated that the law of nations could only "furnish[] rules of interpretation, since unquestionably the people of the United States had a right to form what kind of

union, and upon what terms they pleased, without reference to any former examples."
*Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 449 (1793) (opinion of Iredell, J.); *see also*
Wedgwood, *supra*, at 239-42 (noting that "prescriptive and other forms of jurisdiction
[on the high seas] remained uncertain" during the period and that some held the view
that "any nation might be able to punish common crimes at sea").

Insofar as this postadoption debate reflected different views on Congress's
general authority to enact legislation that extended the jurisdiction of the United States
beyond what was permitted by international law, that debate has been resolved. There
is no limitation on the "sovereignty" of the United States or the "power of Congress"
to enact federal statutes that apply to conduct by foreigners outside the territorial
jurisdiction of the United States. *Lauritzen v. Larsen*, 345 U.S. 571, 578 (1953); *see* GSEBB
16-17, 21. The voicing of different views in the early days of the Republic about
Congress's authority to legislate in derogation of the law of nations does not provide a
compelling basis to construe Congress's powers under the Felonies Clause as
incorporating international-law limitations.

## 8. Assuming International Law Limits Congress's Authority Under the Felonies Clause, § 70502(d)(1)(C) is Consistent with International Law and Therefore a Lawful Exercise of Congress's Legislative Power

The prohibition on drug trafficking aboard vessels that meet the criteria in
§ 70502(d)(1)(C) comports with international law because it extends United States
jurisdiction only to vessels that are stateless.

12

1.    Defendants contend (RSEBB 27-28) that, under international law, once a vessel's master makes a claim of nationality for the vessel, the vessel can be treated as stateless only if the claimed nation affirmatively denies the master's claim. Defendants assert (RSEBB 27-30) that a claim of nationality creates a "presumption" (or "prima facie showing") that "only a *denial* from" the claimed state will rebut.

No such presumption exists in international law, as evidenced by defendants' failure to identify any source for that presumption other than the vacated panel opinion. To the contrary, as confirmed by multiple international agreements with a host of nations, the United States may treat a vessel as stateless "in accordance with international law" after the master makes a claim of nationality but no evidence of nationality is found on the vessel. *See* GSEBB 9, 26. Contrary to defendants' characterization of the government's position (DSEBB 14-15, RSEBB 29), the government does not contend that the United States was permitted to exercise jurisdiction over the vessel in this case because it acted in accordance with an agreement with Costa Rica; rather, that agreement (and others like it) confirm what is permissible under international law, namely that international law permits treating a vessel claiming the nationality of a state as stateless when no evidence of nationality is found on board.

The MDLEA takes a more cautious approach, allowing for a vessel to be treated as stateless when the claimed nation is contacted and either denies the claim, 46 U.S.C. § 70502(d)(1)(A), or does not affirmatively and unequivocally confirm the claim, *id.* § 70502(d)(1)(C). Treating a vessel as stateless in these circumstances is

consistent with international law because the nationality of a vessel reflects a legal connection between the vessel and a state, and each state possesses the authority to "determine[] when the vessel takes on its national character and under what conditions that character is lost." Andrew W. Anderson, *Jurisdiction over Stateless Vessels on the High Seas: an Appraisal Under Domestic and International Law*, 13 J. Mar. L. & Com. 323, 340 (1982). Accordingly, under international law, it is appropriate to treat a vessel as lacking a legal connection with a state in the circumstances covered by § 70502(d)(1)(C) when the master claims nationality for the vessel but the claimed state does not accept and is not willing or able to confirm a legal connection with the vessel. Concluding otherwise would mean that no state could exercise jurisdiction over criminal conduct on vessels covered by § 70502(d)(1)(C), an anomalous result with no support in international law.

Defendants contend (RSEBB 28) that treating vessels covered by § 70502(d)(1)(C) as stateless can lead to errors because of recordkeeping mistakes. But the mere possibility of recordkeeping shortcomings does not render § 70502(d)(1)(C) contrary to international law. In fact, defendants concede that it is consistent with international law to treat a vessel as stateless under § 70502(d)(1)(A) when a state denies a claim of nationality, but there is no reason to believe that recordkeeping mistakes are less likely to occur under § 70502(d)(1)(A) than under § 70502(d)(1)(C).

Defendants' reliance on *United States v. Hernandez*, 864 F.3d 1292 (11th Cir. 2017), and *United States v. Lugo*, No. 20-CR-456 (D.P.R.), is also unavailing. *Hernandez* addressed the method of proving the factual criteria in § 70502(d)(1)(C), finding a

certification by the State Department to be conclusive under § 70502(d)(2) despite potential evidence to the contrary (documents on board the vessel indicating registry). 864 F.3d at 1298-1301. In *Lugo*, Venezuela informed the United States that it could neither confirm nor deny the vessel's registry, and after the panel in this case invalidated § 70502(d)(1)(C), Venezuela informed the United States that it waived any right to exercise jurisdiction over the vessel "to the extent necessary for the enforcement of United States law." *Lugo*, *supra*, ECF No. 69-1, at 3. Neither *Hernandez* nor *Lugo* involve the scope of § 70502(d)(1)(C) or whether it comports with international law.

Finally, defendants err insofar as they suggest (RSEBB 29-30) that international law exhaustively enumerates every instance in which a vessel will be deemed stateless. To the contrary, international law on stateless vessels often speaks at a high level of generality and does not directly address every scenario that may arise. *Cf.* Ted. L. McDorman, *Stateless Fishing Vessels, International Law and the U.N. High Seas Fisheries Conference*, 25 J. Mar. L. & Com. 531, 531 (1994) ("It is difficult to know the true extent of the stateless vessel phenomenon."). For the reasons discussed, § 70502(d)(1)(C) is consistent with international law on statelessness, but even if international law were silent regarding jurisdiction over such vessels, the exercise of jurisdiction by the United States would be permissible under the *Lotus* principle. GSEBB 27-28.

15

Respectfully submitted,

W. STEPHEN MULDROW
United States Attorney

KENNETH A. POLITE, JR.
Assistant Attorney General

MARIANA E. BAUZÁ-ALMONTE
Chief, Appellate Division

LISA H. MILLER
Deputy Assistant Attorney General

DAVID C. BORNSTEIN
Assistant United States Attorney
District of Puerto Rico

/s/ John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1258
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

September 26, 2022

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

1.    In accordance with this Court's order for supplemental briefing, this brief does not exceed 15 pages, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced, 14-point serif typeface using Microsoft Office Word 2013.

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1258
Washington, D.C. 20530
(202) 307-3766

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the First Circuit by using the appellate

CM/ECF system on September 26, 2022. I further certify that all participants in the

case are registered CM/ECF users and that service will be accomplished by the appellate

CM/ECF system.

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1258
Washington, D.C. 20530
(202) 307-3766